# Exhibit B

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PA
CIVIL DIVISION

MYLAN INC., MYLAN
PHARMACEUTICALS INC., MYLAN
TECHNOLOGIES, INC. and MYLAN
SPECIALTY LP,

          Plaintiffs,

v.

KIRKLAND & ELLIS LLP,

          Defendant.

No.: 2015-2377

TYPE OF PLEADING:

*MOTION FOR PRELIMINARY INJUNCTION*

FILED

MAY 01 2015

B.R. MATHENY
PROTHONOTARY

*FILED ON BEHALF OF*:

Mylan Inc., Mylan Pharmaceuticals Inc.,
Mylan Technologies, Inc. and Mylan
Specialty LP

*COUNSEL OF RECORD FOR THIS PARTY*:

ROGER J. ECKER, ESQ.
    PA. ID. NO. 05446
PEACOCK KELLER & ECKER, LLP
70 East Beau Street
Washington, PA 15301
Tel.: 724-222-4520
Fax: 724-222-3318
REcker@PeacockKeller.com

WILLIAM PIETRAGALLO, II, ESQ.
    PA. ID. NO. 16413
JOHN A. SCHWAB, ESQ.
    PA. ID. NO. 89596
PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
Tel.: 412-263-2000
Fax: 412-263-2001
WP@Pietragallo.com
JAS@Pietragallo.com

MICHAEL S. SOMMER, ESQ.
    N.Y. ID. NO. 2182939
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Tel.: 212-999-5800
Fax: 212-999-5899
msommer@wsgr.com

## IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PA
### CIVIL DIVISION

MYLAN INC., MYLAN
PHARMACEUTICALS INC., MYLAN
TECHNOLOGIES, INC. and MYLAN
SPECIALTY LP,

                Plaintiffs,

    v.

KIRKLAND & ELLIS LLP,

                Defendant.

No.: _____

## NOTICE OF PRESENTATION

**TO:**   KIRKLAND & ELLIS, LLP

Notice is hereby given that the within Motion for Preliminary Injunction and Scheduling

Order will be presented to the Honorable Michael J. Lucas on Tuesday, May 5, 2015 in

Courtroom Number 6 at the Washington County Common Pleas, Washington County

Courthouse, Washington, Pennsylvania, or as soon thereafter as suits the convenience of

the Court.

Respectfully submitted,

ROGER J. ECKER, ESQ.
PA. ID. NO. 05446
PEACOCK KELLER & ECKER, LLP
70 East Beau Street
Washington, PA 15301
Tel.: 724-222-4520
Fax: 724-222-3318
REcker@PeacockKeller.com

**IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PA**
**CIVIL DIVISION**

| | |
|---|---|
| MYLAN INC., MYLAN PHARMACEUTICALS INC., MYLAN TECHNOLOGIES, INC. and MYLAN SPECIALTY LP,<br><br>Plaintiffs,<br><br>v.<br><br>KIRKLAND & ELLIS LLP,<br><br>Defendant. | No.: _____ |

## SCHEDULING ORDER

AND NOW, this _____ day of May, 2015, it is hereby ORDERED that a hearing on Plaintiffs' Motion for Preliminary Injunction will be held on the _____ day of May, 2015, at _____ o'clock ____.m. in Courtroom _____, Washington County Courthouse, Washington, Pennsylvania.

BY THE COURT,

_____, J.

**IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PA**
**CIVIL DIVISION**

MYLAN INC., MYLAN
PHARMACEUTICALS INC., MYLAN
TECHNOLOGIES, INC. and MYLAN
SPECIALTY LP,

No.: _____

                    Plaintiffs,

    v.

KIRKLAND & ELLIS LLP,

                   Defendant.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

AND NOW, this _____ day of _____, 2015, upon consideration of the Plaintiffs'
Complaint and Motion for Preliminary Injunction, this Court finds that:

(a) the Plaintiffs will suffer irreparable harm if the requested relief is not granted and the
Plaintiffs do not have an adequate remedy at law;

(b) greater injury will be inflicted upon the Plaintiffs by a denial of the requested
preliminary injunctive relief than will be inflicted upon the Defendant by the granting of such
relief;

(c) the granting of the requested injunctive relief is necessary to preserve the status quo;

(d) the Plaintiffs are likely to prevail on the merits of their claims;

(e) the requested injunctive relief is reasonably suited to abate the Defendant's wrongful
conduct; and

(f) the requested injunctive relief will not adversely affect the public interest.

Therefore, it is hereby ORDERED, ADJUDGED, and DECREED that the Defendant,
their agents, partners, servants, contractors, associates, attorneys and employees, are

preliminarily (i) enjoined from representing, advising, or otherwise acting on behalf or in support of Teva Pharmaceutical Industries Ltd. in connection with its efforts to acquire Mylan N.V. and its subsidiaries, including but not limited to in connection with the proposed transaction as set forth in Teva's letter to Mylan dated April 21, 2015; (ii) prohibited from using, relying on or disclosing any information it learned from its representation of Plaintiffs in any representation of any other Kirkland & Ellis LLP client; (iii) required to maintain the confidentiality of all non-public information it has learned as a result of its representation of Plaintiffs; and (iv) required to retrieve all work product provided by Defendant to Teva in connection with its efforts to acquire Mylan N.V. and its subsidiaries and maintain the confidentiality of said work product.

