# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MYLAN INC., MYLAN PHARMACEUTICALS INC., MYLAN TECHNOLOGIES, INC. and MYLAN SPECIALTY LP,<br><br>             Plaintiffs,<br><br>   v.<br><br>KIRKLAND & ELLIS LLP,<br><br>             Defendant. | 2:15-CV-00581-LPL |

## EXPERT REPORT OF PROFESSOR JANE CAMPBELL MORIARTY

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

By: _____

William Pietragallo, II, Esquire

*Counsel for Plaintiffs Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Technologies, Inc., and Mylan Specialty LP*

**EXPERT REPORT OF PROFESSOR JANE CAMPBELL MORIARTY**

I.      **BACKGROUND AND QUALIFICATIONS OF PROFESSOR MORIARTY**

     1.     The undersigned, Jane Campbell Moriarty, is the Carol Los Mansmann Chair in Faculty Scholarship, Associate Dean of Faculty Scholarship, and Professor of Law at Duquesne University. I have held this position since 2011. Prior to working at Duquesne, I was a professor for fourteen years at the University of Akron School of Law, where I was granted tenure and made a full professor, served as the Director of Faculty Scholarship, and was named as a fellow in the Miller-Becker Center for Professional Responsibility.

     2.     I have taught Legal Ethics courses for approximately 15 of my 18 years as a professor at Akron, Duquesne, and during visiting appointments at Case Western University School of Law (Spring, 2009), and at the University of Pittsburgh School of Law (Fall, 2006).[1] After graduating from Boston College, *summa cum laude* and *Phi Beta Kappa* (1980), and Boston College Law School, *cum laude* (1983), I was admitted to practice in Massachusetts in 1983 and in Pennsylvania in 1987 and am a member of various federal courts. From 1983-2007, I practiced law in both Boston and Pittsburgh as a litigator and appellate lawyer and served as a law clerk for the Superior Court of Massachusetts (1983-1884) and for the late Honorable Ralph J. Cappy, Justice of the Pennsylvania Supreme Court (1990-1992).

     3.     I have spoken about legal ethics issues at various academic and practice-oriented symposia nationally and internationally, including at the International Legal Ethics Conference in London (2014), the Ohio State Judges' Convention (2009), the ABA Criminal Justice Section, New York, NY (2010), the Connecticut Bar Foundation at University of Connecticut Law School, Hartford, CT (2010), and the ABA Intellectual Property Summer Meeting, Boston, MA (2006). I was an invited speaker at roundtable programs for the ABA Prosecutorial and Defense Function Revisions (2010) and at two different academic conferences at the Louis Stein Center for Law & Ethics at Fordham Law School in 2011 and 2014 on legal ethics issues. I am a

---

[1] Required legal ethics courses have various titles, including Professional Responsibility and Legal Ethics, among others, and are required courses at US law schools.

member of the planning committee for the International Legal Ethics Conference to be held in New York in 2016.

4.      More regionally, I have lectured in both Ohio and Pennsylvania more than 15 times during the last several years, providing Continuing Legal Education on legal and judicial ethics.  In addition, I have published law review articles about legal and judicial ethics and my scholarship on these matters has been cited in several articles and excerpted in a casebook on legal ethics.

## II.      SUMMARY OF CONCLUSIONS:

5.      I have been asked to render an opinion as to whether Kirkland & Ellis, LLP (or "firm" or "K&E") violated its fiduciary duty to Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Technologies, Inc., and Mylan Specialty LPs (collectively "Mylan," or "Client") and/or violated the Pennsylvania Rules of Professional Conduct (Pa. R. Prof. Conduct") governing the conduct of lawyers representing clients, by virtue of K&E's representation of Teva Pharmaceutical Industries, Ltd. ("Teva") in its unsolicited attempt to acquire Mylan N.V., the parent company of Mylan. I have also been asked to respond to matters in the Declaration of Professor Richard Painter ("Painter Declaration") filed in this case.

6.      Based upon my review of certain documents filed in the case of Mylan Inc., *et al* v. Kirkland & Ellis, LLP, US Dis. Ct. No. 2:15-cv-00581-LPL, as well as the Painter Declaration, the Expert Report of John C. Coates ("Coates Report") and other documents listed in Attachment A hereto, as well as published accounts of Teva's attempt to acquire Mylan, my knowledge of the Pennsylvania Rules of Professional Conduct ("Pa. R. Prof. Conduct."), case law, and prevailing norms and standards related to the ethical practice of law, I have the following opinions:

a.      Kirkland & Ellis, LLP, which has represented Mylan since January, 2013, is in breach of its fiduciary duty to Mylan, by abrogating its duty of loyalty and trust to its client;

b.  Mylan is a current client of Kirkland & Ellis.[2]  The firm violated Pa. R. Prof. Conduct 1.7 in simultaneously representing Mylan in matters while representing Teva in its attempted acquisition of Mylan N.V. and its subsidiaries:   Teva and Mylan have adverse interests as defined by Pa. R. Prof. Conduct. 1.7; K & E could not reasonably have believed it could simultaneously represent Mylan while also representing Teva in a takeover attempt of Mylan and its related affiliates; and there was no effective waiver of the conflict due to a lack of informed consent by Mylan.

c.  The January 9, 2013 retention letter signed by both Mylan and K&E (along with the addendum of April 3, 2013) is ineffective to permit K&E to represent Teva in its attempted acquisition of Mylan, as the firm did not comply with the requirements of Pa .R. Prof. Conduct. 1.7 requiring that clients give "informed consent" as defined in Rule 1.0 and in Comment [22] to Rule 1.7.  Moreover, the letter is insufficient as an advance waiver under ABA Formal Opinion 05-436, entitled *Informed Consent to Future Conflicts of Interest*, and law on the subject of advance waivers, given the nature of the conflict at issue here and the contractual limitation inserted into the engagement agreement.

d.  K&E agreed that it would not accept any engagement adverse to Mylan or its affiliates that was "related to" the work it was performing for Mylan.  As part of its engagement negotiation, Mylan required the term "related to," rather than the original term proposed by K&E, "substantially related to," as a condition for hiring K&E.  The term "related to" is a lesser standard than "substantially related to" for purposes of analyzing any conflict of interest.[3]  It is evident that the work K&E is doing by representing Teva in its attempted acquisition of Mylan N.V. and its subsidiaries is "related to" the work it has done and continues to do for Mylan.  It is also clear that K&E's representation of Teva in this matter is "substantially related" to its work for Mylan.

---

[2] This point seems to be conceded by K&E in the Painter Declaration in section B, entitled "The Mylan Entities that are Kirkland Clients."

[3] Pa. R. Prof. Conduct 1.0 (l) provides that "'[s]ubstantial' when used in reference to degree or extent denotes a material matter of clear and weighty importance."

      e.      Mylan N.V. has not filed a claim in this matter and is not claiming to be a client of K&E. Mylan, however, is a client and the agreement that K&E drafted and signed indicated it would only represent clients with matters that were adverse to Mylan or *any of its affiliates* on matters that were "not related to" the services it was rendering to Mylan. K&E's representation of Teva in its attempted takeover of Mylan NV and its subsidiaries, which include these Mylan plaintiffs, is both adverse to Mylan and its affiliates and is "related to" the services K&E has provided (and is providing) to Mylan. Although K&E claims that Teva's attempted takeover of Mylan NV and its affiliates "has no adverse effect on the interests of Mylan,"[4] such an argument disregards the nature of the relationship between Mylan and its affiliates and the obvious interests Mylan has with respect to the possible takeover of Mylan NV and its affiliates.[5]

      f.      In sum, K&E is violating its fiduciary and professional duties to Mylan by engaging in conflicts of interests in its representation of Teva and has violated the laws, norms, and standards governing lawyers' relationship with clients. Given that it has been representing Mylan for more than two years on matters related to Teva's attempted acquisition of Mylan's entire business, K&E should be prohibited from representing Teva in this matter.

