# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MYLAN INC., MYLAN PHARMACEUTICALS INC., MYLAN TECHNOLOGIES INC. and MYLAN SPECIALTY LP,

              Plaintiffs,

           v.

KIRKLAND & ELLIS LLP,

              Defendant.

Civil Action No. 2:15-cv-00581-JFC-LPL

---

## [DEFENDANT KIRKLAND & ELLIS LLP'S PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to this Court's May 14, 2015 Order, Defendant Kirkland & Ellis, LLP ("Kirkland") hereby lodges the following [Proposed] Findings of Fact and Conclusions of Law.[1]

---

[1] Kirkland respectfully requests that the Court disregard the six declarations that Plaintiffs filed with their reply, to which Kirkland has had no opportunity to respond, and which directly implicate its burden of proof. Plaintiffs' Motion was unsupported by *any* specific facts (see Motion to Strike filed May 22, 2015). This District has long recognized that "the practice of 'sandbagging,' perhaps allowable in poker," is "not proper in a lawsuit" (particularly one seeking a drastic preliminary remedy appealing to the equity power of the Court). *Kane Gas Light & Heating Co. v. Pennzoil Co.*, 587 F. Supp. 910, 912-13 (W.D. Pa. 1984). *See also Alston v. Forsyth*, 379 F.App'x 126, 129 (3d Cir. 2010); *Karlo v. Pittsburgh Glass Works, LLC*, 880 F. Supp. 2d 629, 641-42 (W.D. Pa. 2012), class decertified in part, 2014 WL 1317595 (W.D. Pa. Mar. 3, 2014). This is particularly offensive when the relief sought here would effectively give the Plaintiffs all the relief they are requesting in the lawsuit. In the alternative, Kirkland respectfully requests leave to file rebuttal evidence, including rebuttal expert declarations.

## FINDINGS OF FACT

### This Action

1.      On May 1, 2015, Plaintiffs Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Technologies Inc., and Mylan Specialty LP filed a Complaint in Equity (the "Complaint") against Kirkland in the Court of Common Pleas of Washington County, Pennsylvania, Civil Division, entitled *MYLAN INC., MYLAN PHARMACEUTICALS INC., MYLAN TECHNOLOGIES INC., AND MYLAN SPECIALTY LP v. KIRKLAND & ELLIS LLP*, Case No. 2015-2377 (the "Action").

2.      On May 1, 2015, Plaintiffs filed a Motion for Preliminary Injunction (the "Motion").

3.      On May 1, 2015, Plaintiffs served the Complaint and Motion on Kirkland. (Kuhns Decl. ¶ 15.)

4.      On May 4, 2015, Kirkland timely removed this Action to the United States District Court for the Western District of Pennsylvania (the "Court").

### The Parties

5.      Mylan Inc., an indirect subsidiary of Mylan N.V., is a Pennsylvania corporation with its corporate headquarters in Canonsburg, Pennsylvania.  (Compl. ¶ 6.)

6.      Mylan Pharmaceuticals Inc., a wholly owned subsidiary of Mylan Inc., is a West Virginia corporation with its corporate headquarters in Morgantown, West Virginia.  (Compl. ¶ 7.)

7.      Mylan Technologies Inc., a wholly owned subsidiary of Mylan Inc., is a West Virginia corporation with its corporate headquarters in St. Albans, Vermont.  (Compl. ¶ 8.)

2

8.     Mylan Specialty LP, a wholly owned subsidiary of Mylan Inc., is a Delaware corporation with its corporate headquarters in Morgantown, West Virginia.  (Compl. ¶ 9.)

9.     Kirkland is a limited liability partnership organized under the laws of Illinois. (Notice of Removal ¶ 18.)  All equity partners of Kirkland are citizens of states of the United States or of foreign nations, and no equity partner of Kirkland is a citizen of Pennsylvania, West Virginia, Vermont, or Delaware.  (*Id.* at ¶ 19.)

### Mylan N.V.

10.     Mylan N.V. is a public limited liability pharmaceutical company organized in the Netherlands with its principal executive offices in Potters Bar, England.  (Fox Decl. ¶¶ 6, 11.)

11.     Mylan N.V. was originally incorporated as New Moon B.V., a Dutch private limited liability company.  On February 27, 2015, New Moon B.V. became a public company, and changed its name to Mylan N.V., in connection with its acquisition for $6.3 billion of the non-U.S. specialty and branded generic drug business of Abbott Laboratories, Inc. ("Abbott") and Mylan Inc.  In connection with that acquisition, 22% of Mylan N.V. shares were issued to Abbott, which did not own any stock in Mylan Inc.  Moreover, Mylan N.V. granted a call option for preferred shares that would allow the holder of that option (a foundation or stichting incorporated under Dutch law) a 50% voting interest if the foundation exercises that option. (Fox Decl. ¶¶ 6–7; Tan Decl. Ex. C, at 3, 5-6.)

12.     Mylan N.V. owns more than one hundred direct and indirect subsidiaries around the world.  (Fox Decl. ¶ 6.)

13.     Mylan N.V. and its subsidiaries have some 1400 marketed products.  (Shumsky Decl. ¶ 23.)

14.     Mylan N.V. is not a party to this litigation.

3

15.     Kirkland has never represented Mylan N.V. nor has it ever been asked to represent Mylan N.V.  (Fox Decl. ¶ 8; Shumsky Decl. ¶ 8; Kuhns ¶ 4.)

**Teva**

16.     Teva Pharmaceutical Industries Ltd. ("Teva") is a global generic and specialty pharmaceuticals company headquartered in Petach Tivka, Israel.  (Desheh Decl. ¶ 1.)

**The Kirkland Litigation Attorneys**

17.     Jay Lefkowitz is a litigation partner in the New York, NY office of Kirkland. (Lefkowitz Decl. ¶ 1.)  Mr. Lefkowitz represents a large number of Life Sciences companies, including pharmaceutical companies.  (Lefkowitz Decl. ¶ 2.)  He has successfully challenged a number of FDA decisions on behalf of pharmaceutical companies under the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355 *et seq*., as amended *inter alia* by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act"), in the D.C. District Court and D.C. Court of Appeals and has a large practice in this area.  (*Id.*)

18.     Michael Shumsky is a litigation partner in the Washington, DC office of Kirkland. (Shumsky Decl. ¶ 1.)  He is licensed to practice law in the State of Connecticut and the District of Columbia.  (*Id.*)  His practice focuses primarily on representing generic pharmaceutical manufacturers in litigation and regulatory matters relating to the Hatch-Waxman Act.  (*Id.* ¶ 3.)

**The Mylan Inc. In-House Litigation Attorneys**

19.     Jill Ondos is the Senior Vice President and Global General Counsel, Litigation, for Mylan Inc., where she has worked since 2003.  (Ondos Decl. ¶ 3.)   In her capacity as Global General Counsel, Ms. Ondos is responsible for all litigation and litigation-related matters for Mylan Inc.  (*Id.*)  Ms. Ondos graduated from law school in 1996, and was employed as an attorney with Eckert Seamans Cherin & Mellott, LLC from 1996 until July 2003.  (*Id.* ¶ 2.)