BY THE COURT,

_____, J.

## IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PA
### CIVIL DIVISION

MYLAN INC., MYLAN
PHARMACEUTICALS INC., MYLAN
TECHNOLOGIES, INC. and MYLAN
SPECIALTY LP,

                Plaintiffs,

    v.

KIRKLAND & ELLIS LLP,

                Defendant.

No.: _____

**MOTION FOR PRELIMINARY
INJUNCTION**

       Plaintiffs Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Technologies, Inc., and

Mylan Specialty LP, (collectively, "Mylan" or "Plaintiffs"), by and through their undersigned

attorneys, and pursuant to Pa. R. Civ. P. 1531, aver as follows:

### INTRODUCTION

       1.     Mylan's counsel, Kirkland & Ellis LLP ("K&E" or "Defendant"), has

breached its fiduciary, professional, ethical and other duties to Mylan.  Mylan therefore brings

this Motion for Preliminary Injunction to prohibit K&E from further representing a client in a

matter directly adverse to Plaintiffs.

       2.     Beginning in or around January 2013, K&E sought and obtained legal

work from Mylan in a significant number of matters of substantial importance to Mylan,

including matters that are presently ongoing.  In connection with those representations, K&E, as

Mylan's trusted legal advisor, requested and was provided with wide-ranging access to Mylan's

business, including aspects related to its commercial, legal and regulatory strategies and its

portfolio of current and unlaunched products.

3.      Despite holding itself out as Mylan's trusted legal advisor and in derogation of its legal, professional and ethical obligations to Mylan, Mylan has recently learned that K&E recently agreed to bring its considerable skill to bear on a matter in which K&E is advising a client whose interests are directly adverse to those of Mylan, and in which the very information entrusted to K&E about Mylan's various strategies and products will certainly be implicated.  Specifically, K&E is now representing Teva Pharmaceutical Industries Ltd. ("Teva"), one of Mylan's primary competitors, in a hostile effort by Teva to acquire Mylan's parent company, Mylan N.V., including its assets and subsidiaries.  Indeed, K&E has come to be an intricate part of Teva's efforts to acquire Mylan as was made clear in a recent headline that declared "BREAKING: Kirkland Reps Teva In $82 Per Share Offer For Mylan."

4.      K&E's representation of Teva presents a clear conflict of interest.  The interests of Teva in its bid to take over Mylan are unequivocally adverse to the interests of Mylan, whose parent company is the direct target of that acquisition.  Moreover, K&E is plainly in possession of confidential Mylan information, acquired during K&E's confidential representations of Mylan – certain of which are ongoing matters – and it may use that information (even if inadvertently) in helping Teva formulate and pursue its attempted takeover of Mylan N.V. and its subsidiaries, including Plaintiffs.

5.      Despite the obvious conflict of interest and resulting irreparable harm to Mylan, K&E did not seek and has not been granted Mylan's consent to represent Teva in connection with the takeover effort.  Thus, Plaintiffs seek a preliminary injunction barring K&E from representing Teva in connection with its attempted acquisition of Mylan N.V. and its subsidiaries.

6.     In support of this Motion for Preliminary Injunction, Mylan submits and incorporates by reference the following: (i) Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction ("Memorandum"); and (ii) Declaration of Douglas Miner in Support of Motion for Preliminary Injunction ("Miner Declaration").

## BACKGROUND

A.     **Mylan's Relationship with K&E**

7.     In or around January 2013, Mylan engaged K&E to act as its outside counsel. The parties entered into a written retention agreement (the "Agreement") for rendering professional services for then-current and future matters.

8.     Pursuant to the parties' retention, K&E has served as outside counsel to Mylan on a number of matters since early 2013. For example, K&E has represented Mylan in FDA regulatory proceedings regarding various products and has represented Mylan in connection with drugs under review by the FDA. K&E also currently represents Mylan in litigation concerning the generic version of the drug Benicar®. K&E recently represented Mylan in connection with advising Mylan on its commercial relationships with its customers, which representation implicated Mylan's highly proprietary strategies for pricing a vast array of its products.

9.     In addition, and of enormous concern to Mylan, K&E over the past two years has represented Mylan in connection with various aspects of Mylan's EpiPen® Auto-Injector product ("EpiPen®"), which has been the most prescribed epinephrine auto-injector in the United States for the last twenty-five years, and for which nationally nine out of every ten prescriptions are written. The scope of that representation in 2013 was varied and involved numerous issues. In the course of K&E's work on these issues, Mylan again provided K&E with

confidential information relating to the EpiPen® Auto-Injector, as well as Mylan's regulatory and legal strategy.

10.     In late 2014, the scope of K&E's representation of Mylan expanded with respect to the EpiPen® product.  During that time, Mylan continued to provide K&E with an array of highly confidential information relating to the EpiPen® product, including (among other things) confidential communications and legal and strategic analyses prepared by Mylan.

11.     The fact that Teva, one of Mylan's primary competitors, had applied to the FDA for approval of an AB-rated version of the EpiPen® has been publicly disclosed.  Although Mylan was aware that K&E had represented Teva with respect to other molecules and drug products in the past, K&E assured Mylan that these past representations would not create a conflict of interest.  Specifically, among other assurances, K&E advised that it was a "free agent" in relation to activities involving EpiPen®, and that as K&E had been providing Mylan with legal advice relating to the EpiPen® since 2013, K&E would, in any event, be ethically barred from representing Teva in any matter in which the EpiPen® was in any way implicated.