## III.    BASIS AND REASONS FOR OPINIONS

### A.    Kirkland & Ellis has Breached and Continues to Breach its Fiduciary Duty to Mylan

      7.      Pennsylvania recognizes that attorneys are fiduciaries to their clients and that fiduciary duty demands "undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and holds that breach of such duty is actionable." *Maritrans v. Pepper Hamilton & Sheetz*, 602 A.2d 1277, 1283 (Pa. 1982*); Dougherty v. Philadelphia Newspapers, LLC.,* 83 A.3d

---

[4] K&E's Memorandum of Law in Response to the Motion for Preliminary Injunction at p. 21, referencing the Painter Decl. at ¶¶ 43-49.

[5] The Coates Report at Section VIII. A. explains the relationship between Mylan N.V. and Mylan, highlighting that one of the "principal assets of Mylan N.V. is the stock of Mylan, Inc." By contrast, the Declaration of Professor Richard Painter ("Painter Declaration") does not consider the close relationship of Mylan and Mylan N.V. and the exceptional importance of Mylan to Mylan N.V.

1082, 1087 (Pa. Super. 2014).  As part of his fiduciary duty under the common law, "[a]n

attorney may not represent conflicting interests."  *Estate of Pew,* 655 A.2d 521, 545 (Pa. Super.

1994).

        8.     In *Maritrans,* the Supreme Court of Pennsylvania clarified that a conflict of

interest violating a rule of professional conduct could also constitute a breach of fiduciary duty

under the pre-existing common law of the state.  602 A.2d at 1284.  *See also, Dougherty*, 85

A.2d 1094, n. 4 (Donohue, J., concurring).

        9.     In my opinion, K&E breached, and continues to breach, its fiduciary duty to

Mylan.  Since January 2013, the firm has been representing Mylan on matters that concern

several of Mylan's major products and has been privy to confidential information about Mylan's

business, its strategies, and products, including those already in the market and those that have

not yet launched.[6]   During some portion of this time period and continuing to the present,

Kirkland & Ellis has been representing Teva in its attempt to acquire Mylan NV and its affiliates,

all of which include the Plaintiffs. *See Generic Drugmaker Teva Makes $40 Billion for Offer for

Rival Mylan*, http://www.nytimes.com/reuters/2015/04/21/business/21reuters-mylan-m-a-teva-

pharm-ind.html?_r=0 (listing Kirkland and Ellis as counsel for its "rival," Teva, in this

acquisition offer).

        10.    Given that the Kirkland & Ellis is representing Teva in its hostile attempt to

acquire Mylan NV and its affiliates, K&E is far from acting with "with undivided loyalty" to

those Mylan affiliates.  To the contrary, K&E is acting against the interest of Mylan, while in

possession of Mylan's confidential information, plans, product knowledge, and secrets.[7]

        11.    An attorney's fiduciary duty encompassing loyalty and confidentiality is a

bedrock principal of ethical practice.  THE RESTATEMENT (THIRD) OF THE LAW—THE LAW

GOVERNING LAWYERS §121, comment b (2000) (updated 2015), notes that the prohibition

---

[6] *See* the Miner Declaration and Supplemental Declaration.

[7] Clients, of course, can waive conflicts of interests in certain situations—a point discussed
*infra* in section III B (3); this is not one of those situations, however, as more fully explained.

against conflicts is to first, "assure clients that their lawyers will represent them with undivided loyalty. A client is entitled to be represented by a lawyer whom the client can trust." This prohibition against conflicts can also "extend to situations, not involving litigation, in which significant impairment of a client's expectation of the lawyer's loyalty would be similarly likely [and would include]. . . [c]ontentious dealings, for example . . . [and] negotiating on behalf of one client when a large proportion of the lawyer's other client's net worth is at risk." Fiduciary obligations encompass a duty both to preserve client's confidence and to not use them against the client. "Preventing use of confidential client information against the interests of the client, either to benefit the lawyer's personal interest, in aid of some other client, or to foster an assumed public purpose is facilitated through conflicts rules that reduce the opportunity for such abuse." *Id.* at §121, comment b.

12.     All of Mylan's interests and indeed its continued corporate identity and existence are at stake in Teva's acquisition attempt. The confidential information Mylan has disclosed to Kirkland & Ellis includes information that would be valuable to Teva and harmful to Mylan if shared or disclosed; which information is set out in both the Miner and Ondos Declarations and the Report of Professor Coates[8] As such, the firm's concurrent representation of Mylan and Teva in these matters constitutes a breach of Kirkland & Ellis' fiduciary duty to Mylan.

As also explained in more depth below, K&E's violation of Pa. R. Prof. Conduct 1.7, among other rules, is also evidence of its breach of fiduciary duty.

**B.     By representing Mylan and Teva in these matters, Kirkland & Ellis has violated and continues to violate Pa. R. Prof. Conduct 1.7, and the firm's proposed waiver of conflicts is ineffective for this matter.**

13.     Rule 1.7 of the Pennsylvania Rules of Professional Conduct, entitled "Conflict of Interest:  Current Clients," provide as follows:

(a)  Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

---

[8] See the Miner Declaration, the Miner Supplemental Declaration, the Ondos Declaration, and the Report of Professor Coates.

(1)  the representation of one client will be directly adverse to another client; or

(2)  there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b)  Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1)  the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)  the representation is not prohibited by law;

(3)  the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4)  each affected client gives informed consent.

## 1.    Mylan and Teva Have Plainly Adverse Interests

14.    As explained in section III A, *supra,* K&E currently represents both Mylan and Teva: Mylan in certain matters as described in the Declaration of Douglas Miner,[9] and Teva in its announced attempted acquisition of Mylan NV and its affiliates.  Neither K&E nor Professor Painter appear to dispute this point.  Thus, the conflict analysis starts with Rule 1.7, which applies to concurrent conflicts.  The rule considers first whether the representation of Teva in its attempt to acquire Mylan is "directly adverse" to Mylan.  "Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent."[10]  Pa. R. Prof. Conduct 1.7, Comment 6.  The relationship between Mylan and Teva in the acquisition context is plainly adverse.  Teva has publicly announced its desire to acquire Mylan N.V. and its affiliates, and Mylan has rebuffed that overture.    A matter need not be in litigation to be adverse—negotiations are often considered adverse, as what is helpful for one client in the negotiation is generally harmful to the other.  As Pa. R. Prof. Conduct 1.7, comment (7) explains:

---

[9] See Miner Declaration and Supplemental Declaration.

[10] The issue of informed consent is addressed in section III B (3) *infra.*

7

(7)     Directly adverse conflicts can also arise in transactional matters. For example, if lawyer is asked to represent the seller of a business in negotiations with a buyer represented by the lawyer, not in the same transaction but in another, unrelated matter, the lawyer could not undertake the representation without the informed consent of each client.

15.     The situation here is even more distressing, given that this is not a mutually agreed-upon decision to buy and sell, but rather an unsolicited attempt to acquire. *See Generic Drugmaker Teva Makes $40 Billion for Offer for Rival Mylan*, http://www.nytimes.com/reuters/2015/04/21/business/21reuters-mylan-m-a-teva-pharm-ind.html?_r=0 (noting that the bid was "unsolicited") and a rejection of that attempt.

16.     Professor Painter states, in section B of his Declaration, that K&E has been and is working to ensure it wins "each and every case" for Mylan and argues therefore there really is no adversity.[11] This reasoning sidesteps the true nature of the adversity at issue here: Teva's attempted takeover of Mylan, N.V. and its subsidiaries, which include Mylan and its affiliates. K&E contractually agreed not to represent a client in a related matter that is *adverse to Mylan or its affiliates.* Given the importance of Mylan and its affiliates to this takeover, the adversity is evident.