20.    Doug Miner is the Associate General Counsel, Commercial and Product Litigation, for Mylan Inc., where he has worked on non-patent litigation matters since 2008. (Miner Decl. ¶ 1.)  Mr. Miner graduated from the Columbia University School of Law and was admitted to the Bar of the State of California in 2001.  Mr. Miner was a panelist at the 2014 Antitrust Law Conference in Washington, DC, where he spoke on the antitrust implications of "pay-for-delay" reverse-payment settlements between branded and generic drug companies.

### Hatch-Waxman Litigation

21.    The Hatch-Waxman Act allows applicants to secure FDA approval for a generic version of a previously approved drug without conducting the same clinical trials that brand manufacturers typically must complete as a precondition to their products' approval.  Instead, where a generic applicant's Abbreviated New Drug Application ("ANDA") shows that its proposed generic drug has the same active ingredient as a previously approved brand-name drug and is bioequivalent to the previously approved brand-name drug (meaning that it delivers its active ingredient to patients at the same rate and to the same extent as the brand-name equivalent), the generic applicant is entitled to rely on the safety and efficacy data supplied by the brand manufacturer in its previously approved New Drug Application ("NDA").  (Shumsky Decl. ¶ 4.)

22.    Under the Hatch-Waxman, the first generic manufacturer that challenges a patent protecting the brand-name drug may receive a 180-day period of marketing exclusivity during which the FDA is barred from approving any other generic version of the same drug.  Congress intended this exclusivity reward to be an incentive for generic applicants to challenge competition-blocking patents, with the hope that such challenges would help open the marketplace to generic competition before brand manufacturers' patents are scheduled to expire.

Generic drug companies routinely seek to convince the FDA either that they are entitled to exclusivity or that one of their competitors is not entitled to such exclusivity.  Moreover, because generic applicants may lose their eligibility for 180-day exclusivity in certain circumstances, generic companies frequently seek to "trigger" the "forfeiture" of a competitor's 180-day exclusivity period so that they may enter the market earlier than the 180-day exclusivity period would allow.  (Shumsky Decl. ¶ 5.)

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

**The Engagement Agreement**

26.     In early January 2013, Mr. Lefkowitz sent a proposed engagement letter addressed to Ms. Ondos.  (Lefkowitz Decl. ¶ 9.)  Later, Ms. Ondos returned Mr. Lefkowitz's draft with comments, which Kirkland addressed.  (*Id.*)  Ms. Ondos accepted and executed the engagement letter dated January 9, 2013 with the conflict waiver on behalf of Mylan Inc., Mylan Technologies Inc. and Mylan Pharmaceuticals Inc.  (*Id.*)  Ms. Ondos was aware of Kirkland's adverse representation of Teva and other drug companies, and agreed those representations were not "related to" Kirkland's representation of Mylan Inc. or its affiliates.  (Ondos Decl. ¶¶ 6, 11).

27.     The engagement agreement dated January 9, 2013 ("Engagement Agreement") expressly limited Kirkland's representation to three entities—Mylan Inc., Mylan Technologies Inc., and Mylan Pharmaceuticals Inc.  (Lefkowitz Decl. ¶ 10, Ex. 1.)  The Engagement Agreement did not identify Mylan Specialty LP as a client, and Mylan Specialty LP has never been a client of Kirkland.  By that Engagement Agreement, the specified entities "agree[d] that [Kirkland's] representation is solely of Mylan Inc., Mylan Technologies, and Mylan Pharmaceuticals, and that no parent, subsidiary, affiliate, or other entity of person related to [them] has the status of client for conflict of interest purposes."  (Lefkowitz Decl., Ex. 1, at 3.) The purpose of this language was to clarify that no party other than those expressly identified

7

would be Kirkland's client, and to protect Kirkland and its other clients if the specified Mylan entities engaged in corporate acquisitions or changes in corporate form, which have been common in the pharmaceutical industry.  (Lefkowitz Decl. ¶ 10; Painter Decl. ¶¶ 31–32.)

28.    The Engagement Agreement also contained a conflict waiver (the "Conflict Waiver").    The Conflict Waiver defined and specifically permitted "Allowed Adverse Representation[s]," by Kirkland both currently and in the future.  For representations under the current Engagement letter, such Allowed Adverse Representations were defined as all "matters that are not related to (i) the legal services that [Kirkland] has rendered, is rendering or in the future will render to you under the Engagement."  For future engagements under a separate agreement, an Allowed Adverse Representation included any representation that was not related to "(ii) other legal services that [Kirkland] has rendered, is rendering or in the future will render to you or any of you affiliates **under a separate agreement**."  (emphasis added).  It is undisputed that there is no such separate agreement here.  Further, the engagement letter expressly provides:  "that no parent, subsidiary, affiliate or other person related to Mylan Inc., Mylan Technologies, and Mylan Pharmaceuticals has the status of client for conflict of interest purposes."  (Lefkowitz Decl., Ex. 1, at 3.)  Mylan Inc., Mylan Technologies Inc., and Mylan Pharmaceuticals Inc. also agreed in the Engagement Letter that any Allowed Adverse Representation would "not breach any duty that [Kirkland] owes to you or any of your affiliates."  (Lefkowitz Decl., Ex. 1, at 3.)

29.    These provisions protected Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies Inc. by ensuring that Kirkland would not accept an adverse matter regarding a product or project where Kirkland already was representing them.  (Lefkowitz Decl. ¶ 13.)  It also protected Kirkland by ensuring that the firm could continue its current representations, or

take on new representations, adverse to the Mylan entities and their affiliates as long as they did not involve the legal rights in the same products or project.  (Lefkowitz Decl. ¶¶ 14–15; Painter Decl. ¶ 24.)   Ms. Ondos approved this language, deleting only the word "substantially." (Lefkowitz Suppl. Decl. ¶ 3.)  Mr. Lefkowitz accepted her edit because he recognized that if the Engagement Agreement stated that Kirkland was only precluded from adverse representations "substantially related" to its legal services, it might be interpreted to allow Kirkland to take on representations adverse to the specifically identified Mylan entities — even with respect to a particular product (such as generic Lidocaine or Benicar) — so long as the legal services did not have substantial factual or legal overlap.  (*Id.* ¶ 5.)  Mr. Lefkowitz, however, never intended that the word "related" would be read so broadly.  He understood "related to" to require that if Kirkland was providing advice on a particular product or project, it would not undertake a representation adverse to that specific product regardless of whether the adverse representation overlapped with Kirkland's work.  (*Id.* ¶ 6.)