12.     In reliance on K&E's assurances of undivided loyalty with respect to the EpiPen®, in November and December 2014, Mylan provided K&E with an array of highly confidential information relating to the EpiPen® product.  These materials included, among other things, legal and strategic analyses prepared by Mylan, as well as other confidential and non-public materials belonging to Mylan regarding its EpiPen® Auto-Injector.  K&E also participated in conference calls with Mylan relating to these materials and other issues relating directly to EpiPen®.  In short, K&E was provided with unfettered access to Mylan's business, legal and regulatory strategies relating to the EpiPen®.

13.    Within days of receiving additional confidential information and participating in calls, K&E called Mylan and explained that it had discovered a conflict of interest in connection with its continued representation of Mylan relating to EpiPen®. Though Mylan requested specifics about the nature of the conflict and the identity of the party to whom Kirkland believed it owed a superseding duty of loyalty prior to Mylan, Kirkland flatly refused to provide any details.

**B.    K&E's Representation of Teva**

14.    On April 21, 2015, Mylan N.V. received an unsolicited letter from Teva's President and Chief Executive Officer, Erez Vigodman, proposing a transaction to acquire Mylan N.V. and its subsidiaries, including Plaintiffs.

15.    Mylan N.V. is a public limited liability company organized in the Netherlands. On February 27, 2015, Mylan Inc. was reorganized as an indirect wholly owned subsidiary of Mylan N.V., which is the successor to Mylan Inc. for financial reporting purposes.

16.    Teva's April 21 letter to Mylan N.V. identified K&E as legal counsel for Teva in connection with the proposed transaction. This was the first time Mylan became aware of K&E's representation of Teva.

17.    K&E had not previously informed Mylan that it was representing Teva in the proposed acquisition or any other then-pending matter and had not sought a waiver from Mylan permitting it to engage in such a representation.

18.    K&E, in representing Teva, seeks to play a lead counsel role in assisting Teva in acquiring Mylan, including the very drugs about which K&E has and continues to provide legal advice to Mylan, including EpiPen®. In addition, K&E has been entrusted with unique knowledge of Mylan's commercial relationships and strategies, information that neither a

competitor such as Teva nor its counsel should have in connection with a takeover effort. Finally, K&E has been provided with highly confidential information regarding products Mylan has not yet launched – and which require FDA approval.  Such insight into Mylan is again the very type of information Teva would like to know.

19.     On April 27, 2015, the Board of Directors of Mylan N.V. unanimously rejected Teva's unsolicited expression of interest, concluding that the Teva expression of interest grossly undervalued Mylan and contained nothing meaningful to indicate why a combination with Teva would be in the best interest of Mylan's employees, patients, customers, communities and other stakeholders.

### C.     Injury to Mylan

20.     In representing Teva in connection with a proposed acquisition of Mylan N.V. and thus Plaintiffs themselves, all while both continuing to simultaneously represent Mylan, and while in possession of Mylan's confidential information which was entrusted to K&E in its role as Mylan's legal advisor, K&E has breached its fiduciary, professional, ethical, and other obligations to Mylan.

21.     K&E's representation of Teva is adverse to Mylan's interests, as Teva seeks to acquire Mylan N.V., and thus Plaintiffs and all of their assets.  At the time that K&E began representing Teva, K&E was in possession of highly confidential information concerning the operations of Mylan's business.  K&E had acquired this information in its role as Mylan's legal counsel and fiduciary.

22.     Unless K&E is enjoined from continuing to represent Teva, such representation will result in irreparable injury to Mylan.

## STANDARD FOR PRELIMINARY INJUNCTION

23.     The purpose of this motion for preliminary injunction is to "preserve the status quo" as it existed before K&E's wrongful conduct, "thereby preventing irreparable injury or gross injustice." *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 259 (1992); *see also W. Penn Specialty MSO, Inc. v. Nolan*, 737 A.2d 295, 298 (Pa. Super. Ct. 1999) ("A preliminary injunction operates to maintain affairs between the parties as they existed prior to the underlying dispute and 'to compel a wrongdoer to give up the status he appropriated before an action could have been instituted against him.'") (citation omitted). "Moreover, '[a] court may restrain conduct which it feels may develop into a breach of ethics; it is not bound to sit back and wait for a probability to ripen into a certainty'. . . . The courts do not have to wait until the derelict attorney appears before it." *Maritrans*, 529 Pa. at 255 (internal marks and citation omitted).

24.     In assessing whether a preliminary injunction is warranted, the Court must consider whether: "(1) the injunction is necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages; (2) greater injury would result from refusing the injunction than from granting it, and, concomitantly, the issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) the preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and, (6) the preliminary injunction will not adversely affect the public interest." *SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 501-02 (Pa. 2014); *see also Summit Towne Ctr., Inc. v. Shoe Show of Rocky Mount, Inc.*, 573 Pa. 637, 646-47 (2003) (describing elements). To establish a right to relief, the party seeking an injunction is not required to prove the merits of the

underlying claim, "but need only demonstrate that substantial legal questions must be resolved to determine the rights of the parties." *SEIU*, 104 A.3d at 506.

26. As set forth below, each of these factors weighs heavily in favor of enjoining K&E from further violating its fiduciary and professional duties by its representation of Teva in connection with Teva's efforts to acquire Mylan.