### 2.     K&E cannot reasonably believe that they will be able to provide competent and diligent representation to each of the clients affected in this matter.

17.     When a lawyer wishes to provide representation to two adverse clients, Rule 1.7 requires that lawyer to be able to "reasonably believe that he could provide competent and diligent representation to each affected client." Pa. R. Prof. Conduct 1.7( b)(1).[12]

18.     The focus of the "reasonable belief" analysis is on competent representation, loyalty, and perhaps most critically, confidentiality. *See generally*, RONALD D. ROTUNDA & JOHN S. DZIENKOWSKI, LEGAL ETHICS, THE LAWYERS' DESKBOOK ON PROFESSIONAL

---

[11] See Painter Declaration at p. 16.

[12] Nonetheless, if the matter is adverse and the lawyer can satisfy the "reasonable belief" standard, the rule still requires that the lawyer obtain the informed consent of both clients.  This issue is addressed later in section III B (3), *infra.*

RESPONSIBILITY§ 1.7-2, *Simultaneous Representation of Adverse Multiple Clients in Related Matters* (2013-2014 ed.)("A lawyer in a multiple client representation has equal loyalty to each client and thus cannot, in the majority of cases, properly discharge this obligation and keep information confidential against others").

19.     Here, K&E cannot fulfill these multiple obligations to its adverse clients in this instance. Teva, is seeking to acquire Mylan NV and its affiliates, which means Teva is interested in virtually every aspect of Mylan. Additionally, as set forth in the Miner Declaration, K&E currently represents and has recently represented Mylan with respect to certain of its important products, including lidocaine patches, olmesartan, EpiPen®, and others.  In the course of these and other representations, the K&E has learned confidential and proprietary information about Mylan – information that otherwise would not be available to K&E or Teva.  A lawyer cannot reasonably believe that she could provide loyalty, competence, and diligent representation to Mylan on matters involving company strategy, pricing of its important products, litigation, and regulatory representation while assisting Teva on how best to acquire Mylan NV and its affiliates (including its assets and products).   As Professor Coates concludes in his Expert Report, K&E's representation of Teva in its hostile acquisition proposal is a clear conflict with its representation of Mylan.[13]  He believes it is hard to imagine a more obvious conflict; a position with which I agree fully.[14]

20.     The "reasonable lawyer" standard is both subjective—in that it looks to the lawyer at issue— and objective—in that a "reasonably prudent and competent lawyer would

---

[13] As a subsidiary matter, even if were determined that K&E's representation of Teva is not "directly adverse" to Mylan, it is unquestionably true that K&E's representation of Teva still violates Pa. R. Prof. Conduct 1.7 (a)(2).  This rule prohibits the representation if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client, a former client, or a third person. . . ."  Given all that K&E has learned about Mylan and its products—which are a large percentage of the value of Mylan NV—K&E is materially limited by its knowledge and ongoing representation of Mylan.

[14] As an incidental matter, the conflicts of one lawyer in a firm are imputed to the other members of the firm and there is no ethical screen available for this situation. *See generally* Pa. R. Prof. Cond. 1.10 (a). Thus, any suggestion that an ethical screen would adequately protect Mylan is without merit.

come to the same belief, given the same information and time for reflection." Geoffrey C.
Hazard, Jr., et al, The Law of Lawyering §11:20 at p. 11-60 (3d ed. 2014 supp). THE
RESTATEMENT (THIRD) OF THE LAW (Third) of The Law—The Law Governing Lawyers concurs,
stating "if a *reasonable and disinterested lawyer* would conclude that one or more of the affected
clients could not consent to the conflicted representation because the representation would likely
fall short [in representing either of the clients' interest or the lawyer's relationship with each
client], the conflict is nonconsentable." *Id.* at §122, comment g(iv) (2000) (updates though 2015,
emphasis supplied). Under this "reasonably prudent and competent lawyer" test, Kirkland &
Ellis cannot represent both these clients as Teva seeks to acquire Mylan.

21.     K&E claims that because it is representing Teva against Mylan NV, it has no
conflict with Mylan and its affiliates. This technical argument clearly misses the very important
and close relationship between Mylan NV and the Mylan plaintiffs. While formal opinion 95-
390 recognizes that representing one corporate affiliate does not always make the other affiliates
clients, an attorney must be sensitive to the client's understanding of the relationships and any
analysis needs to consider the relationship not in a theoretical way, but as a fact-driven analysis.
As the opinion cautions "the circumstances of a particular representation may be such that the
corporate client has a reasonable expectation that the affiliates will be treated as clients, either
generally or for purposes of avoidance of conflicts, and the lawyer is aware of the expectation."
The opinion also goes on to recommend that "as a general matter, in the absence of a clear
understanding otherwise, *the better course is for a lawyer is to obtain the corporate client's
consent before the lawyer undertakes a representation adverse to its affiliate.* That did not
happen in this case and, in fact, had K&E sought Mylan's consent, they would not have received
it, as is clear from both the Miner and Ondos Declarations.

22.     Professor Painter claims that Mylan and its affiliates are no more important to
Mylan NV than the wishes of a single tenant in a 1,000 person apartment building about the
decision by a buyer to make an offer on the building. This analogy is overly facile and
misleading. Without Mylan and its affiliates, the value of Mylan NV is directly related to

10

Mylan's products; —Mylan is far more than a tenant in a building—it is a major part and parcel of the value of the building itself.[15]  As Professor Coates explains in his Report, "the value of the products owned by Mylan—about which K&E has been providing advice—is the foundation for the value of Mylan on a stand-alone basis. . . ."[16]

> ### 3.   The firm's engagement letter with Mylan does not reflect informed consent and the waiver provision is ineffective as to K&E's representation of Teva in seeking to acquire Mylan

23.    K&E and Mylan executed and Engagement Letter (supplied to the Court on May 14, 2015 in response to the request of the Court), with the following conflict waiver provision:

> [Y]ou agree that K&E LLP may, now or in the future, represent other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to you or any of your affiliates on matters that are not related to (i) the legal services that K&E LLP has rendered, is rendering or in the future will render to you under the Engagement and (ii) other legal services that K&E LLP has rendered, is rendering or in the future will render to you or any of your affiliates under a separate engagement (as "Allowed Adverse Representation").

24.    For a conflict waiver to be effective as required by Pa. R. Prof. Conduct 1.7 (b)(4), each client must give informed consent.  Rule 1.0 (e) of the Pa. R. Prof. Conduct defines "Informed Consent" as "consent by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  Virtually no information about the nature of the likely conflicts is provided in the document, other than K & E may represent "entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to you . . . ."

25.    Although the use of advance or prospective waiver of conflict agreements has become more common in recent years, courts and commentators have addressed the multiple

---

[15] Also unpersuasive is the comparison to PepsiCo's ownership of Quaker Oats and the other "hundreds of subsidiaries" it owns.  PepsiCo and Quaker Oats may share little but common ownership.  By comparison, the relationship between Mylan NV and the Plaintiffs are inextricably entwined and the value of Mylan NV rests in substantial part on the value of Mylan and its affiliates, who K&E represented. *See Ondos Declaration.*

[16] Coates Report at p. 19

ethical concerns these agreements pose, including the nature of the conflict.[17]  While advance

waivers may be useful for large law firms, they present serious ethical concerns for clients and

raise problematic concerns about the public perception of lawyer's duties of loyalty, fidelity, and

confidentiality with the public.