30.    The Engagement Agreement further provided that if Kirkland undertook an Allowed Adverse Representation, neither the fact that Kirkland represented the Mylan entities specified as clients, nor the "actual or possible possession of confidential information belonging to [Mylan Inc.] or its affiliates is a basis to disqualify [Kirkland] from representing another entity or person in any Allowed Adverse Representation (for the sake of clarity, this does not include possible or actual breaches of [Kirkland's] confidentiality obligations)."   (Lefkowitz Decl., Ex. 1, at 3; Painter Decl. ¶¶ 19–21.)  This language was intended to protect against any attempt by any Mylan entity to disqualify Kirkland from representing an adverse party based solely upon Kirkland's receipt of confidential information — unless the confidentiality of information was not being protected properly.  (Lefkowitz Decl. ¶¶ 14–15.)  If receiving confidences could alone

9

create relatedness in the legal services being provided in otherwise unrelated matters it would have been impractical for Kirkland to take on Mylan Inc. or any of its subsidiaries as clients.  (*Id.* ¶ 15.)

31.     The Engagement Agreement did not relieve Kirkland of the obligation to preserve any and all confidences Kirkland lawyers learned in the course of its representation of Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies Inc.  What those entities waived was the right to seek disqualification of Kirkland on any Allowed Adverse Representation based on the alleged disclosure of confidences to Kirkland.  (Lefkowitz Decl. ¶ 16.)

32.     The parties subsequently agreed to an April 9, 2013 addendum to the Engagement Agreement that modified the amount of fees that could be charged on the two matters. (Lefkowitz Decl. ¶¶ 21–22, Ex. 3.)   The addendum provided that "all other provisions of the Agreement shall continue to apply in full force and effect."  (Lefkowitz Decl. Ex. 3.)

### Kirkland's Limited Representation of Certain Mylan N.V. Indirect Subsidiaries

33.     Kirkland has represented Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies Inc. on only 8 molecules or products, which is one-half of one-percent (.05%) of Mylan N.V.'s indirect subsidiaries' combined product portfolio, and the representations involved specific legal issues.  (Shumsky Decl. ¶¶ 23–24.)

11





[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

50.    Mylan Inc. never mentioned any of the matters on which Kirkland worked in its SEC filings (except in a generic catch-all section on litigation and regulatory proceedings that Mylan Inc. itself said publicly were immaterial to Mylan Inc.'s value or financial results).  (Tan Decl., Ex. A (Mylan Inc. 2013 Annual Report on Form 10-K), at 3–14; Ex. B (Mylan Inc. 2014 Annual Report on Form 10-K), at 4–12.)  Mylan Inc.'s officers attested to the accuracy of that no materiality statement as part of the discharge of their Sarbanes-Oxley affirmation duties associated with the publication of those SEC filings.  (Tan Decl., Ex. F (Mylan Inc. 2013 Annual Report on Form 10-K Certification); Ex. G (Mylan Inc. 2014 Annual Report Form on 10-K Certification).)

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]



52.     Kirkland has not received any confidential information from its representation of Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies Inc. that involved commercial relationships and strategies.  (Shumsky Decl. ¶ 45.)

53.     Kirkland has not received any confidential information from its representation of Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies Inc. that involved pricing strategies across an enormous range of Mylan products or which would otherwise be relevant to an acquisition of Mylan N.V. by Teva.  (Shumsky Decl. ¶ 47.)

54.     Almost all of the information related to Kirkland's representation of Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies Inc. is now publicly available, outdated, or immaterial.  (Shumsky Decl. ¶¶ 30–43.)



56.     Kirkland has never represented Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Technologies Inc., or Mylan Specialty L.P. in corporate law matters, corporate financings, or corporate transactions, and Kirkland has never been asked to do so.  (Shumsky Decl. ¶ 24.)  No one at Kirkland has performed M&A work, SEC compliance work, financing work, executive compensation work, corporate governance work, restructuring work, tax work, or any other form of corporate or transactional work for Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc., or any other Mylan Inc. subsidiary (Kuhns Decl. ¶ 4.)  No one at Kirkland has provided any advice whatsoever to, or represented, the Board of Directors of Mylan N.V., Mylan Inc. or any of their subsidiaries.  (*Id*.)  No one at Kirkland has provided any advice to, or represented, Mylan N.V., Mylan Inc. or any of their subsidiaries regarding any of their Articles of Incorporation, Shareholder Agreements, Minutes of the Board of Directors, or filings with any U.S. or foreign department of corporations.  (*Id.*)

57.     Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies Inc. are sophisticated consumers of legal services, and have hired multiple, leading law firms to both provide corporate advice and pursue litigation on their behalf.  In the past two years, these firms have included Cravath, Swaine & Moore LLP, Skadden, Arps, Slate, Meagher & Flom LLP, Alston & Bird LLP, Connell Foley LLP, Morgan, Lewis & Bockius LLP, Munger, Tolles & Olson LLP, Perkins Coie LLP, Steptoe & Johnson PLLC, and Venable LLP.  (Tan Decl. ¶ 6.)

58.     Mr. Lefkowitz has not had any interaction with Mylan N.V. or with the Mylan Inc. Board of Directors or any of its non-legal senior management.  (Lefkowitz Decl. ¶ 35.) Mr. Shumsky has never met with any Board of Directors for any Mylan entity, or any non-legal member of any Mylan entity's executive management.  (Shumsky Decl. ¶ 56.)

16

59.     To date, none of Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. has terminated Kirkland's engagements, and Kirkland continues to actively represent Mylan Pharmaceuticals in the Benicar® matter.  (Shumsky Decl. ¶ 59.)

**Kirkland's Adverse Representations Before and After the Engagement**

60.     Both before and after the Engagement Letter, Kirkland represented Teva and its U.S. affiliates in matters directly adverse to Mylan Inc. or one of its subsidiaries.  (Shumsky Decl. ¶ 9.)

61.     In 2012, Kirkland represented Teva Pharmaceutical USA, Inc. in litigation directly adverse to Mylan Pharmaceuticals Inc. related to their respective versions of a generic Provigil® (modafinil).  (Shumsky Decl. ¶ 10-11.)  Mylan Pharmaceuticals Inc. never objected to Kirkland's representation.  (*Id.* ¶ 12.)

62.     In 2014, Kirkland represented Teva Pharmaceutical USA, Inc. in litigation directly adverse to Mylan Pharmaceuticals Inc. related to their respective versions of a generic Celebrex® (celecoxib).  (Shumsky Decl. ¶ 13.)  Mylan Pharmaceuticals Inc. never objected to Kirkland's representation.  (*Id.* ¶¶ 14-15.)

63.     In 2014, Kirkland represented Teva and Teva Neuroscience, Inc. in litigation against the FDA that directly affects and was adverse to Mylan Pharmaceuticals Inc. regarding those Teva entities' Copaxone® and Mylan Pharmaceuticals Inc.'s generic version.  (Shumsky Decl. ¶¶ 16, 18-19.)   Mylan Pharmaceuticals Inc. never objected to Kirkland's representation. (*Id.* ¶ 19.)

64.     Kirkland represented Teva Pharmaceutical Industries Ltd. and its affiliates in litigation directly adverse to Mylan Pharmaceuticals Inc. and Mylan Inc. regarding those Teva entities' Copaxone® and Mylan Pharmaceuticals Inc.'s generic version, which began in

November 2013 and thus after the specified Mylan entities first retained Kirkland in January 2013.  (Shumsky Decl. ¶ 20.)