## MYLAN HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS UNDERLYING CLAIMS

### A.   K&E has Breached its Fiduciary Duty to Mylan

26. The Pennsylvania Supreme Court has repeatedly observed that the attorney-client privilege "'is deeply rooted in our common law' and is 'the most revered of our common law privileges.'" *Dougherty v. Phila. Newspapers, LLC*, 85 A.3d 1082, 1086 (Pa. Super. Ct. 2014) (quoting *Levy v. Senate of Pa.*, 619 Pa. 586, 596-97 (2013)).

27. Attorneys owe a fiduciary duty to their clients, one that "demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest[.]" *Maritrans*, 529 Pa. at 253. A breach of that duty is a violation of Pennsylvania's Rules of Professional Conduct and is actionable at common law. *Id.* (collecting cases); *accord The Hyman Cos., Inc. v. Brozost*, 964 F. Supp. 168, 172 (E.D. Pa. 1997) (citing *Maritrans*). Even before the Rules of Professional Conduct were adopted, "the common law recognized that a lawyer could not undertake a representation adverse to a former client in a matter 'substantially related' to that in which the lawyer previously had served the client." *Maritrans*, 529 Pa. at 256 (citing *Consol. Theatres, Inc. v. Warner Bros. Circuit Mgmt. Corp.*, 216 F.2d 920 (2d Cir. 1954)).

28. As explained further in the Memorandum and Miner Declaration, K&E is representing Teva in a matter that is directly adverse to Mylan's interests and is in possession of Mylan's confidential client information which would allow it to advance the interests of Teva at

-8-

Mylan's substantial expense.  In the course of K&E's many undertakings on behalf of Mylan, including representations that are ongoing, it has been entrusted with highly confidential, privileged and proprietary information crossing a broad spectrum of Mylan's business.  K&E, through its representation of Mylan, has gained a granular, intensive understanding of Mylan's confidential information.

29.     This confidential, highly sensitive information that K&E obtained about Mylan's strategies and products – including products that have yet to be approved by the FDA – would be integral to Teva's formulation of its hostile acquisition strategy on which it is being directly advised and represented by K&E.  Teva's valuation of Mylan as a target entity would be directly shaped by information that Mylan has disclosed to K&E.  The process of seeking to acquire a company is entirely tied to assessing the assets of the target – what those assets are, what value they have, what income stream they are likely to generate, when products are likely to be brought to market, and what price margins the products can generate.  These are the precise issues on which K&E has been advising Mylan with respect to its business.

**B.     K&E is Prohibited from Representing Teva Under Pa.R.P.C. 1.7**

30.     K&E's conduct also runs afoul of the Pennsylvania Rules of Professional conduct.  Rule 1.7 of Pennsylvania's Rules of Professional Conduct provides in pertinent part that a lawyer shall not represent a client if "the representation of one client will be directly adverse to another client," unless each client gives informed consent.  Pa.R.P.C. 1.7(a)(1).  The two representations do not have to be related; it is enough that the clients' interests are adverse. *Id.* cmt. 6 ("[A] lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated."); *see also Allman v. Sears, Roebuck & Co.*, No. CIV. A. 87-6074, 1988 U.S. Dist. LEXIS 11659, at *12-13 (E.D. Pa. Oct. 17, 1988) (citing *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976)).

In such a situation, courts apply a *prima facie* standard of review, which carries a heavy presumption against the simultaneous representation of adverse parties. *Id.*

31.    Consistent with the above, it is well-settled that it is a violation of counsel's "duty of undivided loyalty" to represent two clients whose interests are adverse. *Allman*, 1988 U.S. Dist. LEXIS 11659, at *12-13 (citing *Cinema 5*, 528 F.2d at 1386; *IBM v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978); *Kaminski Bros., Inc. v. Detroit Diesel Allison*, 638 F. Supp. 414, 415 (M.D. Pa. 1985)). Any doubt that a lawyer has violated his ethical obligations should be resolved in favor of disqualification. *Id.*; *J&J Snack Foods Corp. v. Kaffrissen*, No. CIV. A. 98-5743, 2000 U.S. Dist. LEXIS 6277, at *5 (E.D. Pa. May 9, 2000); *Imbesi v. Imbesi*, No. CIV. A. 01-1259, 2001 U.S. Dist. LEXIS 17689, at *4 (E.D. Pa. Oct. 30, 2001).

32.    As explained further in the Memorandum and Miner Declaration, Mylan is a current client of K&E in connection with several matters. K&E has appeared in federal court on Mylan's behalf as recently as this past week and filed a brief in federal court yesterday, April 30, 2015. And yet, just last week it was announced that K&E has now also taken on the representation of Teva in its hostile efforts to acquire Mylan. It is difficult to imagine a transactional scenario in which two clients' interests are more adverse than in the hostile takeover context in which one client is attempting to acquire the other against its wishes. Mylan did not and will not consent to K&E's representation of Teva. Accordingly, there cannot be a clearer violation of Pa.R.P.C. 1.7 – by accepting the Teva engagement, K&E is now simultaneously representing the interests of two parties who are adverse to each other.

33.    Because K&E's concurrent representation is a blatant violation of its "duty of undivided loyalty" to Mylan, Rule 1.7 requires that K&E be removed as counsel to Teva.

**C.     K&E is Prohibited from Representing Teva Under Pa.R.P.C. 1.9**

34.     Even if Mylan were not a current client of K&E (which it is) and was considered only a former client, K&E must still be disqualified from its representation of Teva.