26.     The most critical concerns are focused on the problem of informed consent, a

point Professor  Painter's Declarations does not address, choosing to focus on the fact that

advance waivers are common for sophisticated clients and in-house counsel[18]  Regardless of the

sophisticated nature of the client, the burden is on the lawyer to provide sufficient information

about the possible conflicts that could arise or do exist. For example, in *In re Congoleum Corp*.,

426 F.3d 675, 691 (3d Cir. 2005), the Court of Appeals for the Third Circuit noted that the

validity of the prospective waiver depended on whether the clients gave "truly informed

consent."[19]  Commentators have noted that an important consideration is "the extent to which the

future conflict can be identified and whether the adverse consequences to the client anticipated

and explained."  RONALD E. MALLEN ET AL, 2 LEGAL MALPRACTICE § 17:35 *The Fiduciary*

*Obligations—Conflicting Interests.*   "Client consent to conflicts that might arise in the future is

subject to special scrutiny, particularly if the consent is general."  RESTATEMENT, *supra*, § 122.

"Clients, even the most sophisticated, must give informed consent to counsel in order to waive

conflicts of interest."  8 FEDERAL PROC., L. ED. § 20:24 (2015).  "The key factor to determine if

an advance waiver is effective is whether the lawyer can properly explain to the client all of the

materials risks associate with the future conflict. . . [including] the comprehensiveness of the

information provided to the client."  RONALD D. ROTUNDA & JOHN S. DZIENKOWSKI, LEGAL

ETHICS, THE LAWYERS' DESKBOOK ON PROFESSIONAL RESPONSIBILITY§ 1.7-4 (2013-14).

---

[17] RESTATEMENT, *supra*, § 122, comment *g(iv)*.

[18] Painter Decl. at 9-10

[19] *In re Congoleum* interprets New Jersey Rule 1.7, which is similar in all material respects to
the parallel Pennsylvania Rule.

27.    For an open-ended advance conflict waiver such as was executed in this case, Comment [22] of Pa. R. Prof. Conduct 1.7 premises the waiver's efficacy on whether "the client reasonably understands the materials risks that the waiver entails. The more comprehensive the explanation of the types of future representations that might arise and the more reasonably foreseeable the adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding." *Id.*

28.    Comment [22] also focuses on whether the client is "already familiar" with the current conflicts; if so, then the "consent will be effective with regard to *that type of conflict.*" *Id.,* emphasis supplied. Here, it was understood that K&E represented other corporate clients, including Teva, in other litigation matters involving specific drug products. But there is no information that would have suggested the type of all-encompassing conflict at issue here. Where the consent was "general and open-ended, then the consent ordinarily will be ineffective, *because it is not reasonably likely that the client will have understood the material risks involved.*" Comment [22], emphasis supplied. Here, of course, Mylan could not have understood the risks of K&E representing a competitor in its attempt to acquire Mylan or it would not have signed the advance waiver. [20]

29.    Given the magnitude of this adverse matter between Mylan and Teva, and the type of conflicts about which Mylan knew when it signed the engagement letter, a "truly informed consent," *In re Congoleum,* 426 F.3d at 691, would have advised Mylan that "K&E may currently or in the near future represent a rival company that will try to acquire Mylan or any of its affiliated companies in a takeover attempt, possibly acquiring the company's assets and extinguishing Mylan's corporate identity." Of course, no such language appeared in the future conflict waiver agreement and K&E never provided any such information orally.

---

[20] Indeed, the Ondos Declaration confirms as much: "Simply stated, at no time, was I ever informed by K&E, nor did I ever consider on my own that K&E would take the position, that it could be adverse to Mylan in seeking to acquire the entire company. Indeed, had any such disclosure been made by K&E, I can say with absolute certainty that Mylan would not have agreed.

Certainly it is disingenuous to assert now that Mylan (or any company) would have knowingly agreed to such a waiver.[21]   Consent is valid only when "the client has been armed with sufficient information about the situation to be able to make a rational choice." HAZARD, *ET AL, supra,* at §10.8, page 10.22-1. Here, had Mylan been so armed, there would have been only a single, rational choice:  not hiring K&E.[22]

30.     Although K&E has claimed that the consent was effective because Mylan was an experienced user of legal services and was represented by counsel who signed the engagement letter, the waiver still fails, given the clear adversity of the client, the impossibility that a "reasonable lawyer" believed these two clients could receive competent representation in this circumstance, and the lack of "informed consent."[23]

31.     Moreover, by the terms of the engagement letter, consent to this conflict fails. The advance waiver segment of the engagement letter provides that K&E may only represent matters adverse to Mylan that are "not related to" the legal services K&E is providing to Mylan. As set forth in the expert report of Professor John Coates, "K&E's work for Mylan is related to professionally competent work as a bidder counsel for Teva."[24]  Teva is seeking to acquire, in a hostile manner and with the assistance of K&E, the very products on which K&E provided advice to Mylan.[25]  I agree fully with Professor Coates that given K&E's agreement to the

---

[21] In fact, as Comment [22] notes, "advance consent cannot be effective if the circumstances that materialize in the future are such as would make the conflict nonconsentable under paragraph (b)."

[22] Additionally, a "material change" in the factual basis on which the client originally gave informed consent can justify a client withdrawing consent." RESTATEMENT, *supra,* § 122, comment *f.*

[23] Pa. R. Prof. Conduct 1.7, comment [15], notes "[c]onsentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients are permitted to give their informed consent to representation burdened by a conflict of interest."

[24] Expert Report of John Coates at section VII.

[25] Comment [22] to Rule 1.7 and ABA Formal Opinion 05-436 (2005) do not have any effect on the question of whether a law firm may be adverse to a corporate affiliate of a current or former client.  The analysis of whether a conflict exists in a representation adverse to a corporate affiliate of a client turns on the adversity of interests and the relevance of previously acquired confidential information to the conflicting representation; the addition of Comment 22 to Rule

engagement letter that mandated K&E take on no adverse engagement that was "related" to the work it was doing and continues to do for Mylan, "any argument that K&E's Teva engagement is not related at all to its work for Mylan. . . [is] frivolous."[26] Despite Professor Painter's assertions that nothing K&E would have learned in representing Mylan would be useful to a client such as Teva in this case, the facts clearly support the opposite conclusion.[27]

32.     Professor Painter's argument that the engagement letter is not concerned with K&E learning confidential information is not persuasive in this matter.  The case is not simply about confidential information learned as a basis for this lawsuit; it is the adversarial nature of K&E representation of Teva against Mylan and its affiliates' interest that forms the basis for this suit.  Confidential information is only one aspect of the matter. [28]

33.     As set forth in the Miner and Ondos Declarations, K&E received a great deal of confidential information from Mylan that was useful for Teva's takeover attempt. That is the

---

1.7 merely speaks to the enforceability of advance waivers and whether a sophisticated entity represented by independent counsel may be deemed to have given informed consent.

[26] Expert Report of John Coates at section VII.

[27] Even if the court were to use the "substantially related" standard, which I do not believe applies due to the express wording of the advance waiver, this engagement letter would prohibit K&E from now representing Teva in its acquisition attempt.  The test of whether matters are substantially related is found in Pa. R. Prof. Conduct 1.9, comment 3. "Matters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute *or* if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Thus, to establish a "substantial relationship," the critical concern is "when an attorney might have acquired confidential information as counsel in one matter which is also relevant to the other matter." *Billy v. Peiper,* 2013 WL 4083657, *6 (M.D. Pa., 2013); *International Longshoreman's Ass'n Local Union 1332 v. International Longshoreman's Assoc,* 909 F.Supp. 287, 291 (E.D. Pa. 1995).