65.    Kirkland has represented Teva Women's Health, Inc. in litigation directly adverse to Mylan Pharmaceuticals and Mylan Inc. regarding the drug Quartette®, and that adverse representation began after the Engagement Agreement was effective.  (Shumsky Decl. ¶ 21.)

66.    Kirkland has represented GlaxoSmithKline in litigation directly adverse to Mylan Inc.  (Shumsky Decl. ¶ 21.)

67.    Until this Action, Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies Inc., nor any other Mylan entity, had never objected to Kirkland's representation of matters directly adverse to them.  (Shumsky Decl. ¶ 22.)

68.    Until this Action, neither Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies Inc., had ever challenged the validity or scope of waiver of conflicts provision in their Engagement Agreement with Kirkland in the existing or new adverse matters.  (Shumsky Decl. ¶ 22; Lefkowitz Decl. ¶ 19.)

69.    Since Kirkland began representing Mylan Inc., Mylan Pharmaceuticals Inc., and Mylan Technologies Inc., Kirkland has been directly adverse to one or more of those entities in at least 6 federal lawsuits.  (Shumsky Decl. ¶ 23.)  These adverse representations — which no Mylan entity has ever objected to and several of which were ongoing at the time of the Engagement Agreement — have cost Mylan Inc. and its subsidiaries Mylan Pharmaceuticals Inc. and Mylan Technologies Inc. tens, if not hundreds, of millions of dollars.  (Shumsky Decl. ¶ 22.)

70.    In 2004, Kirkland represented Smith Kline Beecham Corporation in defending a major contract action brought by Mylan Inc. and Mylan Pharmaceuticals Inc.  (Painter Decl. ¶ 13.)  In the course of that representation, Kirkland lawyers cross-examined Ms. Ondos, the

same General Counsel for Litigation and IP of the Mylan entities who had negotiated the advance waiver on their behalf.  (Lefkowitz Decl. ¶ 18; Painter Decl. ¶ 13.)  Any no time did any Mylan entity voice an objection, even though this easily could have been argued to implicate confidences learned from Kirkland having worked directly with Ms. Ondos for more than a year. (Lefkowitz Decl. ¶ 18.)

### The Proposed New Engagement

19

80.    On January 16, 2015, Mylan Specialty L.P. filed a publicly available Citizen Petition in which the company formally asked the FDA to refrain from approving an ANDA referencing EpiPen® that had been filed by Teva USA on grounds "that the design and operating principles of the Teva proposed product differ significantly from those of the EpiPen® auto-injector" and that "[a]s discussed herein and in the experts' reports, the differences in design and operating principles of the EpiPen® and Teva auto-injectors are of a nature and magnitude that, without retraining or physician intervention, likely will prevent patients and caregivers trained on the EpiPen® auto-injector from safely and effectively using the Teva product in an emergency." (Shumsky Decl. ¶ 53, Ex. 7.)   Mylan Specialty L.P. fully disclosed its legal and regulatory strategy regarding EpiPen® in these public proceedings and it can no longer be considered confidential.  (*Id.*)

83.     On April 28, 2015, Mylan Specialty L.P. filed a publicly available supplemental Citizen Petition describing the details and results of the final study, whose preliminary design Mr. Miner had sent Mr. Shumsky.  (Shumsky Decl., ¶ 54, Ex. 8.)

### Mylan N.V.'s Offer to Acquire Perrigo

84.     On April 8, 2015, Mylan N.V. offered to acquire Perrigo Co Plc ("Perrigo"), an Irish pharmaceutical company, for about $29 billion in cash and stock.  (Tan Decl. ¶ 5, Ex. D (Mylan N.V. Schedule 14A Proxy), at 2-14.)  Perrigo rejected the offer.  (*Id.*)

85.     On April 24, 2015, Mylan N.V. offered to acquire Perrigo for about $34 billion in cash and stock.  (*Id.*)  Perrigo rejected the offer.  (*Id.*)

### Teva's Offer to Acquire Mylan N.V.

86.     By letter dated April 21, 2015 from Teva's CEO to Mylan N.V.'s Executive Chairman, Teva offered to engage in a transaction pursuant to which Teva would acquire Mylan N.V. at a substantial premium to its then stock price.  (Fox Decl. ¶¶ 9-10.)

87.     On April 27, 2015, Mylan N.V. responded to Teva's offer by letter and in a press release, both of which were issued from Mylan N.V.'s headquarters in Potters Bar, England. (Fox Decl. ¶ 11.)  Teva subsequently sent a detailed response letter to Mylan N.V. on April 29, 2015.  (*Id.* ¶ 12.)  Mylan N.V. rejected Teva's proposal to negotiate or otherwise provide its public shareholders an opportunity to consider Teva's proposal.  (*Id.* ¶¶ 11–13.)  All of the actions Mylan N.V. has taken in response to the Teva proposal have been solely in the name of Mylan N.V.  (*Id.* ¶ 14.)

### The Importance of the Lead Kirkland Transactional Attorney Representing Teva

88.     David Fox is a partner in the New York office of Kirkland.  (Fox Decl. ¶ 1.)  He is a member of the Bar of the State of New York.  (*Id.* ¶ 2.)  He joined Kirkland in 2009. (*Id.*)

Prior to joining Kirkland, he was a senior partner at Skadden, Arps, Slate, Meagher & Flom LLP in New York.  (*Id.*)  He has practiced law for more than 30 years, with a specific focus, and a developed expertise, in complex mergers and acquisitions, including contested and cross-border transactions.  (*Id.*)

89.    Mr. Fox has represented Teva in connection with a number of complex transactions.  (Fox Decl. ¶ 4.)  For example, he was the lead lawyer in connection with Teva's $6.8 billion acquisition in 2011 of Cephalon, Inc., a biopharmaceutical company.  (*Id.* ¶ 5.)  He has known Teva's senior executives, including its CEO and CFO, for many years.  (*Id.* ¶ 4.)  They have a close relationship built on a very high level of trust, familiarity, and respect.  (*Id.*; Desheh Decl. ¶ 13.)  Mr. Fox speaks Hebrew fluently, and is very familiar with the culture, business, and legal framework of Israel.  (Fox Decl. ¶ 4.)  He lived in Israel for seventeen years, obtained his law degree in Israel, and became a member of the Israeli bar in 1983.  (*Id.*)

### Kirkland's Representation of Teva in Connection with the Proposed Acquisition

90.    Kirkland first learned of the possibility of a proposed acquisition of Mylan N.V. by Teva in early April 2015, when Mr. Fox received a call from a senior executive at Teva asking him to lead a Kirkland deal team to advise Teva.  (Fox Decl. ¶ 15.)  This was the first time that anyone at Teva contacted Kirkland about anything related to a potential transaction involving Mylan N.V.  (*Id.*)

91.    Upon receiving the call, Mr. Fox followed Kirkland's standard conflict check procedures to confirm that a deal team at Kirkland could represent Teva while honoring Kirkland's ethical obligations to its other clients.  (*Id.* ¶ 16.)  The conflicts check confirmed that Mylan N.V. was not and has never been a client of Kirkland.  (*Id.*)

24

92.     Mr. Fox contacted Thomas Kuhns, Kirkland's General Counsel, to consult with him on whether Kirkland was permitted under ethical rules to accept the Teva representation. (Fox Decl. ¶ 17; Kuhns Decl. ¶ 4.)   Messrs. Fox and Kuhns concluded that Kirkland could properly represent Teva in connection with the proposed transaction.  (Fox Decl. ¶ 18; Kuhns Decl. ¶ 5.)  They reached this conclusion because (a) the proposed transaction was with Mylan N.V. only and involved an effort to acquire its common stock, and (b) the Engagement Agreement with Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies did not bar Kirkland from representing Teva.  (Fox Decl. ¶ 18; Kuhns Decl. ¶ 5.)