35.     Pa.R.P.C. 1.9 protects "[t]his same duty of confidentiality" as is encompassed within an attorney's fiduciary duty. *Dougherty*, 85 A.3d at 1087. The rule provides, in pertinent part, that a lawyer who has formerly represented a client in a matter "shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client[.]" Pa.R.P.C. 1.9(a). Because K&E's representation of Teva in its hostile effort to acquire Mylan is both directly adverse and substantially related to its prior representation of Mylan, K&E must be enjoined from continuing as Teva's counsel.

36.     In order to grant a motion for disqualification under Rule 1.9, the Court must find (1) the existence of a former attorney-client relationship which is adverse to the subsequent representation by the law firm of the current client; (2) that a member of the law firm acquired knowledge of confidential information from or concerning the former client during the course of representation; and (3) that the subject matter of the two representations is "substantially related." *Dougherty*, 85 A.3d at 1087; *see also James v. Teleflex, Inc.*, No. CIV. A. 97-1206, 1999 U.S. Dist. LEXIS 1961, at *9 (E.D. Pa. Feb. 24, 1999) (setting forth equivalent standard in federal court).  Mylan easily satisfies all three elements.

37.     *First*, K&E has represented Mylan in numerous former and current representations, and K&E's current representation of Teva is directly adverse to the interests of Mylan.

-11-

38.     *Second*, K&E was entrusted with highly confidential, privileged and proprietary information crossing a broad spectrum of Mylan's business during the course of its representation.

39.     *Third*, the matters in which K&E represented Mylan are substantially related to K&E's current representation of Teva.  The question of whether two matters are "substantially related" involves an analysis of the nature and scope of the prior representation, the nature and scope of the current representation, and whether the former client "might have disclosed confidences to his attorney which could be relevant and detrimental to the [former] client in the current action." *Greenwood Land Co. v. Omnicare, Inc.*, No. CIV. A. 09-686, 2009 U.S. Dist. LEXIS 74374, at *14-15 (W.D. Pa. Aug. 20, 2009).  Here, the representation of Teva squarely implicates the precise disclosures that Mylan made to K&E during its extensive and long-standing representation, and is consequently impermissible.

40.     K&E's representation of Teva must immediately cease.  K&E has acquired intimate knowledge of Mylan's business – knowledge that is of obvious relevance to Teva's efforts to acquire Mylan.  Under these circumstances, Pa.R.P.C. 1.9 requires that K&E be disqualified from further representing Teva.

## THE INJUNCTION IS NECESSARY TO PREVENT IMMEDIATE AND IRREPARABLE HARM TO MYLAN

41.     A fundamental purpose of a preliminary injunction is "the avoidance of irreparable injury or gross injustice until the legality of the challenged action can be determined." *W. Penn*, 737 A.2d at 299 (internal marks and citation omitted).  An injury is deemed "irreparable" if "it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard." *Id.*  "In the commercial context, the impending loss of a business opportunity or market advantage may aptly be characterized as an 'irreparable injury'" for

purposes of equitable relief. *Sovereign Bank v. Harper*, 674 A.2d 1085, 1093 (Pa. Super. Ct. 1996).

42.     Pennsylvania courts have repeatedly held that the potential disclosure of information disclosed in the course of the attorney-client relationship constitutes irreparable harm that clearly justifies emergency relief, particularly where that information might be divulged to business competitors. *See Maritrans*, 529 Pa. at 260-63 ("Maritrans' competitive position could be irreparably injured if [Pepper Hamilton] continued to represent their competitors[.]"); *Hyman*, 964 F. Supp. at 173 (enjoining plaintiff's former in-house counsel from representing its competitor in certain matters; "[counsel] could divulge specific, valuable, confidential information learned while at Hyman, information that, if disclosed, could injure Hyman's economic health to the point of irreparable harm"); *Dougherty*, 85 A.3d at 1086 ("Dougherty has averred facts establishing a colorable claim of the potential disclosure of attorney work product and breach of attorney-client privilege, which could result in irreparable harm.").

43.     There is no doubt that a preliminary injunction preventing K&E from representing Teva in its hostile takeover effort is "necessary to prevent immediate and irreparable harm that cannot be compensated adequately by damages[.]" *SEIU*, 104 A.3d at 501-02. K&E has been entrusted with wide-ranging access to Mylan's business, including aspects related to its commercial, legal and regulatory strategies, and its portfolio of current and future products. This very same information may be used by K&E to assist Teva in its attempted hostile takeover of Mylan, and could be disclosed (even inadvertently) at any time. *See Dougherty*, 85 A.3d at 1087 ("[T]he duty owed by an attorney to his or her client extends to members of the attorney's law firm[.]"); *Estate of Pew*, 655 A.2d 521, 545 (Pa. Super. Ct. 1994)

("Confidential information gained by one member of a law firm is imputable to other members of the same law firm.").   K&E's extensive insight into Mylan's business, which it obtained as Mylan's trusted legal advisor, is just the sort of confidential information that Teva would like to know in its ongoing bid for Mylan.

44.     Any disclosure of Mylan's confidences to Teva therefore threatens to inflict a severe market disadvantage upon Mylan that is impossible to quantify or monetize, particularly given the hostile nature of Teva's actions and Teva's status as one of Mylan's chief competitors in the pharmaceutical industry.