[28] Moreover, Professor Painter's claim about the .0001 (01%) of likelihood that Mylan would suffer harm has no foundation in fact and fails as a legitimate statistical probability.  These probabilities are not grounded in facts and the use of the so-called "product rule" to multiple the probabilities should not apply where there is no proof of the independence of each of the events. Without a much better foundation, these probabilities are both misleading and unsupportable. For an explanation of the standards governing probabilistic evidence, *see* GIANNELLI, IMWINKELRIED, ROTH & MORIARTY, SCIENTIFIC EVIDENCE § 15.07[A] (5TH ED. 2012)/

nature of the concern that courts must focus on in deciding whether a conflict exists and whether it can be waived.

34.     That Teva considers K&E its trusted advisor, or that K&E has done, and stands to do more, substantial work for Teva, does not resolve the problem of its current representation of Mylan and the confidential information that K&E learned during such representation.  The size of the client or the matter does not define the degree of the loyalty.  Here, K&E has a serious concurrent conflict in which the interests of the clients could not be more adverse and the stakes could hardly be higher.  Public policy and the ethical rules governing concurrent conflicts establish that K&E is violating its fiduciary duty to Mylan.

## IV.   CONCLUSION

35.   For the reasons set forth herein, it is my opinion that K&E has, and continues to breach its fiduciary duty to Mylan; is violating Pa. R. Prof. Conduct 1.7, and is not complying with the laws governing the relationship of attorneys and clients. It is further my belief that K&E cannot continue to represent Teva, given its more than two years of representation of Mylan on multiple matters that are related to Teva's attempted acquisition of Mylan.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated:  May 22, 2015

Professor Jane Moriarty

# EXHIBIT A

**JANE CAMPBELL MORIARTY**
**Carol Los Mansmann Chair in Faculty Scholarship**
**Associate Dean for Scholarship**
**Professor of Law**
**Duquesne University School of Law**
**600 Forbes Avenue**
**Pittsburgh, PA 15282**

<u>**Academic Professional Experience**</u>

**Duquesne University School of Law, 2011-**
Carol Los Mansmann Chair in Faculty Scholarship
Associate Dean for Scholarship, 2011-2015
Professor of Law

**University of Akron School of Law (1997-June, 2011)**
Professor (promoted, 2008)
Director of Faculty Research and Development (July 2009-2011)
Fellow, Miller Becker Institute of Professional Responsibility (2010-2011)
Associate Professor (1999-2008), tenure granted, 2003
Visiting Associate Professor (1997-1999)

Recent teaching subjects: evidence, expert and scientific evidence, law and neuroscience, and professional responsibility. Other subjects: employment discrimination, disability discrimination, family law, remedies, and an intensive advanced legal communication course.

**Case Western Reserve University School of Law (Visiting Professor)**
Spring 2009 (Professional Responsibility)

**University of Pittsburgh School of Law (Visiting Associate Professor)**
Fall 2006 (Evidence and Legal Profession)

**Cyril H. Wecht Institute of Forensic Science and Law at Duquesne University**
Consultant and Member, Board of Advisors (2009-__)
Program Chair of Wecht Institute Symposium, "Does Forensic Science Need Fixing?"
Sept. 2009
Adjunct Professor for Appellate Advocacy and coach, ABA Moot Court Team (1996)

**PUBLICATIONS**

**BOOKS**

**Treatises**

SCIENTIFIC EVIDENCE (Giannelli, Imwinkelried, Roth, & Moriarty, 5th Ed, 2012)(Two Volumes) and Supplement (2013, 2014, ___).

PSYCHOLOGICAL AND SCIENTIFIC EVIDENCE IN CRIMINAL TRIALS (Clark Boardman Callaghan/Thomson/West, 1996) (two volumes, annual supplements 1997-2006)

**Casebook**
John M. Conley and Jane Campbell Moriarty, SCIENTIFIC AND EXPERT EVIDENCE (Aspen, 2007)(with Teachers' Manual); (Second Edition, 2011)

**Editor**
Jane Campbell Moriarty, Editor, WOMEN AND THE LAW (Thomson/West) (1998-2010)(annual editions)

**Editor/overview author**
Jane Campbell Moriarty, Editor, THE ROLE OF MENTAL ILLNESS IN CRIMINAL TRIALS: INSANITY & MENTAL INCOMPETENCE (three volumes in the CONSTITUTIONAL CONTROVERSIES series)(Routledge Press, 2001)

**CHAPTER**
Langleben, D.D., Willard, D., & Moriarty, J. C. *Detecting Deception* in J. R. SIMPSON (ED.), *NEUROIMAGING IN FORENSIC PSYCHIATRY: FROM THE CLINIC TO THE COURTROOM.* CHICHESTER: WILEY AND SONS (2012)

**ARTICLES**

Moriarty, J.C., Langleben, D.D., and Provenzale, J.M., *Brain Trauma, PET Scans, and Forensic Complexity,* 31 BEHAV. SCI. & L. 701-720 (2013) (invited submission)(science and law peer reviewed)

Langleben, D.D. and Moriarty, J.C., *The Legal and Policy Implications of Using Brain Imaging for Lie Detection,* 19 PSYCH., PUB. POL'Y & LAW 222 (2013)

Bruce A. Green and Jane Campbell Moriarty, *Rehabilitating Lawyers: Perceptions of Deviance and its Cures in the Lawyer Reinstatement Process,* XL FORDHAM URB. L. J. 139 (2012)

Jane C. Moriarty and Marisa M. Main, *"Waiving" Goodbye: Plea Bargaining and the Defense Dilemma of Competent Representation,* 38 HASTINGS CON. L. QUART. 1029 (2011)(Invited Symposium)

Jane Campbell Moriarty, *"Will History Be Servitude?" The NAS Report on Forensic Science and the Role of the Judiciary,* 2010 UTAH L. REVIEW 299 (2010)(Invited Symposium)

Jane Campbell Moriarty, *Visions of Deception: Neuroimaging and the Search for Evidential Truth,* 42 AKRON L. REV. 739 (2009)(Symposium Article)

Jane Campbell Moriarty, *Flickering Admissibility: Neuroimaging Evidence in the US Courts,* 26 BEHAV. SCI. & L. 29 (2008)(by invitation; science and law peer-reviewed)

Jane Campbell Moriarty, *"Misconvictions," Science and The Ministers of Justice*, 86 NEBRASKA L. REV. 1 (2007)

Jane Campbell Moriarty, *"While Dangers Gather": The Bush Preemption Doctrine, Battered Women, Imminence and Anticipatory Self-Defense*, 30 N.Y.U. REV. L. & SOC. CHANGE 1 (2005)

Jane Campbell Moriarty and Michael J. Saks, *Forensic Science: Grand Goals, Tragic Flaws & Judicial Gatekeeping*, 44 ABA JUDGES' JOURNAL 16 (2005)

Jane Campbell Moriarty, *"Wonders of the Invisible World": Prosecutorial Syndrome and Profile Evidence in the Salem Witchcraft Trials*, 26 VT. L. REV. 43 (2001)


**Essays & Symposia Forewords**

Jane Campbell Moriarty, *Neuroscience, Law & Government: Foreword to the Symposium,* 42 AKRON L. REV. 681 (2009)(Symposium article)

Jane Campbell Moriarty, *Rape, Affirmative Consent to Sex, and Sexual Autonomy: Introduction to the Symposium,* 41 AKRON L. REV. 839 (2008)(roundtable chair in the Berlin symposium; organized written Symposium)

Jane Campbell Moriarty, *Daubert, Innocence and Forensic Science: Foreword to the Symposium,* 43 TULSA L. REV. 229 (2007)(invited symposium)

**Book Reviews:**

Jane Campbell Moriarty, Review of *Science for Lawyers*, edited by Erik York Drogin, 93 Judicature Magazine (Dec. 2009)

**Early Essays and Short Articles**

Jane Campbell Moriarty, *The First Circuit Experience with Daubert v. Merrell Dow Pharmaceuticals, Inc.: Requiring the Gatekeeper to Be Reliable?* 4 MSL L.REV. 28 (1997)