93.     Kirkland has a long-standing practice of establishing ethical walls between clients, and where necessary, between matters for the same clients.  (Kuhns Decl. ¶ 7.)  At the direction of Mr. Kuhns, Kirkland set up an ethical wall between attorneys who would work on the proposed transaction and attorneys who had worked on, who were working on, or who might in the future work on matters for Mylan Inc., Mylan Pharmaceuticals Inc. Mylan Technologies Inc. and (in an abundance of caution), Mylan Specialty L.P. (which was not a Kirkland client, but which Mylan Inc. claimed was a client).  (Fox Decl. ¶ 19; Kuhns Decl. ¶ 7.)

94.     Through implementation of the software program, "Wallbuilder," Kirkland attorneys working on the proposed transaction have no access to, or knowledge of, any electronic files, documents or materials received from or concerning any matters for the Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc., or vice-versa.  (Kuhns Decl. ¶ 7.)

95.     A screening memo was circulated to all Kirkland attorneys and staff on both the Teva and Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. teams, instructing each team that under no circumstances should the Teva team discuss any confidential aspects of the Firm's representation of Teva in the business combination matter with attorneys working on

25

matters for Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. (Kuhns Decl. ¶ 8.) Attorneys working on matters for Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. were told that under no circumstances should they discuss any confidential aspects of the Firm's representation of any such matter with the Teva team. (*Id.*) Attorneys on both teams were instructed to take all measures necessary or appropriate under the circumstances to prevent access by one team to files or information relating to matters handled by the other team. (Kuhns Decl. ¶ 9.)

96.     Since shortly after Kirkland was first retained by Teva in connection with the proposed transaction in April 2015, no attorney working on that matter has had any access to any files, documents or other materials from or concerning Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. — whether electronic or hard copy. (Kuhns Decl. ¶ 10.) No attorney working on any matters for Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. has had any access to or knowledge of any files, documents or other materials, whether electronic or hard copy, as it relates to the proposed transaction. (*Id.*)

97.     The ethical wall was reinforced by Mr. Fox's oral instruction from the outset to all members of the Kirkland deal team working on the proposed transaction that under no circumstances should they seek or obtain any information concerning Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. matters from any Kirkland lawyers who had previously represented them. (Fox Decl. ¶ 20.)

98.     Mr. Fox currently serves as the lead outside counsel in connection with the proposed transaction. (Fox Decl. ¶ 21.) His responsibilities include leading and supervising a large team of attorneys from Kirkland, as well as lawyers in the Netherlands. (Fox Decl. ¶ 22.) The proposed transaction involves the laws of the United States (where the securities of both

26

Mylan N.V. and Teva are traded), Israel, and the Netherlands.  (Fox Decl. ¶ 23.)  The laws of Ireland are also relevant because of Mylan N.V.'s efforts to acquire Perrigo.  (*Id*.)  Kirkland's work involves developing, implementing, and coordinating the complex legal strategies and operative corporate law principles worldwide.  (*Id.* ¶ 22.)  The Kirkland deal team is not responsible for, and does not advise on, valuation methodology.  (*Id.* ¶ 26.)  Kirkland's work is focused on a transaction with Mylan N.V.  (*Id.* ¶ 22.)  It is not directed at or focused on any of the hundreds of subsidiaries or indirect subsidiaries of Mylan N.V.  (*Id.*)  Nor is it focused on product-related litigation and or FDA regulatory matters involving products owned by Mylan N.V.'s indirect subsidiaries.  (*Id.* ¶ 24.)

### Teva's Financial Advisors

99.    Teva's financial advisors in connection with the proposed transaction are Barclays Capital, Inc. ("Barclays") and Greenhill & Co., Inc. ("Greenhill").  (Desheh Decl. ¶ 7; Brody Decl. ¶ 2; Contractor Decl. ¶ 2.)

100.    As part of their engagement, Barclays and Greenhill prepared financial analyses, projections and valuations.  (Desheh Decl. ¶ 8; Brody Decl. ¶ 3; Contractor Decl. ¶ 3.)

101.    In preparing their analyses, projections, and valuations, Barclays and Greenhill relied on publicly available information regarding Mylan N.V. and comparable companies and transactions.  (Desheh Decl. ¶ 9; Brody Decl. ¶ 3; Contractor Decl. ¶ 4.)  The analyses prepared by Teva were also based on public information concerning Mylan N.V.  (Desheh Decl. ¶ 9.)  Teva's senior executive management and financial advisors used this public information to assess the synergies that would result from the proposed transaction and to develop the bid price for Mylan N.V.  (Desheh Decl. ¶ 10; Brody Decl. ¶ 3; Contractor Decl. ¶ 4.)

102.     Neither Barclays nor Greenhill received, considered, relied upon, or had access to non-public information regarding Mylan N.V. or any of its subsidiaries or affiliates.  (Brody Decl. ¶ 3; Contractor Decl. ¶ 5.)

103.     Kirkland did not participate in preparing the financial analyses, projections, and models.  (Brody ¶ 4; Contractor ¶ 7.)

104.     Kirkland never provided to Teva, Greenhill, or Barclays any non-public information concerning Mylan N.V.'s or its subsidiaries' products, strategy, litigation risks, and business results or projections.  (Desheh Decl. ¶ 9; Brody Decl. ¶ 4; Contractor Decl. ¶ 5.)

105.     Neither Greenhill nor Barclay has prepared financial analyses, projections, or models regarding Mylan N.V.'s subsidiaries.  (Brody Decl. ¶ 6; Contractor Decl. ¶ 6.)

106.     Neither Greenhill nor Barclay has prepared financial analyses, projections, or models regarding specific products of Mylan N.V. or its subsidiaries.   (Brody Decl. ¶ 6; Contractor Decl. ¶ 6.)

### No Harm to Mylan Inc. or Any of Its Subsidiaries

107.     Mr. Lefkowitz has not shared any information in connection with his work for any Mylan entity outside of the relevant internal Kirkland teams handling the matters, has destroyed all information as requested by Mylan Inc., and has complied with Kirkland's ethical wall. (Lefkowitz Decl. ¶ 35.)