## THE BALANCE OF EQUITIES FAVORS AN INJUNCTION

45.     The denial of a preliminary injunction risks severe, imminent, and irreparable harm through the disclosure of Mylan's most confidential and sensitive business information to Teva – a chief competitor and hostile bidder.  Any disclosure of such information could inflict incalculable injury upon Mylan's position in the market and in these critical negotiations.

46.     By contrast, K&E stands to suffer little (if any) harm if it is enjoined from representing Teva in its hostile takeover attempt.  At worst, K&E would lose the opportunity to earn legal fees from its representation of Teva.  Even if the Teva fees might be substantial for K&E, the relevant question in assessing this factor "is whether, and to what extent[,] . . . the defendants will suffer *irreparable* harm if the preliminary injunction is issued." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 727 (3d Cir. 2004) (emphasis added) (internal marks and citation omitted).  K&E's lost business income, however substantial, would be fully compensable by money damages and therefore cannot constitute irreparable harm as a matter of law. *See Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt. Ltd.*, 456 Fed. Appx. 184, 188-89 (3d Cir. 2012) ("[Defendant] argues that it would suffer irreparable harm because the

injunction would deprive it of business income derived from its longtime clients . . . . However, '[w]e have long held that an injury measured in solely monetary terms cannot constitute irreparable harm.'") (citation omitted).  Moreover, K&E made the affirmative decision to take on the representation of Teva, and chose to do so without seeking Mylan's consent.  By contrast, Mylan has been forced into a situation where it must protect itself from its own counsel.

47.    A preliminary injunction therefore presents no threat to K&E's ongoing business, but the denial of an injunction certainly threatens irreparable harm to Mylan.

## THE INJUNCTION WILL PROPERLY RESTORE THE PARTIES TO THEIR STATUS AS IT EXISTED PRIOR TO K&E'S BREACH OF FIDUCIARY DUTY

48.    Under Pennsylvania law, a preliminary injunction "must address the status quo as it existed between the parties before the event that gave rise to the lawsuit, not to the situation as it existed after the alleged wrongful act but before entry of the injunction." *SEIU*, 104 A.3d at 509 (internal marks and citation omitted).

49.    The injunction that Mylan seeks would serve precisely that purpose – to return the parties to the *ex ante* status quo whereby K&E would not be in a position of conflicted loyalties.  Such an injunction is clearly permissible in purpose and effect. *See, e.g.*, *Maritrans*, 529 Pa. at 260-61; *Hyman*, 964 F. Supp. at 175.

## THE INJUNCTION IS REASONABLY SUITED TO REMEDY THE HARM TO MYLAN

50.    A preliminary injunction must also be "reasonably suited to abate the offending activity." *SEIU*, 104 A.3d at 502.  The danger of a violation of Mylan's confidential relationship with K&E is too great to be prevented by an injunction that merely restrains the firm from revealing the confidential information it has acquired.  An injunction barring K&E from representing Teva as an adverse client is therefore a reasonable remedy. *See Maritrans*, 529 Pa.

at 260 (also noting that merely enjoining the disclosure of confidences would be "difficult, if not impossible, to administer").

51.     The conflict created by K&E's simultaneous representation of adverse clients is so severe that it cannot be remedied by a screen or "Chinese Wall," and under these circumstances the injunction sought is entirely proper in scope. *See Dougherty*, 85 A.3d at 1094-95 (Donohue, J., concurring) (finding that Pepper Hamilton's use of an ethical screen was "irrelevant" because screening only overcomes conflicts of interest "created by a new lawyer to the firm who brings the conflict with him as a result of his prior employment"); *Allman*, 1988 U.S. Dist. LEXIS 11659, at *12-13 (finding that "[t]o permit a law firm to simultaneously represent adverse parties . . . would clearly run afoul of [The Rules of Professional Conduct]," despite the alleged existence of a Chinese Wall); *also Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Ass'n*, 909 F. Supp. 287, 293 (E.D. Pa. 1995) (disqualifying attorneys at late stage in proceedings where the "conflicts of interest [were] simply too severe to allow [lawyers] to remain on the case, despite counsel's assurances that the conflicts will in no way interfere with their professional judgment").

## THE INJUNCTION WILL NOT ADVERSELY AFFECT THE PUBLIC INTEREST

52.     The Pennsylvania Supreme Court has observed that the purpose of the attorney-client privilege "'is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'" *Dougherty*, 85 A.3d at 1087 (quoting *Levy*, 65 A.3d at 368). Enjoining K&E from violating its ethical duties to Mylan will not adversely affect the public interest. To the contrary, it will strengthen and restore public trust in the attorney-client relationship. *See Hyman*, 964 F. Supp. at 175; *Maritrans*, 529 Pa. at 252.

-16-

**WHEREFORE**, Plaintiffs respectfully request that this Court issue an Order in the form attached hereto granting an immediate preliminary injunction pursuant to Rule 1531 of the Pennsylvania Rules of Civil Procedure.

Dated:  May 1, 2015                                Respectfully submitted,

_____
ROGER J. ECKER, ESQ.
   PA. ID. NO. 05446
PEACOCK KELLER & ECKER, LLP
70 East Beau Street
Washington, PA 15301
Tel.: 724-222-4520
Fax:  724-222-3318
REcker@PeacockKeller.com

WILLIAM PIETRAGALLO, II, ESQ.
   PA. ID. NO. 16413
JOHN A. SCHWAB, ESQ.
   PA. ID. NO. 89596
PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
Tel.:  412-263-2000
Fax:  412-263-2001
WP@Pietragallo.com
JAS@Pietragallo.com

MICHAEL S. SOMMER, ESQ.
   N.Y. ID. NO. 2182939
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Tel.:  212-999-5800
Fax: 212-999-5899
msommer@wsgr.com

**<u>VERIFICATION</u>**

I, Douglas Miner, designated representative of Plaintiffs Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Technologies, Inc., and Mylan Specialty I.P, hereby certify that the statements contained in the foregoing Motion for Preliminary Injunction are true and correct to the best of my knowledge, information, and belief.  I understand that the statements therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.