Jane Campbell Moriarty, *Lessons From the O.J. Wars*, 3 CRIM.P.LAW REP. 65 (1995)

The Hon. Ralph J. Cappy and Jane Campbell Moriarty, *The Child Sexual Abuse Syndrome: Exploring the Limits of Relevant Evidence*, 1 CRIM.P.LAW REP.1 (1993)

Jane Campbell Moriarty, *United States v. Leon: How Is It Faring in the Original Thirteen Colonies?* 18 SEARCH & SEIZ. LAW REP. 153 (1991)

## Miscellaneous Scholarship

BLACK'S LAW DICTIONARY, Academic Contributor to the Tenth Edition (2010)

Georgio Ganis and Jane Campbell Moriarty, Contributors, ENCYCLOPEDIA OF FORENSIC SCIENCE: Neuroscience and Deception (2011)

Jane Campbell Moriarty, Contributor, ENCYCLOPEDIA OF LAW & SOCIETY: AMERICAN AND GLOBAL PERSPECTIVES (Sage Publications, 2005 submission on Insanity Defense)

## Scholarship in Progress

### Book

ARE YOU LYING NOW?  NEUROTECHNOLOGY AND LAW (forthcoming, NYU Press, 2016)

### Articles

*Who Speaks for Neuroscience?*

*Losing Faith: The Ministers of Justice and the Prosecutorial Mindset*

*Judicial Decisions About Forensic Science: Heuristics, Complexity, Error, and Innocence*

*Through a Glass, Darkly:  Intoxication, Acquaintance Rape, Perception, and Memory*

## Awards and Honors

Who's Who in America 2015 (69th edition) (2014)

Excellence in Teaching Award, Duquesne School of Law (2013)

Scholar of the Year, University of Akron School of Law (2011)

University of Akron School of Law Alumni Faculty Scholarship Award, April 2008: "*Misconvictions," Science and The Ministers of Justice*, 86 NEBRASKA L. REV. 1 (2007)

University of Akron School of Law Faculty Research Award, April 2008:
"*Misconvictions," Science and The Ministers of Justice*, 86 NEBRASKA L. REV. 1 (2007)

Professor of the Year, University of Akron School of Law (2002)

*Phi Beta Kappa* (1980)
Bapst Philosophy Medal (1980)
*Alpha Sigma Nu* (1980)

## Education

Boston College Law School, J.D., *cum laude*, 1983
Managing Editor, Boston College Third World Law Journal
Comment, *The Jurisprudence of Desegregation: Understanding the Recent Busing Decisions,* 3 B.C.Third World L.J. 109 (1983)

Boston College, B.A. Philosophy, 1980, *summa cum laude, Phi Beta Kappa,*
Recipient: Bapst Philosophy Medal
Member: Arts & Science Honors Program
Member: *Alpha Sigma Nu* (National Jesuit Honor Society)

University of Pennsylvania
Center for Neuroscience & Society
Neuroscience Bootcamp (intensive program on all aspects of neuroscience),
Summer, 2010 Certificate Program

## Judicial Clerkships

The Honorable Ralph J. Cappy, Justice of the Supreme Court of Pennsylvania
Pittsburgh, PA, 1990-1992

The Superior Court of Massachusetts
Boston, MA, 1983-1984

**Work Excerpted in Casebooks:**

JOSHUA DRESSLER & STEVEN GARVEY, CASES AND MATERIALS ON CRIMINAL LAW
(battering and anticipatory self-defense)
SCHNEIDER, HANNA, SACK, AND GREENBERG, DOMESTIC VIOLENCE AND THE LAW
(battering and anticipatory self-defense)
LISA LERMAN AND PHILLIP SCHRAG, ETHICAL PROBLEMS IN THE PRACTICE OF LAW
(Prosecutorial Misconduct
PAPKE, ET AL, LAW & POPULAR CULTURE (Salem Witchcraft Trials)

OWEN JONES, JEFFERY D. SCHALL, & FRANCIS X. SCHEN, LAW & NEUROSCIENCE
(Admissibility of Neuroimaging Evidence; Neuroscience Lie Detection)
JOHN M. CONLEY & JANE CAMPBELL MORIARTY, SCIENTIFIC AND EXPERT EVIDENCE
(various excerpts)

**Service (from 2011 onward)**

Numerous continuing legal education presentations (CLE) (see speaking list)

**School of Law Service**

- Chair, 2011 Self-Study Committee; Co-Chair (2012-14)
- Chair, Faculty Scholarship Committee and Summer Grant Committee (2011-present)
- Member, Ad-Hoc Curriculum Committee (2011-2012)
- Member, Faculty Recruitment Committee (2011-present)(we hired several faculty over three years, which involved multiple rounds of interviews, call-backs, and review of scholarship)
- Member, Library Committee (2013-2014)
- Member, Long-Range Planning Committee (2011-___)
- Member, Budget Task Force Committee (2014-__)
- Member, US News and World Report Ad-hoc Committee (2011-2012)
- Member, Trial Advocacy Committee (2011-2012)
- Member, Webpage Content Committee (2011-2012)
- Faculty Advisor, *Duquesne Law Review* (2011-present)
- Faculty Volunteer with Student Bar Association members cooking for families at Family House (2012, 2014)
- Faculty Donor, PILA Auction (2011-____)

**University Service**

- Chair, Research Integrity Committee, Duquesne University (2013)
- Board Member and frequent speaker/moderator, Cyril Wecht Institute of Forensic Science and Law (2011-____)
- Organizing Committee, Symposium: International Association for Ethics in Education: Ethics Education from a Global Perspective (2011-2012)
- Organizing Committee:  Annual Presidential Conference on the Integrity of Creation (2014-2015)
- Organizing Committee to investigate the creation of a Duquesne Center for Neuroscience, Healthcare Ethics and Law

**Professional and Scholarly Service**

*Journal of Legal Economics*, Editorial Board (2011 - present)

Association of American Law Schools Evidence Section Executive Committee, 2007-present

Association of American Law Schools Evidence Section Secretary, 2010-2011; Chair Elect (2011-2012); Chair (2012-2013)

Invited Peer Reviewer of submitted articles:  Stanford Law Review; Yale Law Review; Multiple tenure and promotion scholarship reviews

## Community Service

Board of Directors, The Western Pennsylvania Board of Directors for the Multiple Sclerosis Foundation (2010-2012)

## Appointments

AALS Evidence Section Executive Committee, 2007- (currently serving)

AALS Evidence Section Secretary, 2010-2011; Chair Elect (2011-2012); Chair (2012-2013)

BLACK'S LAW DICTIONARY, Academic Contributor to the Tenth Edition (2010)

Supreme Court of Ohio Counsel to the Evidence Subcommittee of the Ohio Commission on the Rules of Practice and Procedure, 2008

Pennsylvania Supreme Court - Appellate Court Procedural Rules Committee Member, 1992-1998, Vice-Chair, 1994-1998

## Editorial Board
Journal of Legal Economics (2011-  )

## Symposia Chair and Symposia Committees

2014-2015, Annual Presidential Conference on the Integrity of Creation:  Climate Change, Duquesne University (Organizing Committee)

2014-2015, Fortieth Anniversary of the Pennsylvania Rules of Appellate Procedure, Joint Conference of the Bench, Bar, and Duquesne University School of Law (Organizing Committee)

2014—The Violence Against Women Act and Its Impact on the US Supreme Court and International Law:  A Story of Vindication, Loss, and a New Human Rights Paradigm (Duquesne University School of Law)(Conference Organizer)

2011-2012, International Association for Ethics in Education: Ethics Education from a Global Perspective, Organizing Committee and Panel Moderator, Duquesne University