108.     Mr. Lefkowitz is not (and has not been) involved with work on the proposed acquisition of Mylan N.V. and has never shared any information related to any Mylan entity with the Teva acquisition team at Kirkland or anyone at Teva.  (Lefkowitz Decl. ¶ 36.)  Mr. Lefkowitz has billed no time to the Teva acquisition matter and has had no discussions with Teva's financial advisors on any topic.  (Lefkowitz Decl. ¶ 36.)  Mr. Lefkowitz has not discussed the

Firm's work for Mylan Inc., Mylan Pharmaceuticals Inc., Mylan Technologies Inc. with anyone at Teva. (*Id.*)

109.    Mr. Shumsky has never shared any putative confidential information he may have received from any of the representations of Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. at all outside of the members of the Kirkland team handling the matter. (Shumsky Decl. ¶ 56.)  Mr. Shumsky has not communicated with any member of the Kirkland team representing Teva in the proposed acquisition of Mylan N.V. concerning his representation of Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc. Mr. Shumsky has complied with Kirkland's ethical wall.  (*Id.*)  When he was asked to destroy electronic documents and to shred hard copy documents to prevent any unintentional sharing, Mr. Shumsky complied.  (*Id.*)  Mr. Shumsky has never communicated with Teva's financial advisors.  (*Id.*)

110.    Mr. Shumsky has not represented or advised Teva (or any Teva affiliate) in any way regarding Teva USA's proposed generic EpiPen® or the challenge raised in Mylan Specialty L.P.'s Citizen Petition.  (Shumsky Decl. ¶ 56.)

111.    All Kirkland lawyers who have been working on the proposed transaction have honored the ethical wall that was created, as well as Mr. Fox's oral instructions.  (Fox Decl. ¶ 20.)  At no time during its work on the proposed transaction has Kirkland ever relied upon, or even considered, information that was part of any representation of Mylan Inc., Mylan Pharmaceuticals Inc., or Mylan Technologies Inc.  (*Id.*)  No member of the Kirkland Teva deal team has received any confidential or non-public information relating to Mylan N.V. or any of its direct or indirect subsidiaries.  (*Id.* ¶ 26.)  In the past week, Mr. Kuhns has confirmed that no member of the Kirkland deal team has received any confidential or non-public information relating to Mylan N.V. or any of its direct or indirect subsidiaries.  (*Id.* ¶ 20.)

29

**The Harm to Kirkland and Teva**

112.    If the injunction requested by Plaintiffs were granted, it would be extremely difficult for Teva to secure new lead counsel with Kirkland's experience and expertise, particularly given Kirkland's prior transactional work for Teva.  (Fox Decl. ¶ 28; Desheh Decl. ¶ 14.)   This harm is particularly irreparable here, since Mr. Fox's fluency in Hebrew and familiarity with Israeli law and culture is of unique value to Teva in pursuing this highly complex cross border transaction.

113.    If the injunction requested by Plaintiffs is granted, Teva would have to start over with a new firm that has no knowledge of the strategic decision-making and analysis to date. (Desheh Decl. ¶ 16.)   Teva would have to educate new outside counsel on the complex issues involved in the proposed transaction, which would result in significant disruption and delay of the proposed transaction.  (*Id.*; Fox Decl. ¶ 27.)   This would prejudice Teva and Mylan N.V. shareholders as it would allow the Mylan N.V. board to delay any consideration of the Teva proposal to purchase the stock of Mylan N.V. shareholders at a premium.  (*Id.*)

114.    If the preliminary injunction requested by Plaintiffs is granted, it likely would have the effect of ousting Kirkland permanently from representing Teva in the potential acquisition of Mylan N.V.  (Fox Decl. ¶ 28.)

115.    If the preliminary injunction requested by the Plaintiffs is granted, it could adversely affect the individual reputations of the Kirkland transactional attorneys based of the underlying allegations of a breach of ethical obligations.  (Fox Decl. ¶ 28.)

## CONCLUSIONS OF LAW

### Standards for Granting a Preliminary Injunction to Disqualify Counsel

116.    Preliminary injunctive relief is an "extraordinary remedy, which only should only be granted in limited circumstances." *Ferring Pharm., Inc. v. Watson Pharm, Inc.*, 765 F.3d 205, 210 (3d Cir. 2014).

117.    It is Plaintiffs' burden to prove (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable injury in the absence of preliminary relief; (2) the balance of equities tip in their favor; and (4) an injunction is in the public interest. *Ferring Pharm.*, 765 F.3d at 210.

118.    Plaintiffs must establish all four factors and their failure to establish even one renders a preliminary injunction inappropriate. *NutraSweet Co. v. Vit-Mar Enters.*, 176 F.3d 151, 153 (3d Cir. 1999).

119.    Plaintiffs bear an additional burden to obtain injunctive relief because they are seeking a mandatory injunction that alters the status quo — to bar Kirkland for representing Teva in connection with its proposed acquisition of Mylan N.V. — and would thus provide substantially all of the remedy they are seeking in the lawsuit. *Ferring Pharm.*, 765 F.3d at 219 n.3; *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (3d Cir 1976).

120.    Disqualification, like that sought in this litigation, is a "harsh measure which is generally disfavored by the courts," and should not be granted when sought for tactical purposes. *Sauer v. Honeywell Bldg. Solutions SES Corp.*, 2012 WL 364050, at *2 (W.D. Pa. Feb 2, 2012).

### Plaintiffs Have Not Established A Likelihood Of Success On The Merits

**1.    Kirkland has breached no ethical duties to Mylan N.V.**

121.    Mylan N.V. does not have the status of a client of Kirkland based on Pa. R. Prof'l Conduct Rule 1.7 because the Engagement Agreement  specifically provided that no "parent" of Mylan Inc. would have the status of "client" for conflict purposes.  *See also* Model Rule 1.13; Pa. R. Prof'l Conduct 1.7 cmt. 34.

122.    Kirkland has violated no ethical duties to Mylan N.V.  Mylan N.V. is not, and never has been, a client of Kirkland and therefore Kirkland has no fiduciary, contractual, or ethical duties to Mylan N.V. to be breached by Kirkland.  *Reis v. Barley, Snyder, Senft & Cohen LLC*, 2012 WL 2422794, at *13-14 (E.D. Pa. June 27, 2012); *Guerrero v. Bluebeard's Castle Hotel Inc.*, 982 F. Supp. 343, 347 (D. V.I. 1997).

**2.    Kirkland Has Not Breached Any Ethical Or Contractual Duties to Its Clients: Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies Inc.**

123.    Kirkland has not breached any ethical duties to its clients Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies because the Engagement Agreement permits Kirkland to represent Teva in connection with its proposal to acquire the stock of Mylan N.V. and Kirkland has not breached its duties of confidentiality, nor is there any demonstrated risk of such a breach.