Date:   5 / 1 / 15

Douglas Miner

CERTIFICATE OF SERVICE

I, Roger J. Ecker,  Esquire, do hereby certify that a true and correct copy of the foregoing

Complaint  is being served upon the following Defendant by personal service, U.S. Certified

Mail, Saturday delivery,  this 1 day of May, 2015.

Kirkland and Ellis LLP
300 North LaSalle
Chicago, IL   60654

Respectfully Submitted,

**PEACOCK KELLER & ECKER, LLP**

By: _____
Roger J. Ecker, Esquire

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PA
CIVIL DIVISION

MYLAN INC., MYLAN
PHARMACEUTICALS INC., MYLAN
TECHNOLOGIES, INC. and MYLAN
SPECIALTY LP,

          Plaintiffs,

    v.

KIRKLAND & ELLIS LLP,

          Defendant.

No.: _____

## DECLARATION OF DOUGLAS MINER
## IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Douglas Miner, hereby declare as follows:

1. I am currently the Associate Global General Counsel, Commercial and Product Litigation.  I have worked in Mylan's Legal Department since 2008.  In my current role, I have day-to-day responsibility for overseeing Mylan's U.S. and global non-patent litigation-related matters as well as matters involving pre-litigation disputes.   My responsibilities require me to both engage outside counsel for particular matters and then to work closely with such counsel in those matters for which they are retained.

2. In my position as Associated Global General Counsel, Commercial and Product Litigation, I am familiar with the numerous matters for which Mylan has engaged the law firm of Kirkland & Ellis LLP ("Kirkland") to provide legal services to Mylan.

3. In January 2013, after repeated efforts by Kirkland to obtain significant business from Mylan, Mylan and Kirkland engaged in discussions concerning Kirkland's representation

of Mylan.  Those discussions resulted in Mylan engaging Kirkland to represent Mylan in connection with generic lidocaine patch products and with respect to litigation relating to 180-day exclusivity for the generic version of Benicar.

4.  With respect to the generic lidocaine patch products, in connection with its representation of Mylan, Kirkland was provided confidential information relating to the products and has generated work product in connection with Mylan's legal and regulatory strategy.  In fact, in April 2013, Mylan and Kirkland executed an addendum to the parties' engagement letter by which, in recognition of the extensive work to be undertaken by Kirkland on behalf of Mylan, certain terms of the engagement were modified.

5.  Kirkland's work on the lidocaine patch products matter has been ongoing since the retention in January 2013.  As recently as February 2015, Kirkland prepared a draft document in connection with this matter for Mylan's review and consideration.

6.  Kirkland also represents Mylan in an ongoing litigation relating to generic Benicar (olmesartan) - a widely prescribed drug with that is significantly important to Mylan's portfolio of products.  Mylan was the first generic company to file an ANDA for olmesartan that qualified it for 180-days of generic market exclusivity upon its launch.  Mylan has entrusted Kirkland with working to secure and maintain this exclusivity.  Specifically, Kirkland represents Mylan in critically important litigation related to efforts by a subsequent generic filer to prematurely cause Mylan to forfeit its exclusivity for olmesartan.  In connection with this representation, K&E has been entrusted with confidential information.

7. Kirkland has appeared on Mylan's behalf in the olmesartan matter as recently as April 27, 2015 in the Northern District of Illinois and filed a brief on Mylan's behalf with the U.S. Court of Appeals for the Federal Circuit on April 30, 2015.

8. In May 2013, Kirkland's representation of Mylan expanded to include work relating to an additional drug. With respect to that matter, Kirkland provided strategic regulatory counsel, drafted correspondence with the FDA, and advised Mylan on potential actions it could take.

9. In November 2013, Kirkland again expanded the scope of its representation of Mylan, this time advising Mylan in connection with certain commercial and contractual relationships. In connection with this representation, Mylan shared with Kirkland Mylan's highly proprietary strategies for pricing a vast array of its products.

10. In or around November 2014, Kirkland took on the representation of Mylan with respect to yet another drug product. In this regard, Kirkland worked closely with Mylan drafting various memos and papers and received confidential market and financial forecast information.

11. In or around February 2013, Kirkland began advising Mylan with respect to Mylan's EpiPen® auto-injector product ("EpiPen®"), which has been the most prescribed epinephrine auto-injector in the United States for the last twenty-five years. The scope of that representation in 2013 was varied and involved numerous issues. In the course of Kirkland's work on these issues, Mylan again provided Kirkland with confidential information relating to the EpiPen® Auto-Injector, as well as Mylan's regulatory and legal strategy.

12. In late 2014, the scope of Kirkland's representation of Mylan expanded with respect to the EpiPen® product. During that time, Mylan continued to provide Kirkland with an array of highly confidential information relating to the EpiPen® product, including (among other things) confidential communications and legal and strategic analyses prepared by Mylan.