2009, *Does Forensic Science Need Fixing?* Symposium on the Report of the American Academy of Forensic Science, Wecht Institute of Forensic Science, Duquesne University

2008, *Neuroscience, Law & Government*, University of Akron School of Law (Symposium Chair, Organizer, and Speaker)

### Speaking Engagements, 1996-2015

**National and International Conferences, Symposia, Colloquia, and Judicial Presentations**

**2015**

June, 7-9, Fordham Law School, NY, NY, Faculty Roundtable on Criminal Justice Ethics

April 20, Widener University School of Law, Harrisburg, PA Symposium on Criminal Sentencing and Death Penalty Reform, *Why Death Penalty Reform Matters: Forensic Science Errors, Innocence, and the Role of the Judiciary,*

April 10, Northwestern School of Law, ABA Judicial Division Conference: *"Can the Gate-keeping Function of the Court Improve the Quality of Forensic Science,"* My presentation: *Preliminary Thoughts on the Effects of Heuristics and Cognitive Bias in Judicial Decisions about Forensic Science Evidence*

**2014**

June, 8-10, Fordham Law School, Faculty Roundtable (20-25) on Criminal Justice Ethics

July 10-12, International Legal Ethics Conference VI, Legal Ethics at a Time of Regulatory Change, in London, United Kingdom, City Law School London. Paper: *Losing Faith: The Ministers of Justice and the Prosecutorial Mindset*

**2013**

April, 2013, Society for the Evolutionary Analysis in Law, University of Pennsylvania Law School, *Fair Witness? Neuroscience, Law, and the Obsession with Deception*

January, 2013, AALS, Panel Chair and Moderator: Neuroscience & Evidence: The Science, The Scholarship, The Courtroom and The Classroom, New Orleans, LA

**2012**

December, 2012, Emory University Center for Neuroethics, *Use and Abuse of Neuroimaging in the Courtroom Consensus Conference*, Invited as Key Content Speaker and Participant in a Science, Law, and Ethics Conference.

June, 2012, *From Neuroselves to Neurosocieties*, Hampshire College (Interdisciplinary symposium on the role of neuroscience in society)

May, 2012, *The Judge Sam H. Bell Trial Advocacy Program*, Akron OH.  Topic: Expert Testimony

April, 2012, *Rehabilitating Lawyers: Perceptions of Deviance and its Cures in the Lawyer Reinstatement Process* (with Prof. Bruce Green) at: *The Law: Business or Profession? The Continuing Relevance of Julius Henry Cohen for the Practice of Law in the Twenty-First Century.* Conference at Fordham Law School

April, 2012, The American Academy of Economic and Financial Experts, Las Vegas, NV.  Expert Evidence

**2011**

November, 2011, Duquesne Law School.  Symposium: *The Establishment Clause in Context*, Symposium Moderator

October, 2011, Hampshire College.  Public Lecture.  Topic: *Intersecting Complexity: Neuroscience Lie Detection and the Legal Admissibility Matrix*

October, 2011, Hampshire College.  Faculty/Student Colloquium: *Scientific Evidence in the Courtroom: At the Crossroads of a Contentious Relationship*

June, 2011, Second Annual Prescription for Criminal Justice Forensics, hosted by the American Bar Association Criminal Justice Section and the Louis Stein Center for Law & Ethics at Fordham Law School, New York, NY.  Topic: *Forensic Science Ethics*

April, 2011, 2011 Innocence Network Conference: An International Exploration of Wrongful Conviction, Cincinnati, OH, Topic*: Judicial Gatekeeping of Forensic Science*

March, 2011, University of Denver School of Law Symposium on "Guilty Minds: Neuroscience & Criminal Law Symposium." Topic: *"Neurodeception Evidence: The Admissibility Matrix"*

**2010**

November, 2010, Duquesne University, Cause of Death: An Interdisciplinary Look at the State of Forensic Death Investigation: "Scientific and Legal Considerations in the

Investigation of Sudden, Suspicious, and Medically Unattended Deaths." (panel moderator)

October, 2010, Boston College Law School, Roundtable on ABA Revisions to the Prosecutorial and Defense Function Standards

October, 2010, Vanderbilt Law School, Roundtable on ABA Revisions to the Prosecutorial and Defense Function Standards

September, 2010, Ohio State Judges' Convention—Neuroscience of Deception

June, 2010, The Allegheny County Bench Bar Plenary Panel—Eyewitness Identification and Wrongful Conviction

March, 2010, American Psychology-Law Society, Vancouver, BC: *Testing For Deception*, Invited Panelist on the Opening Plenary Panel

March, 2010, *Is Football Bad for the Brain? Forensic Scientific, Medical-Legal and Societal Aspects of the Concussion Debate,* Wecht Institute of Forensic Science, Duquesne University, Pittsburgh, PA (panel moderator)


**2009**
November, 2009, Symposium Planning Committee and Group Leader, *Beyond Brady Disclosures in Criminal Cases: What Really Works*?, Jacob Burns Ethics Center, Cardozo Law School

September, 2009, *Does Forensic Science Need Fixing*? Symposium on the Report of the American Academy of Sciences on Forensic Science, Wecht Institute of Forensic Science, Duquesne University, Pittsburgh, PA (Conference Chair and Speaker)

September, 2009, Ohio State Judges' Convention—The New Judicial Ethics Rules

March, 2009, Symposium: *Report of the American Academy of Sciences on Forensic Science*, Cleveland Marshall School of Law, Cleveland, OH

February, 2009, Carnegie Mellon University, Symposium on Jay Aronson's book, GENETIC WITNESS

February, 2009, "*Whores of the Court* Revisited," American Association of Forensic Science Annual Meeting, Denver, Colorado (Behavioral Science in the US Courts: From the Salem Witchcraft Trials to *Daubert*)

January, 2009, Case Western University of Law, faculty colloquium, *Neuroimages of Deception and the Search for Evidential Truth*

**2007-2008**

September, 2008, Symposium Chair and Speaker, *Neuroscience, Law, and Government*, University of Akron School of Law, Akron OH

June, 2008, AALS Conference on Evidence, Panel Co-Chair with Prof. Dale Nance, Cleveland, OH

October, 2007, Symposium Moderator for *The New Face of Women's Legal History,* University of Akron School of Law, Akron, OH

July, 2007, Law & Society Conference: Chair of the Roundtable on *Rape, Affirmative Consent to Sex, and Sexual Autonomy*, Berlin, Germany

April, 2007, Faculty Colloquium, Cleveland Marshall College of Law—"*Misconvictions*: When Law & Science Collide"

April, 2007, Scientific Evidence, Ohio Judicial College presentation at the Annual Magistrates Conference

January, 2007, AALS Annual Meeting, Washington, D.C., Litigation Section, "Daubert and Scientific Evidence" Panel

**2005-2006**

June, 2006, ABA Intellectual Property Summer Meeting, Boston, MA (Legal Ethics)

February, 2005, Symposium, University of North Carolina: "*Howerton* and the Future of Scientific Evidence"

January, 2005, University of North Carolina Faculty Colloquium, "*Misconvictions, Science & the Ministers of Justice*"

January, 2005, AALS Annual Meeting, San Francisco, Evidence Section, "*Evidentiary Aspects of Wrongful Convictions*" Panel

**1998-2002**

July, 2002, Pennsylvania Conference of State Court Judges*: Evidentiary Privilege in Pennsylvania,* Hershey, PA

August, 2001, American Psychological Association Annual Meeting, Panelist on Syndrome Evidence, San Francisco, CA

October, 1998, Great Plains Tribal Judicial Training Institute, Evidentiary Issues in Child Sexual Abuse Cases, Program for Federal and Tribal Judges in Rapid City, South Dakota.