124.    The conflict waiver contained in the "Conflicts of Interest" section of the Engagement Agreement (the "Conflict Waiver") is valid and enforceable.  The waiver was agreed to by an "experienced user" of legal services that has employed many leading law firms. In agreeing to this waiver, Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies Inc. were represented by independent counsel Jill Ondos, an experienced head of all Mylan Inc.'s litigation.  The conflicts waiver was agreed to in the context of a then existing adversity between Teva and Mylan Inc. and its subsidiaries, where Teva was represented by Kirkland in litigation

relating to Mylan Inc. products.  PA Rule of Professional Conduct 1.7 comment 22; *Galderma Labs, L.P. v. Actavis Mid Atlantic LLC.*, 927 F. Supp. 2d 390, 403 (N.D. Tex. 2013).

125.    Kirkland's representation of Teva in connection with its proposal to acquire the stock of Mylan N.V. from its public shareholders does not constitute adversity to Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies Inc. and thus Kirkland's representation of Teva is not prohibited.  *Cf.* PA Rule of Professional Conduct 1.7 comment 6.

126.    Pursuant to the Conflict Waiver, only Kirkland's adversity to affiliates of Mylan Inc. that are themselves clients of Kirkland triggers the ability of Mylan Inc. under the Engagement Agreement to bar Kirkland from undertaking such matters that "relate" to Kirkland's legal services for Mylan Inc.  Nevertheless, in this case the representation of Teva seeking to acquire Mylan N.V. is not related to the litigation services provided by Kirkland to Mylan Inc., Mylan Pharmaceuticals Inc. or Mylan Technologies Inc.  Representation of the potential acquirer of the stock of Mylan N.V. that, if successful, would give the acquirer indirect control over Mylan N.V.'s subsidiaries, is not related to the legal services Kirkland has provided in litigation or related advice or regulatory proceedings seeking to enforce the intellectual property rights or other legal rights of its indirect subsidiaries in specific products.  It is not the "same transaction or legal dispute."  *See* PA Rule of Professional Conduct 1.9 comment 3.

127.    Plaintiffs' contention that nevertheless the engagements are related because Kirkland received confidential information that might be useful to Teva in valuing Mylan N.V. is legally insufficient on the following grounds:    (1) the Engagement Agreement prohibits disqualification of Kirkland based on its receipt of confidential information, without a showing (not made here) of a breach of the duty to preserve confidences through proof of an "actual breach" of confidentiality or a failure to adequately protect the information, thereby causing a

33

"possible breach"; (2) Plaintiffs have failed to meet their burdens to prove that (a) Kirkland received information material to Teva's proposal to acquire the stock of Mylan N.V. and that information was and is confidential and (b) Kirkland has breached its duties of confidentiality to its clients; and (3) the belated documents and declarations (expert and fact) filed by Plaintiffs in their reply lack the foundation or specificity to support a finding that the information provided Kirkland in connection with the product-based representations would be useful to Teva in its acquisition of the stock of Mylan N.V. from its public shareholders.  This is particularly true where, as herein, the specific and unequivocal declarations from Teva's financial advisors at Barclays and Greenhill make clear such information was not shared by anyone at Kirkland.

## Plaintiffs Have Failed to Establish Irreparable Harm

128.    Plaintiffs have failed to establish irreparable harm.  Plaintiffs' argument that "the potential disclosure of information disclosed in the course of the attorney-client relationship constitutes irreparable harm" is incorrect.  *Continental Grp v. Amoco Chemicals Corp.*, 614 F.2d 351, 358-59 (3d Cir. 1980).

129.    Plaintiffs have failed to rebut in any manner Kirkland's evidentiary showing that all of the putative confidential information obtained by Kirkland in its representations of Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies Inc. (even assuming materiality to the proposed acquisition of Mylan N.V.), has been destroyed or protected from improper disclosure by robust and properly enforced ethical walls, and has not, and will not, be given or otherwise used by Teva, its financial advisors, or the Kirkland team representing Teva in the proposed acquisition.  *Continental Grp.*, 614 F.2d at 358-59; *CenTra, Inc. v. Estrin*, 639 F. Supp. 2d 790, 815-17 (E.D. Mich. 2009).  The failure to demonstrate with admissible evidence a meaningful

34

risk of improper disclosure and use of confidential information requires denial of the motion for a preliminary injunction. *Id.*

130.    This failure to show that Kirkland had access to or learned non-public confidential information, including "corporate strategies or defensive tactics during the course of its narrowly focused work" for Mylan, is fatal to its claim. *See Air Prods. & Chems., Inc. v. Airgas, Inc.* No. 5249-CC, at *11 (Del. Ch. Mar. 5, 2010) (TRANSCRIPT) (attached as Exhibit A to Notice of Supplemental Authority, Dkt. No. 67-1). In *Airgas*, the Delaware Court of Chancery denied a motion to disqualify a law firm, Cravath, Swaine & Moore, from representing Air Products in its proposed acquisition of Airgas. (Cravath is representing Mylan on its response to the proposed Teva transaction). Like here, "Airgas ha[d] not demonstrated even simply persuasively, let alone clearly and convincingly, that it would be disadvantaged by the presence of its former counsel as advocate for its opponent, Air Products." *Id.* at *10.

131.    The facts and findings in *Airgas* demonstrate that Plaintiffs have failed to meet their burden of showing irreparable harm. There, the court did not find any harm to Airgas even though Cravath had represented Airgas in debt financings — which are clearly more "related" to corporate matters than the purely litigation and regulatory work done by Kirkland for the Mylan entities. This was because Cravath's representation of Airgas over the course of eight years was "*limited in scope and nature*, confined to advising Airgas regarding the completion of debt financings, and *involved neither contact nor advice regarding corporate governance, litigation matters, charter or by-law issues, merger and acquisition advice, defensive tactics or corporate counseling*." *Id.* at *11 (emphasis added). Furthermore, as here, "Cravath did not counsel or meet with the most senior Airgas executives or the Airgas board of directors, and Airgas, in fact, had other long-standing counsel advising it on litigation, corporate governance and mergers and

acquisitions issues." *Id.*   Additionally, "[e]ven if Cravath had access from its earlier representation to information that might be relevant to [the proposed acquisition], it ha[d] represented to [the Delaware court] that it ha[d] no intention of using such information, and as is customary, Cravath has erected an ethical wall" to seal off Cravath attorneys who had worked on the Airgas debt financings from Cravath attorneys who had worked on the Air Products proposed transaction with Airgas. *Id.* at *11–12.

132.   Those same facts are present in this case.  Kirkland has done only specialized litigation and regulatory work among many other leading law firms for Mylan Inc., Mylan Pharmaceuticals Inc. and Mylan Technologies Inc.   This conclusion is reinforced by two undisputed facts in this case not present in *Airgas*:  Mylan N.V. is not a client, and unlike the situation here, Kirkland has an Engagement Agreement that expressly allows Adverse Representations.

133.   Thus, "[g]iven the absence of any credible threat of prejudice," Plaintiffs have failed to show irreparable harm, and so "disqualification of [Kirkland] is not necessary to protect the integrity or the fairness of the proceedings . . . or to maintain public confidence in the judicial system." *See id.* at *12-13.