13. The fact that Teva Pharmaceutical Industries Ltd. ("Teva"), one of Mylan's primary competitors, had applied to the FDA for approval of an AB-rated version of the EpiPen® has been publicly disclosed. Although Mylan was aware that Kirkland had represented Teva with respect to other molecules and drug products in the past, Kirkland assured Mylan that these past representations would not create a conflict of interest. Specifically, among other assurances, Kirkland advised that it was a "free agent" in relation to activities involving EpiPen®, and that as Kirkland had been providing Mylan with legal advice relating to EpiPen® since 2013, Kirkland would, in any event, be ethically barred from representing Teva in matters in which EpiPen® was implicated.

14. Mylan continued to work with Kirkland on matters relating to EpiPen® into the beginning of December 2014, including participating in conference calls with a Kirkland attorney and providing additional confidential materials to Kirkland relating to EpiPen®.

15. On December 5, 2014, in what I can only describe as highly suspicious circumstances, Kirkland called Mylan and explained that it had discovered what it characterized as a conflict of interest in connection with its continued representation of Mylan relating to EpiPen®. Mylan requested that it be provided with specifics as to the nature of the conflict and the identity of the party to whom Kirkland believed it owed a duty of loyalty arising prior to its duty to Mylan. Kirkland refused to provide details.

16. Just four months later, On April 21, 2015, Mylan N.V. received an unsolicited letter from Teva's President and Chief Executive Officer, Erez Vigodman, proposing a transaction to acquire Mylan N.V. and its subsidiaries, including Plaintiffs.

17. Mylan N.V. is a public limited liability company organized in the Netherlands. On February 27, 2015, Mylan Inc. was reorganized as an indirect wholly owned subsidiary of Mylan N.V., which is the successor to Mylan Inc. for financial reporting purposes.

18. Teva's April 21 letter to Mylan N.V. identified Kirkland as legal counsel for Teva in connection with the proposed transaction. This was the first time Mylan became aware of Kirkland's representation of Teva. Kirkland had not previously informed Mylan that it was representing Teva in the proposed acquisition or any other then-pending matter and had not sought a waiver from Mylan permitting it to engage in such a representation.

19. On April 27, 2015, the Board of Directors of Mylan N.V. unanimously rejected Teva's unsolicited expression of interest, concluding that the Teva expression of interest grossly undervalued Mylan and contained nothing meaningful to indicate why a combination with Teva would be in the best interest of Mylan's employees, patients, customers, communities and other stakeholders. As such, the interests of Teva and Mylan are plainly adverse.

20. Kirkland, in representing Teva, seeks to play a lead counsel role in assisting Teva in acquiring Mylan, including the very drugs and pharmaceutical products about which Kirkland has and continues to provide legal advice to Mylan, including the lidocaine patch, the generic version of Benicar, and EpiPen®.

21. In the course of the various representations described above, Kirkland has been entrusted with unique knowledge of Mylan's commercial relationships and strategies -- information

-5-

that a competitor such as Teva would surely relish, but should not have in connection with a takeover effort -- and certainly, such information should not be supplied to Teva by the law firm that represented Mylan in connection with those matters. Kirkland has been provided with highly confidential information regarding products Mylan has not yet launched – and which require FDA approval. It has also been provided with Mylan's pricing strategies across an enormous range of Mylan products. Such insight into Mylan's current and future business efforts is again the very type of information Teva would like to know, but Kirkland must be prohibited from sharing. Mylan also paid Kirkland substantial fees for its services.

22. I do note that the engagement letter with Kirkland, by which Kirkland agreed to represent the interests of Mylan, Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies, Inc., contains language permitting Kirkland to take on matters adverse to Mylan provided that those matters "are not related to the legal services that K&E LLP has rendered, is rendering or in the future will render to [Mylan] under the Engagement." In my view, this "advance waiver" language does not permit Kirkland to represent Teva in connection with Teva's unsolicited effort to acquire Mylan N.V. and its subsidiaries (including Plaintiffs), as that is plainly an engagement "related" to the services Kirkland rendered, is rendering and was expected to continue rendering to Mylan. Specifically, Kirkland has advised Mylan regarding significant products, and in the course of those representations, has been given access to highly confidential and proprietary information that Teva could not otherwise access. Teva now seeks to acquire Mylan, including those very products, with the assistance of Kirkland, the law firm that Mylan appropriately understood had committed its undivided loyalty to Mylan.

-6-

23. As an attorney for Mylan, I can say with absolute certainty that if Kirkland had disclosed
    to Mylan that it believed its engagement letter would permit Kirkland to work against
    Mylan's interests with respect to, among other things, the very products Kirkland had
    been and continues to advise Mylan on, Mylan never would have signed that engagement
    letter.  In this regard, there was no informed and knowing waiver of the type of conflict
    implicated by Kirkland's current representation of Teva.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true
and correct.

Dated:  May 1, 2015

_____
Douglas Miner

CERTIFICATE OF SERVICE

I, Roger J. Ecker,  Esquire, do hereby certify that a true and correct copy of the foregoing

Motion for Preliminary Injunction is being served upon the following Defendant by personal

service, U.S. Certified Mail, Saturday delivery,  this 1 day of May, 2015.

Kirkland and Ellis LLP
300 North LaSalle
Chicago, IL   60654

Respectfully Submitted,

**PEACOCK KELLER & ECKER, LLP**

By:

Roger J. Ecker, Esquire