**Regional, State & Local Conferences and CLE Programs (through 2013)**

March 6, 2015, Wecht Institute of Forensic Science, Duquesne University, Pittsburgh, PA, Symposium: *Is Forensics Getting Fixed?* My presentation: *Forensic Science Evidence Five Years After the NAS Report—Legal and Ethical Considerations*

November, 2014  Dickie McCamey Chilcote Commercial Litigation CLE

March, 2013, Pennsylvania Association of Criminal Defense Lawyers, Pittsburgh PA: The Ethical Implications of Using Social Media

October, 2012, Be-Friending The Jury: The Legal and Ethical Implications of Using Social Media to Investigate Juries, Dickie McCamey Chilcote Commercial Litigation Program

May, 2012, Shaken Baby Syndrome Conference (Moderator), Duquesne University

March, 2012 Women in IP: Ethical Considerations in the Practice of Law, Jones Day LLC, Pittsburgh, PA

February, 2012, Neuroscience & Lie Detection, Wecht Institute Forensic Friday Program

October, 2011, Nemacolin Woodlands, Pennsylvania Academy of Trial Lawyers (update on Pennsylvania Ethics Issues)

March, 2011, Akron Law & Akron Bar Association: Criminal Procedure: Getting Better Seminar

February, 2011, Naples, FL, Akron Law Alumni Winter Institute (Evidence)

November, 2010, Duquesne University, Pittsburgh, PA, The Medical Marijuana Debate: Forensic Scientific and Legal Considerations (Panel Moderator)

April, 2010, Connecticut Bar Foundation, Hartford, CT: *New Technology and Legal Ethics*

April, 2010, Akron Bar Association: NAS Report on Forensic Science

February, 2010, Naples, FL, Akron Law Alumni Winter Institute (Evidence)

September, 2009, Detroit, MI: CJA panel lawyers: The NAS Report on Forensic Science

13

April, 2009, Philadelphia Akron Alumni (legal ethics)

May, 2008, Cuyahoga County Public Defenders (expert evidence)

June, 2007, Allegheny Bench Bar Conference, Program Planner and Moderator: "Breakfast with the Judges: Legal Advertising and Ethics"

January, 2007, Case Western School of Law, Professor Dale Nance's Class on Great Trials in American History:  Experts in the Salem Witchcraft Trials

December, 2005, Pennsylvania Association of Criminal Defense Lawyers (Ethics)

October, 2005, Community Legal Aid, Akron, OH (Persuasive legal writing)

December, 2004, Pennsylvania Association of Criminal Defense Lawyers (Ethics & Evidence)

March, 2004, Pennsylvania Association of District Attorneys (Expert Evidence)

December, 2003, Pennsylvania Association of Criminal Defense Lawyers (Ethics)

May, 2003, Allegheny County District Attorneys and Defenders: Experts and Ethics CLE,

May, 2003, Akron Bar Association Federal Courts Program on Evidence, Akron, OH

May, 2003, University of Akron Alumni Association, Professional Responsibility and Professionalism Update (with Dean William C. Becker)

May, 2002, University of Akron Alumni Association, Professional Responsibility and Professionalism Update (with Dean William C. Becker)

May, 2001, University of Akron Alumni Association, Professional Responsibility Update

November, 2000, ABA Intellectual Property Roundtable, Litigation Division, "Expert Testimony in Intellectual Property," Cleveland, OH

September, 1999, Pennsylvania Association of Criminal Defense Lawyers Annual Meeting (scientific evidence, federal and state)

October, 1999, Akron Bar Association (federal and state scientific evidence) Akron, OH

February, 1998, Akron, Ohio Inns of Court: Evidentiary Issues and Child Sexual Abuse

February, 1998, Akron Bar Association: Mental Health Disabilities under the Americans with Disabilities Act, Akron, OH

1996, Pennsylvania Association of Criminal Defense Lawyers: The Science of Memory and Eyewitness Identification, Pittsburgh, PA

1996, Massachusetts School of Law, Roundtable Symposium: Repressed Memory Andover, MA

**Interviews, media, blog references, and Op-Ed pieces**
WKSU radio (NPR Radio interview on the NAS Forensic Science Report)
RadioLab (neuroscience in the courtroom)
WCPN "Ideastream"—one hour panel discussion on the NAS Forensic Science Report
Christian Science Monitor (Insanity Defense and the "American Sniper" Trial
Mindsetshow.org (Insanity Defense and the "American Sniper Trial) iheart radio
WECB-FM Boston: Neuroscience Lie Detection and the Courts
New Scientist Magazine (UK)(in-depth story on our Neuroimaging Symposium)
ABA Journal (Oct. 2009 article on Neuroscience & Law—feature article)
Cleveland Plain Dealer (article on neuroscience conference that I chaired)
Tampa Tribune (2014)(insanity defense in mother's homicide of children trial)
Pittsburgh Post Gazette (multiple op-eds)
Governing Magazine
Washington Lawyer Magazine
Pittsburgh Post-Gazette (several interviews)
Pittsburgh Tribune-Review
Cleveland Bar Journal
Akron Legal News (lead article on neuroscience conference)
Akron School of Law Magazine (articles; cover story)
Duquesne School of Law Magazine
Duquesne University Magazine
Duquesne Jurist Magazine (interviews)
Stanford's Law & Bioscience Blog
CrimProf Blog
Deception Blog
Neuroethics Blog (Invited Symposium, 2014)
Legal Theory Blog
Evidence Prof Blog
SCOTUS blog (invited commentator on *Lafler v. Cooper*)
Life Sentences Blog
Judge Advocate General Legal Center and Law School Blog
Federal Public Defender Blog
Court Martial Trial Practice Blog
Law and Magic Blog
Trial Ad (And Other Notes) Blog

## **Prior Legal Employment**

1983-84 Clerkship, Massachusetts
Superior Court

1984-1987 –Associate
Parker, Coulter, Daley & White
Boston, Massachusetts
Civil Litigation

1987-1988—Associate
Tucker Arensberg
Pittsburgh, Pennsylvania
Civil Litigation

1988-1990—Proprietor
Law Offices of Jane Campbell Moriarty
Pittsburgh, Pennsylvania
Litigation and Appeals

1990-1991 Clerkship, Pennsylvania
Supreme Court (The Hon. Ralph
J. Cappy, Justice)

1992-1995—Special Counsel
Marcus & Shapira, LLC
Pittsburgh, Pennsylvania
Civil Litigation, Appeals, Securities
Fraud, Labor and Employment

1995-1996—Senior Attorney
Buchanan Ingersoll, LLC
Pittsburgh, Pennsylvania
Civil Litigation, Employment
Discrimination, and Appeals

1996-1997—Research and
Writing Specialist (Expert Evidence)
Federal Defenders' Office
Pittsburgh, Pennsylvania

# EXHIBIT B

**Expert Report of Professor Jane Moriarty**
*Documents Considered*

| | |
|---|---|
| 1 | Complaint in Equity, *Mylan v. Kirkland & Ellis*, 2:15-cv-00581 |
| 2 | Mylan Motion for Preliminary Injunction, *Mylan v. Kirkland & Ellis* |
| 3 | Declaration of Douglas Miner in Support of Motion for Preliminary Injunction |
| 4 | Kirkland & Ellis Opposition to Motion for Preliminary Injunction |
| 5 | Declarations in Support of Opposition to Motion for Preliminary Injunction |
| 6 | Declaration of Jill Ondos in Support of Motion for Preliminary Injunction |
| 7 | Supplemental Declaration of Douglas Miner in Support of Motion for Preliminary Injunction |
| 8 | Expert Declaration of John Coates in Support of Motion for Preliminary Injunction |
| 9 | Drafts and executed copies of Mylan-Kirkland & Ellis Engagement Letter |
| 10 | Addendum to Mylan-Kirkland & Ellis Engagement Letter |