**The Balance of Equities Favor Denying the Motion for Preliminary Injunction**

134.   The balance of equities and hardships also favors denying the motion for preliminary injunction.  As set forth above, Plaintiffs' failure to show an actual or a significant risk of harm, combined with the evidence by Kirkland of its commitment and successful steps to maintain any and all client confidences of Plaintiffs, establishes that Plaintiffs will suffer no hardship from the denial of the preliminary injunction.

135.     On the other hand, Kirkland has demonstrated hardship to Teva, and Kirkland itself.  The record establishes that due to (1) the unique capabilities and experience of Kirkland's lead counsel for Teva, David Fox, with close working and personal relationships with senior Teva management, who speaks Hebrew, lived in Israel for nearly 20 years, and obtained his law degree there, (2) the extraordinary complexity of the cross-border international nature of this transaction, including the laws of multiple jurisdictions, (3) the urgency of the timing issues regarding the potential acquisition, and (4) the considerable work and effort put in by Kirkland to date, disqualifying Kirkland would cause substantial harm to Teva.  *CenTra,* 639 F. Supp. 2d at 817; *see also Airgas*, No. 5249-CC, at *12 ("Disqualification of Cravath, which has been the long-time counsel to Air Products on a wide range of matters, including mergers and acquisitions, would be a serious blow, forcing Air Products to search out and retain new counsel in the heat of an already launched hostile acquisition contest.").   Further, the hardship imposed on Kirkland would be immediate and lasting.  This is not merely "preliminary" relief.  There would be no practical way to restore the status quo if Kirkland is barred from representing Teva and new lawyers were hired and had to attempt to duplicate Kirkland's work.  The fact that this proceeding is essentially a trial on the merits, and Plaintiffs' evidentiary showing was made virtually solely on reply also weighs in this factor, as the procedural fairness of the proceeding is even more meaningful given that this is essentially final relief, with no showing of actual or imminent harm.  Kirkland and its individual lawyers could also be subject to business and reputational harm from the disqualification, again with no showing of actual misuse of confidential information.

### Granting of a Preliminary Injunction Would Not be in the Public Interest

136.    Courts "should pay particular regard for the public consequences of employing the extraordinary remedy of injunction." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008).   Courts should also be cautious in becoming involved in the internal business affairs of parties through issuance of a preliminary injunction.  *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 167 (3d Cir. 1999).   The record on this motion establishes that the underlying purpose of the motion for preliminary injunction is to hinder Teva's efforts to acquire the stock of Mylan N.V., and could affect the interests of several large international conglomerates, and public shareholders all over the world, including by providing Mylan N.V. additional leverage and time in its negotiations.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 396 (2006). These factors weigh against granting the requested preliminary injunction.

### Plaintiffs' New Evidence Will Be Disregarded

137.    This District has long recognized that "the practice of 'sandbagging,' is "not proper in a lawsuit." *Kane Gas Light & Heating Co. v. Pennzoil Co.*, 587 F. Supp. 910, 912-13 (W.D. Pa. 1984) ("[T]he presentation of additional evidentiary material in the reply brief was improper . . . all evidentiary material should be filed with the motion; to allow this practice would be to permit a practice of 'sandbagging', perhaps allowable in poker, but not proper in a lawsuit.").   It is improper to consider evidence first submitted in reply if such evidence "could otherwise have been raised opening brief."   *Karlo v. Pittsburgh Glass Works, LLC*, 880 F. Supp. 2d 629, 642 (W.D. Pa. 2012), class decertified in part, 2014 WL 1317595 (W.D. Pa. Mar. 3, 2014); *see also INVISTA N.A. S.A.R.L. v. M&G USA Corp.*, 951 F. Supp. 2d 626, 651 (D. Del. 2013) (striking new expert report submitted with reply brief); *Cf. Alston v. Forsyth*, 379 F.App'x 126, 129 (3d Cir. 2010) ("There is cause for concern where a movant presents new

arguments or evidence for the first time in a summary judgment reply brief, particularly if the District Court intends to rely upon that new information in granting summary judgment to the movant."). "[R]eply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion." *Karlo*, 880 F. Supp. 2d at 642. Therefore, "[o]nce a plaintiff has had a chance to prove a fact, he cannot reopen the matter simply by stating that he wishes to introduce more or better evidence." *Id.* (internal quotations omitted). Nor may the moving party "shift gears and introduce new facts or different legal arguments in the reply brief than [those that were] presented in the moving [papers]." *Id.* at 641 (internal quotations omitted).

138.    Plaintiffs' filing of six new declarations and thirty-four new exhibits with their reply brief was improper. None of this information was new. All of it was available or accessible to Plaintiffs when they filed their Motion in the proceedings in state court and when they re-filed it here. Plaintiffs knew that Ms. Ondos, not Mr. Miner, had signed the Engagement Agreement. Yet, they elected to file a single declaration from Mr. Miner. Moreover, it is clear that Plaintiffs engaged the three experts and began working on their declarations long before Kirkland filed its opposition papers on May 20, 2015. If Plaintiffs thought that expert testimony was relevant, they should have submitted that testimony with their Motion. Likewise, if Plaintiffs though the exhibits attached to the Mollick declaration were relevant, they should have submitted them with their Motion. They did not. Had Plaintiffs submitted this new evidence with their Motion, Kirkland could have responded. Instead, by waiting until reply, they denied Kirkland an opportunity to respond. *See, e.g.*, *D'Aiuto v. City of Jersey City*, 2007 WL 2306791, at *4 n.1 (D.N.J. Aug. 8, 2007) ("Because Plaintiff has been denied an opportunity to respond to the new arguments raised in Amtrak's reply . . .this Court will not consider them in ruling on the

pending motion to dismiss.").   The Court will therefore disregard all six declarations and the attachments thereto.

139.   The Motion for Preliminary Injunction is therefore denied.

Dated:  May 25, 2015                         Respectfully submitted,

                                             K&L GATES LLP


                                             By:_____/s/ Richard W. Hosking_____
                                                   Richard W. Hosking, PA 32982
                                                   Melissa J. Tea, PA 80195
                                                   K&L GATES LLP
                                                   210 Sixth Avenue
                                                   Pittsburgh, Pennsylvania  15222-2613
                                                   Telephone:  (412) 355-6500
                                                   Facsimile:  (412) 355-6501
                                                   richard.hosking@klgates.com
                                                   melissa.tea@klgates.com


                                             GIBSON, DUNN & CRUTCHER LLP

                                                   Kevin S. Rosen (admitted pro hac)
                                                   Daniel S. Floyd (admitted pro hac)
                                                   GIBSON, DUNN & CRUTCHER LLP
                                                   333 South Grand Avenue
                                                   Los Angeles, CA  90071-3197
                                                   Telephone:  (213) 229-7000
                                                   Facsimile:  (213) 229-7520
                                                   KRosen@gibsondunn.com
                                                   DFloyd@gibsondunn.com

                                             Counsel for Defendant,
                                             Kirkland & Ellis LLP