IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MYLAN INC., MYLAN PHARMACEUTICALS, INC., MYLAN TECHNOLOGIES, INC. and MYLAN SPECIALTY, LP, <br><br>           Plaintiffs, <br><br>   v. <br><br> KIRKLAND & ELLIS LLP, <br><br>           Defendant. | Civil Action No. 2:15-cv-00581-JFC-LPL |

**OBJECTIONS OF DEFENDANT KIRKLAND & ELLIS LLP
TO REPORT AND RECOMMENDATION
ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

I.    OVERVIEW .................................................................................................. 1

II.   BACKGROUND ........................................................................................... 6

      A.    Kirkland's Limited Representation Of Three Mylan Entities ................. 6

      B.    Kirkland's Previous Involvement In The Teva/Mylan N.V. Transaction ............. 9

III.  STANDARD OF REVIEW ........................................................................ 10

IV.   ARGUMENT ............................................................................................. 11

      A.    KIRKLAND'S REPRESENTATION OF TEVA PRESENTED NO
            CONFLICT OF INTEREST, AND THE R&R'S CONCLUSION TO THE
            CONTRARY IS BASED ON A LEGALLY ERRONEOUS
            INTERPRETATION OF RULE 1.7 .................................................... 11

            1.    Kirkland's Representation Of Teva Was Not "Directly Adverse"
                  To The Mylan Clients .............................................................. 12

                  a.    Economic Impact On An Indirect Subsidiary Does Not Create
                        Direct Adversity ............................................................. 12

                  b.    Corporate Distinctions Cannot Be Ignored When Analyzing
                        Direct Adversity ............................................................. 15

                  c.    The R&R's Wholesale Substitution Of A "Related To"
                        Standard In Place Of Direct Adversity Is Legally Erroneous ........... 17

            2.    Kirkland's Representation Of Teva Did Not Materially Limit Its
                  Representation Of The Subsidiaries .......................................... 20

      B.    THE CONFLICT WAIVER IS VALID ............................................... 21

            1.    The R&R Ignores The Context Of The Engagement Agreement,
                  Which Confirms That There Was "Informed Consent" ................ 21

            2.    The R&R Ignores The Content Of The Engagement Agreement To
                  Avoid The Obvious Fact That The Conflict Waiver Is Applicable. .......... 26

                  a.    "Related To Legal Services" ........................................... 26

                  b.    "Affiliates" .................................................................... 32

      C.    INJUNCTIVE RELIEF IS NOT WARRANTED ................................ 36

            1.    Reasonable Likelihood Of Success .......................................... 36

**TABLE OF CONTENTS**
(continued)

Page

2.    Irreparable Injury ..................................................................37

    a.   A Mandatory Injunction Would Be Unlawful.................................... 37

    b.   A Prohibitory Injunction Is Now Moot ............................................. 41

3.    Balance Of Hardships ..........................................................42

V.    CONCLUSION.......................................................................................... 45

## TABLE OF AUTHORITIES

Page(s)

## Cases

*15192 Thirteen Mile Rd. v. City of Warren*,
   593 F. Supp. 147 (E.D. Mich. 1984)................................................................ 42

*Akerly v. Red Barn Sys.*,
   551 F.2d 539 (3d Cir. 1977) ........................................................................... 39

*Alford v. Frontier Enters., Inc.*,
   599 F.2d 483 (1st Cir. 1979)........................................................................... 16

*Behunin v. Dow Chem. Co.*,
   642 F. Supp. 870 (D. Colo. 1986)............................................................... 40, 45

*Burgess v. United States*,
   553 U.S. 124 (2008)........................................................................................ 25

*Cecala v. Newman*,
   532 F. Supp. 2d 1118 (D. Ariz. 2007) ........................................................... 26

*Celgene Corp. v. KV Pharm. Co.*,
   No. 07-4819SDW, 2008 WL 2937415 (D.N.J. July 29, 2008) ..................... 24, 25

*CenTra, Inc. v. Estrin*,
   639 F. Supp. 2d 790 (E.D. Mich. 2009)....................................................... 19, 43

*Chesapeake Shipping, Inc.*,
   932 F.2d 218 (3d Cir. 1991) ........................................................................... 25

*Conair Corp. v. Old Dominion Freight Line, Inc.*,
   22 F.3d 529 (3d Cir. 1994) ............................................................................. 32

*ContiMortgage Corp. v. Mortgage Am., Inc.*,
   47 F. Supp. 2d 575 (E.D. Pa. 1999) ............................................................... 32

*Continental Grp. v. Amoco Chems. Corp.*,
   614 F.2d 351 (3d Cir. 1980) ........................................................................... 39

*CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*,
   381 F.3d 131 (3d Cir. 2004) ........................................................................... 32

*Doe v. Reg'l Sch. Unit No. 1*,
   No. 2:11-cv-25, 2013 WL 492540 (D. Me. Feb. 7, 2013)............................. 20

*Dole Food Co. v. Patrikson*,
   538 U.S. 468 (2003)........................................................................................ 15

*EEOC v. Orson H. Gygi Co.*,
   749 F.2d 620 (10th Cir. 1984) ....................................................................... 40

*Elliott v. Kiesewetter*,
   98 F.3d 47 (3d Cir. 1996) ............................................................................... 11

*Engelhard Corp. v. NLRB*,
   437 F.3d 374 (3d Cir. 2006) ........................................................................... 32

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Essex Chem. Corp. v. Hartford Accident & Indem. Co.*,
993 F. Supp. 241 (D.N.J. 1998) ................................................................ 41

*Estate of Cowart v. Nicklos Drilling Co.*,
505 U.S. 469 (1992) ................................................................................ 32

*Ferring Pharm., Inc. v. Watson-Pharm., Inc.*,
765 F.3d 205 (3d Cir. 2014) ..................................................................... 41

*First Wis. Mortg. Trust v. First Wis. Corp.*,
584 F.2d 201 (7th Cir. 1978) .................................................................... 40

*Fund of Funds, Ltd. v. Arthur Andersen & Co.*,
567 F.2d 225 (2d Cir. 1977) ..................................................................... 36

*Galderma Labs., L.P. v. Actavis Mid Atl. LLC*,
927 F. Supp. 2d 390 (N.D. Tex. 2013) ........................................... 24, 25, 26

*GEM Holdco, LLC v. Changing World Techs., L.P.*,
46 Misc. 3d 1207(A)  (N.Y. Sup. Ct. Jan. 9, 2015) ..................................... 25

*IBM Corp. v. Levin*,
579 F.2d 271 (3d Cir. 1978) ................................................................ 38, 39

*In re Caesars Entm't Operating Co.*,
No. 15-01145 (Bankr. N.D. Ill. May 28, 2015) ......................................... 15

*In re IPO Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001) ......................................................... 26

*Instant Air Freight Co. v. CF Air Freight, Inc.*,
882 F.2d 797 (3d Cir. 1989) ..................................................................... 43

*Janus Capital Grp. v. First Derivative Traders*,
131 S. Ct. 2296 (2011) ............................................................................ 16

*Kaleta v. Clausi*,
No. 4:12-cv-1987, 2013 WL 1804203 (M.D. Pa. Apr. 29, 2013) ................ 20

*Lesko v. Frankford Hosp.-Bucks Cnty.*,
15 A.3d 337 (Pa. 2011) ............................................................................ 33

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
874 F. Supp. 2d 169 (S.D.N.Y. 2012) ....................................................... 28

*Lorber v. Winston*,
No. 12-cv-3571, 2012 WL 5989464 (E.D.N.Y. Nov. 29, 2012) .................. 38

*Manoir-Electroalloys Corp. v. Amalloy Corp.*,
711 F. Supp. 188 (D.N.J. 1989) ................................................................ 40

*Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*,
602 A.2d 1277 (Pa. 1992) ........................................................................ 44

iv

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Marshall v. Sobina,*
No. 10-169, 2013 WL 5351554 (W.D. Pa. Sept. 24, 2013)...................................................... 42

*Motorola Mobility LLC v. AU Optronics Corp.,*
775 F.3d 816 (7th Cir. 2014) ...................................................... 16

*Pacemaker Yacht Co. v. NLRB,*
663 F.2d 455 (3d Cir. 1981) ...................................................... 30

*Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.,*
913 F.2d 64 (3d Cir. 1990) ...................................................... 42

*Punnett v. Carter,*
621 F.2d 578 (3d Cir. 1980) ...................................................... 43

*Reddick v. Justice,*
No. 2:13-cv-3379, 2014 WL 4079355 (D.S.C. Aug. 14, 2014) ........................................... 42

*United States v. Bestfoods,*
524 U.S. 51 (1998) ...................................................... 16

*United States v. DeMichael,*
461 F.3d 414 (3d Cir. 2006) ...................................................... 38

*United States v. Hoffecker,*
530 F.3d 137 (3d Cir. 2008) ...................................................... 38

*United States v. Munsingwear,*
340 U.S. 36 (1950)...................................................... 42

*United States v. Raddatz,*
447 U.S. 667 (1980) ...................................................... 10

*Wagner v. Lehman Bros. Kuhn Loeb, Inc.,*
683 F. Supp. 189 (N.D. Ill. 1987) ...................................................... 38

*Williams v. Apfel,*
98 F. Supp. 2d 625 (E.D. Pa. 2000) ...................................................... 10

*Williams v. Curtiss-Wright Corp.,*
681 F.2d 161 (3d Cir. 1982) ...................................................... 11

*Yeager v. Reliance Standard Life Ins. Co.,*
88 F.3d 376 (6th Cir. 1996) ...................................................... 32

## Statute

28 U.S.C. § 636(b) ...................................................... 10

## Other Authorities

ABA Formal Op. 05-434 ...................................................... 13

ABA Formal Op. 05-435 ...................................................... 13, 14

## TABLE OF AUTHORITIES
(continued)

Page(s)

ABA Formal Op. 05-436 ........................................................................... 24, 25

ABA Formal Op. 95-390 .................................................................. 12, 13, 16, 17

Restatement (Third) of the Law Governing Lawyers § 122 cmt. c(i) (2000) ............................. 24

### Rules

Fed. R. Civ. P. 65(d) ............................................................................... 42

Fed. R. Civ. P. 72(b)(3) ............................................................................ 10

Pa. R. Prof'l Conduct 1.0 .......................................................................... 24

Pa. R. Prof'l Conduct 1.6 ................................................................... 19, 20, 42

Pa. R. Prof'l Conduct 1.7 ........................... 11, 13, 14, 17, 18, 19, 20, 24, 29, 36

Pa. R. Prof'l Conduct 1.9 .......................................................................... 18

# I.  OVERVIEW

In April 2015, when Kirkland & Ellis LLP was asked by its longstanding client Teva Pharmaceuticals Industries, Ltd. to represent Teva in connection with its interest in acquiring Mylan N.V., Kirkland conducted a detailed conflicts check to confirm that it was able to do so. Kirkland's diligence revealed that:

- Teva's intended acquisition focused exclusively on Mylan N.V., a Dutch corporation head-quartered in England, and Kirkland had never represented Mylan N.V. in any capacity.

- Although Kirkland represented three entities that since had been acquired by, and had become indirect subsidiaries of, Mylan N.V., the Engagement Agreement with those three clients expressly limited Kirkland's representation only to those entities—and not any of their current or future parents, affiliates, or subsidiaries.

- The legal services Kirkland provided to the three indirect subsidiaries dealt with discrete issues involving exclusivity periods for specific drugs under the Hatch-Waxman Act and FDA regulations, contract analysis, and a small amount of intellectual property work.

- The Engagement Agreement included an express conflict waiver allowing Kirkland to represent any client in matters adverse to the three Mylan indirect subsidiaries so long as such representation was not related to Kirkland's "legal services" to the three entities.

- The legal services provided to the three Mylan entities were not related to legal services Kirkland would provide regarding Teva's proposed acquisition of Mylan N.V.

- Kirkland contractually agreed to protect the confidences of the three Mylan entities, and those three entities in turn agreed not to seek Kirkland's disqualification on the ground that Kirkland lawyers learned confidential information in representing them, even if that information would be relevant to Kirkland's adverse representation of another client.

Because Mylan N.V.—the target of the proposed acquisition—had *never* been a Kirkland client, and because the three indirect subsidiaries that were Kirkland clients had agreed to waive any conflicts as described above, Kirkland concluded unsurprisingly that it was free to represent Teva in the transaction.  The referenced waiver was part of the Engagement Agreement Kirkland had negotiated with Jill Ondos—the Mylan entities' highly experienced Senior Vice President and Global General Litigation Counsel.  At that time, Kirkland lawyers had told Ms. Ondos that

Kirkland represents many pharmaceutical companies in regulatory, litigation, and transactional settings, and that Kirkland already represented (and anticipated future representation of) several clients—including Teva—adverse to the Mylan entities.  Thus, the Kirkland lawyers explained, Kirkland would be unable to represent any of the entities unless they agreed to waive in advance all conflicts in matters not related to Kirkland's legal services for them.  By so agreeing, the Mylan entities secured Kirkland's otherwise unavailable Hatch-Waxman Act FDA expertise.

In the two years following execution of the waiver, Kirkland represented numerous clients adverse to the three Mylan indirect subsidiaries—in cases involving drugs with more than $1 billion dollars in annual revenue.  Indeed, in one of those cases, Kirkland lawyers cross-examined Ms. Ondos herself.  At no time did any Mylan entity ever challenge the validity of the waiver or the propriety of Kirkland's representing other industry clients in major matters directly adverse to the Mylan entities.

Despite all of this, after Teva announced its intention to acquire Mylan N.V., the three Mylan indirect subsidiaries proceeded to do exactly what they had promised to refrain from doing:  They filed suit to enjoin Kirkland from representing Teva in the transaction involving their new indirect parent, basing their claim on the argument that Kirkland had learned confidences from the three Mylan entities that could be relevant to Teva's attempted acquisition of Mylan N.V. (an indisputable non-client).  This Court referred the matter to Magistrate Judge Lenihan, who set a schedule for submission of briefs and declarations (a schedule Plaintiffs gamed by holding back virtually all of their declarations until filing their Reply on late Friday afternoon of Memorial Day weekend, with oral argument set for that Tuesday).  After briefing and oral argument, the Magistrate Judge issued a Report and Recommendation ("R&R") concluding that

Kirkland's representation of Teva constituted a "conflict of interest" despite the indirectness of any possible impact on any Kirkland client and despite the conflict waiver.

The R&R recommends not only that Kirkland be enjoined from representing Teva in the proposed acquisition, but also (despite Plaintiffs' having never even briefed the issue) recommends an unprecedented injunction compelling Kirkland to somehow retrieve its past work product from Teva. In so doing, the R&R fails to address controlling authority and deems "immaterial" the uncontested evidence that (i) no lawyer who represented the three Mylan indirect subsidiaries ever disclosed any confidences to any lawyer working on the Teva matter, and (ii) an ethical screen is securely in place to prevent such disclosure. This is just one example of the many ways in which the R&R is based on profound misinterpretations of, and often failure even to consider, relevant legal principles, coupled with a refusal to engage meaningfully with the evidentiary record even where the facts are undisputed.

These errors led to a very wrong outcome in this case. They threaten significant destabilizing effects on corporate representation and transactions across the Third Circuit. The Court should, therefore, reject (or vacate) the R&R and deny the motion for a preliminary injunction for any of the several independent grounds discussed below and summarized here:

***First***, the R&R treats the legal status of distinct corporations as mere technicalities to be casually cast aside. Thus, even though Mylan N.V. (a newly incorporated Dutch entity created by the simultaneous acquisition of assets valued at $6.3 billion from another public multinational company and Mylan Inc.) had gone to great lengths to locate in the Netherlands and create a corporate entity wholly distinct from its subsidiaries to enjoy the massive tax benefits of an "inversion," the R&R concludes that Kirkland was required to ignore this corporate structure. Instead, the R&R demands that Kirkland treat Mylan N.V., a company with significantly different assets,

businesses, and shareholders than the three Mylan entities, as a client, even though the Engagement Agreement unambiguously states that it is not.  Moreover, the R&R declares that anything that affects Mylan N.V. necessarily affects the three indirect subsidiaries that were clients.  This conclusion, based on a novel "bag/contents" rule premised on disregarding corporate identities, contravenes extensive authority establishing that representation of subsidiaries does not constitute representation of a parent (or grandparent) corporation, and that the economic impact on subsidiaries from actions involving their parent companies does not constitute the required "direct adversity" generating a conflict.  There is, therefore, no conflict here under the ethical rules.

*Second*, even if the Court somehow concludes that some sort of conflict did otherwise exist, it was squarely addressed by the Conflict Waiver, the execution of which was an absolute precondition to Kirkland's willingness to offer the three Mylan entities access to its legal services on the discrete matters of the engagement.  The R&R erroneously insists the waiver could be valid only if Kirkland lawyers explicitly told Ms. Ondos it allowed Kirkland to represent a client in a hostile takeover of the three entities' indirect parent.  This reasoning disregards a core aspect of an advance waiver—the impossibility of anticipating the kinds of adversity that might arise.  That is why the law focuses on whether the client agreeing to the waiver was sophisticated and represented by counsel.  When that is the case, as it is here, there is no reason to doubt the client's understanding of the scope of the waiver's language.  Oddly, by reasoning that the waiver covers litigation (which even Plaintiffs conceded was not the subject of a putative conflict) but does not cover transactional work, the R&R would allow Kirkland to engage in *litigation* surrounding a "hostile takeover," but bar Kirkland from the far less adverse *transactional* work.  This analysis and import of the R&R is completely contrary to the Agreement's meaning, common sense, and the parties' intent.

4

In construing the Agreement, the R&R also applies the very standard of disqualification the parties had contractually agreed would not be applied.  The Mylan entities promised never to seek Kirkland's disqualification on the ground that the firm possesses confidences that might relate to an adverse representation for another Kirkland client.  In defiance of that provision, the R&R effectively rewrites the waiver and declares that Kirkland's work for the three entities was "related to" the Teva transaction because other Kirkland lawyers may have learned information about drugs or pricing relevant to the acquisition (itself a highly questionable conclusion).  The R&R does not even try to square this recommendation with the Agreement's "related to legal services" formulation, and it commits legal error by interpreting "relatedness" by reference to a standard the parties affirmatively repudiated rather than using the standard to which they agreed.

*Third*, the R&R recommends entry of an injunction that has largely become moot and is otherwise unlawful.  As has been reported, because of the uncertainty generated by the R&R, Kirkland has withdrawn from representing Teva in this matter and has not communicated with—and will not communicate with—Teva's successor counsel in the matter.  Thus, Mylan's ostensible tactical objective in bringing this lawsuit was accomplished before this Court even had a chance to conduct its *de novo* review of the R&R.  As for the mandatory injunction requiring Kirkland to retrieve work product, the Court can—and prudentially should—reject the R&R's recommendation without even addressing the conflict and waiver issues.  In that event, Kirkland respectfully submits the Court should vacate the R&R.  However, if the Court does choose to address the conflict and waiver issues, it should not adopt the R&R's extreme conclusions.  Rather, faithfully applying the applicable authorities to the evidentiary record can lead only to the conclusion that Kirkland was correct back in April when it ran its conflict check and determined

that it was fully able under the governing rules of ethics and professional responsibility to represent Teva in connection with the proposed transaction.

## II. BACKGROUND

**A.      Kirkland's Limited Representation Of Three Mylan Entities**

Kirkland has served as counsel for Teva and its affiliates since at least 2006, representing those companies in a wide "array of high-profile matters," ranging from Hatch-Waxman Act litigation to "major corporate transactions."  Shumsky Decl. ¶ 9; Fox Decl. ¶¶ 4–5; *see also* Shumsky Decl. ¶¶ 9–22 (describing Kirkland's most significant matters on behalf of Teva and its affiliates).  Several of those matters have been directly adverse to a Mylan entity, including some of the entities that brought this lawsuit.  Shumsky Decl. ¶ 9.[1]

In late 2012, two Kirkland litigation partners, Jay Lefkowitz and Michael Shumsky, began discussing a potential engagement with Mylan Inc.'s Senior Vice President and Global General Litigation Counsel, Jill Ondos.  Shumsky Decl. ¶¶ 25–26; Lefkowitz Decl. ¶ 9.  Ms. Ondos, on behalf of the Specified Mylan Entities, wished to secure counsel for two specific matters involving the 180-day exclusivity periods for the generic versions of two drugs.  Lefkowitz Decl. ¶ 8; *id.* Ex. 1, at 1.

At the time of these discussions, Kirkland already was engaged in "at least one ongoing matter that was directly adverse" to certain of the Specified Mylan Entities.  Shumsky Decl. ¶ 12.  For that reason, Mr. Lefkowitz and Mr. Shumsky explained to Ms. Ondos "the scope of Kirk-

---

[1]  This brief will refer to three Mylan entities for whom Kirkland has provided legal services (Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan Technologies, Inc.) as "the Specified Mylan Entities" or the "Mylan clients."  These entities plus one more (Mylan Specialty LP) are the Plaintiffs in this lawsuit and will be referred to as such, or as "the Mylan Indirect Subsidiaries" or "the Subsidiaries."  The brief will refer to the various declarations in the record using the format "[Last Name] Decl."  In addition, Exhibit A, which is attached to this brief, provides an ECF cross-reference for each of the record documents cited.

land's previous and current representation of Teva, which included a broad range of FDA and intellectual property litigation, as well as transactional corporate work."  Further Supp. Lefkowitz Decl. ¶ 2; *see also* Ondos Decl. ¶¶ 7, 11 (confirming that Ms. Ondos was "aware" that Kirkland "had long served as counsel for Teva" and that Kirkland was "*continu*[*ing*] *to represent Teva* in certain . . . matters [for] which the interests of Mylan were adverse to Teva" (emphasis added)).  The Kirkland attorneys "made . . . clear" that the firm was "likely to be adverse to . . . Mylan entities in future matters."  Lefkowitz Decl. ¶ 5; *see also* Ondos Decl. ¶ 11.

The Kirkland attorneys informed Ms. Ondos that, in light of that preexisting (and almost certain-to-continue) adversity, the firm would not be able to agree to the representation unless the Specified Mylan Entities contractually waived conflicts of interest, except in certain narrow contexts.  Lefkowitz Decl. ¶¶ 5, 12; Shumsky Decl. ¶¶ 12, 26.  On behalf of the Mylan clients, Ms. Ondos agreed to sign such a contract and, after making multiple revisions to the proposed terms, she did.  Ondos Decl. ¶¶ 12–14.  The resulting Engagement Agreement, dated January 9, 2013, had several key components.

**First**, the Engagement Agreement explained that Kirkland was agreeing to take on *only* three clients:  "[Kirkland's] representation is **solely** of Mylan Inc., Mylan Technologies, and Mylan Pharmaceuticals, and . . . **no parent, subsidiary, affiliate, or other entity or person related to [those three clients] has the status of client for conflict of interest purposes**."  Lefkowitz Decl., Ex. 1, at 3 (emphasis added).

**Second**, the Engagement Agreement acknowledged that the Mylan clients were "engaged in activities . . . in which [their] interests may diverge from those of [Kirkland's] other clients," and that, accordingly, "the possibility exists that one of [Kirkland's] clients may take positions adverse to you in a matter in which such other client may have retained [the firm]."  *Id.*  The

7

Mylan clients thus agreed that Kirkland could represent clients in matters adverse to the Mylan clients that were "not related to (i) the legal services that [Kirkland] has rendered, is rendering or in the future will render to you under the Engagement and (ii) other legal services that [Kirkland] has rendered, is rendering or in the future will render to you or any of your affiliates under a separate engagement."  *Id.*  Moreover, the Mylan clients confirmed that the future adverse representations they were authorizing would "not breach any duty" (including loyalty) that Kirkland owed to them.  *Id.*

**Third**, the Engagement Agreement acknowledged that Kirkland would be receiving confidential information from the three Mylan clients and contained a pledge from those clients that they would never use Kirkland's receipt of that confidential information as "a basis to disqualify [Kirkland] from representing another entity or person."  *Id.*

Waivers like the one Ms. Ondos negotiated and signed are regularly executed by large, sophisticated corporate entities embroiled in legal proceedings and are a mutually beneficial precondition to retaining highly qualified counsel, particularly in the pharmaceutical industry. Lefkowitz Decl. ¶¶ 6–8; Shumsky Decl. ¶¶ 6, 8; Painter Decl. ¶¶ 15, 28.

For Kirkland, the waiver was "an integral part of [its] engagement," especially given the pharmaceutical sector's deep-rooted culture of strategic acquisitions.  Shumsky Decl. ¶ 22; *see also* Lefkowitz Decl. ¶ 12.  Kirkland clarified its duty of loyalty to the Mylan clients in light of its longstanding work for various pharmaceutical companies, including Teva.  Kirkland also made clear its need to protect itself against the risk that the dynamic nature of the pharmaceutical industry would result in its having to sever its relationship with a longstanding client.  Lefkowitz Decl. ¶ 6 (explaining that "the considerable acquisition activity and consolidation in the pharma-

8

ceutical sector . . . can lead to unforeseen and thrust-upon conflicts as a company changes ownership or corporate structure").

For the Mylan clients, the Engagement Agreement was the key that unlocked the unique benefits inherent in securing legal representation from a firm that is a leader in the specialized field of FDA litigation.  Lefkowitz Decl. ¶¶ 3–4.  Had they refused to sign a waiver, Kirkland—and, likely, the vast majority of its peer firms—would not have been willing to accept representation of the Mylan clients.  *Id.* ¶¶ 5, 8; Shumsky Decl. ¶ 6; Painter Decl. ¶¶ 15–17.

**B.    Kirkland's Previous Involvement In The Teva/Mylan N.V. Transaction**

In early April 2015, Teva asked Kirkland (its longstanding counsel) to represent the company in connection with its proposed acquisition of Mylan N.V.  Fox Decl. ¶ 15.  After performing the standard conflict-check procedures, Kirkland determined that Mylan N.V. was not, and had never been, a client.  *Id.* ¶ 16; Kuhns Decl. ¶ 4.  Although that alone was conclusive, Kirkland *further* confirmed that the waiver Ms. Ondos had signed covered Kirkland's involvement in the proposed acquisition because the legal services the firm would be providing to Teva were unrelated to the legal services it had provided (and was providing) to the Mylan clients.  Fox Decl. ¶ 18; Kuhns Decl. ¶ 5.  Kirkland thus agreed to represent Teva.

Kirkland implemented a sophisticated ethical wall and circulated a screening memo to ensure that no attorney working on the Teva transaction would have access to any information Kirkland had received from the Mylan clients.  Kuhns Decl. ¶¶ 6–11; Fox Decl. ¶¶ 19–20.  Plaintiffs have never disputed (despite an opportunity to do so at an evidentiary hearing) that the ethical wall was effective or that it and the screening memo successfully prevented their information from being shared outside Kirkland's litigation team representing the Mylan clients.

On May 1, 2015, notwithstanding the fact that the proposed transaction involved only Mylan N.V., the waiver Ms. Ondos had signed, and the incontrovertible evidence that no confidential information passed from the attorneys representing the Mylan clients to the attorneys representing Teva (Desheh Decl. ¶¶ 8–9; Fox Decl. ¶¶ 20, 26; Kuhns Decl. ¶¶ 10–11), the Mylan clients moved to enjoin Kirkland from participating in the Teva/Mylan N.V. transaction.

This litigation is just one piece of a much larger drama unfolding on the international stage.  As an additional strategy for disrupting the Teva transaction, Mylan N.V. has accelerated its hostile bid for Perrigo Company, plc, an Irish pharmaceutical company.  Desheh Decl. ¶¶ 11, 16; 5/26/15 Tr. at 49:3–23.  Mylan N.V. is currently seeking its shareholders' approval of that bid; if it succeeds before Teva can acquire Mylan N.V., the hostile takeover of Perrigo could foreclose Teva's acquisition bid.  Desheh Decl. ¶ 16.[2]  Mylan N.V. thus has every incentive to delay the Teva transaction, and this lawsuit is a calculated part of that delay tactic.[3]

### III.   STANDARD OF REVIEW

"A district court's review of a magistrate judge's report and recommendation is *de novo*." *Williams v. Apfel*, 98 F. Supp. 2d 625, 630 (E.D. Pa. 2000); *see also* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(3).  To pass constitutional muster, the "ultimate decision" must be made by the district court.  *United States v. Raddatz*, 447 U.S. 667, 683 (1980).

No deference should be afforded to the R&R because there was no evidentiary hearing and the Magistrate Judge made no credibility findings with respect to any disputed issues of fact.

---

[2]  The R&R dismisses the possibility that this lawsuit is a "delaying technique," ostensibly because Plaintiffs filed their disqualification papers "shortly after learning" of Kirkland's involvement in the Teva/Mylan N.V. transaction.  R&R at 25–26 n.28.  But the R&R's rationale misses the point.  The "delaying technique" is this litigation itself, where the removal of Kirkland as Teva's counsel threatens to delay Teva's acquisition while Mylan N.V.'s takeover bid for Perrigo proceeds.

[3]  Consistent with the tactical nature of this lawsuit, Plaintiffs alerted the *Wall Street Journal* about this case before notifying or serving Kirkland.  Kuhns Decl. ¶ 15.

*Cf. Elliott v. Kiesewetter*, 98 F.3d 47, 53–56 (3d Cir. 1996); *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982) (per curiam). Moreover, Plaintiffs initially relied entirely on a single, generalized declaration from their in-house counsel, and then established virtually their entire record in connection with a reply brief filed on the Friday evening before Memorial Day, with the oral argument scheduled for the following Tuesday morning. Kirkland's Findings of Fact ¶¶ 137–38. This sandbagging led both sides to file Supplemental Declarations and Findings of Fact that have not been the subject of oral argument or full deliberation. Thus, plenary review by this Court on the full record is critical.

## IV.   ARGUMENT

### A.   KIRKLAND'S REPRESENTATION OF TEVA PRESENTED NO CONFLICT OF INTEREST, AND THE R&R'S CONCLUSION TO THE CONTRARY IS BASED ON A LEGALLY ERRONEOUS INTERPRETATION OF RULE 1.7

Although the Mylan clients executed a valid conflict waiver in the Engagement Agreement, there is no need even to consider this waiver if there was no conflict. And there was no conflict unless: (1) Kirkland's "representation of [Teva was] ***directly adverse*** to [the Mylan clients]"; or (2) "there [was] a significant risk that the representation of [the Mylan] clients [would] be materially limited by [Kirkland's] responsibilities to [Teva]." Pa. R. Prof'l Conduct 1.7(a) (emphasis added). Neither element was satisfied here: It is undisputed that Mylan N.V. was never a client of Kirkland; there was no "direct adversity" between Teva and the actual Mylan clients; and there was no significant risk that Kirkland's representation of those Mylan clients would be materially limited by its representation of Teva. The R&R mistakenly concludes that there was a conflict because it misinterprets the direct adversity requirement of Rule 1.7(a), and in so doing ignores the relevant authorities confirming that there is no direct adversity here. R&R at 23–38.

11

1.       **Kirkland's Representation Of Teva Was Not "Directly Adverse" To The Mylan Clients**

The Mylan clients are the focus of the direct adversity inquiry because Mylan N.V. was never a Kirkland client.  Plaintiffs have never argued that Mylan N.V. was a client; nor could they:  "The fact of corporate affiliation, without more, does not make a corporate client's affiliates into clients as well."  ABA Formal Op. 95-390 at 2–3.  Nor did the R&R so find.  The Engagement Agreement, moreover, expressly limits its scope to the Mylan clients and *expressly excludes* any corporate "parent" from "the status of a client."  Lefkowitz Decl., Ex. 1, at 3.

Accordingly, even if one assumes that Kirkland's work for Teva was "directly adverse" to Mylan N.V., there was no conflict.  The test is whether the Teva representation was directly adverse to the Mylan clients.  ABA Formal Op. 95-390 at 2–3, 13.  There was no such direct adversity to them.

a.       **Economic Impact On An Indirect Subsidiary Does Not Create Direct Adversity**

"Direct adversity" is fundamentally much more than "adversity."  In fact, three Formal Opinions from the American Bar Association Ethics Committee squarely address this distinction in ways that are dispositive here.  Yet the R&R simply ignores their reasoning.

ABA Formal Opinion 95-390 focuses on the central issue here:  whether the representation of a corporate client bars a lawyer from undertaking a representation that is adverse to a corporate affiliate of that client.  The Formal Opinion first addresses the situation where a lawyer who represents a corporate client brings a lawsuit against that client's wholly owned subsidiary.  In that scenario, the Formal Opinion explains, the suit against the subsidiary is obviously "adverse" to the parent company.  That is because "if the suit is successful, this will affect adversely not only the subsidiary but the parent as well, in the sense that one of its assets is the equity in the subsidiary, and its consolidated financial statements may (unless the subsidiary has applica-

ble insurance coverage) reflect the impact of material adverse judgments against the subsidiary." ABA Formal Op. 95−390 at 10.

Formal Opinion 95-390 makes very clear that despite the adverse economic impact on the affiliate client, that adversity is "indirect rather than direct, since its immediate impact is on the affiliate and only derivatively upon the client.  Rule 1.7(a)'s text is not ambiguous:  the reference to a representation that is 'directly adverse' clearly draws a distinction between direct and indirect adverseness."  *Id*. at 11.  The R&R does not address this language or that distinction.

Two additional ABA Formal Opinions, which the R&R does not address, focus on "direct adversity" in ways completely contrary to the R&R's analysis.  R&R at 30–31 (erroneously suggesting that direct adversity exists if a lawyer undertakes to work "in opposition to the clients' wishes and interests toward an objective to which the client is opposed").

ABA Formal Opinion 05-434 involves a lawyer retained by a testator to prepare instruments disinheriting a beneficiary who is the lawyer's current client.  Here, too, there was obvious adversity to the client being disinherited.  Nevertheless, the Formal Opinion—once again confirming the material distinction between "adversity" and "direct adversity"—concludes that there is no conflict because "[d]irect adverseness requires a conflict as to the legal rights and duties of the clients, not merely conflicting economic interests."  ABA Formal Op. 05-434 at 2.

Finally, in ABA Formal Opinion 05-435, the ABA Ethics Committee considers the situation where a lawyer represents an insurance company, while simultaneously representing a plaintiff against a defendant insured by that insurance company client.  Though the insurance company would be responsible for any damage award, the Formal Opinion confirms that the scenario is not "direct adversity."  It explains, "Economic adversity alone between the insurer and the plain-

13

tiff . . . is not, in the opinion of the Committee, the sort of direct adversity that constitutes a concurrent conflict of interest under the Model Rules."  ABA Formal Op. 05-435 at 3–4.

Contrary to, and without consideration of, the "direct adversity" analysis of these authorities, the Magistrate Judge found a conflict based on a subjective sense that an unsolicited takeover offer for a grandparent corporation is necessarily adverse to any subsidiary, coupled with speculation that a change in ownership of the parent would have "potential adverse effects" on the indirect subsidiaries because it might lead to layoffs or other business decisions that would affect the subsidiaries' business or personnel.  R&R at 29−30.  Of course, a change in indirect ownership could lead to additional investment or business expansion, and personnel reductions (even if true) are not adverse if they add efficiencies.  These are precisely the types of effects on economic interests of corporate affiliates that are recognized in the ABA Formal Opinions as *not* constituting direct adversity.  But what is important is that these (hypothetical) effects have nothing to do with the matters on which Kirkland provided legal services to the Mylan clients.

Indeed, the impact here is far *less* direct than the situations in any of the Formal Opinions.  The impact when a law firm sues its client's subsidiary knowing that the client ultimately will be paying every penny of an award, or when a law firm takes action to help one client disinherit another, or when a law firm represents a plaintiff suing a defendant insured by the insurance company the firm represents, does not depend on speculation.  This contrasts markedly with the R&R's speculation about economic impact—*despite the absence of any evidence whatsoever from Plaintiffs*—about whether an acquisition of the grandparent will be good or bad for the subsidiary, or about whether layoffs or a restructuring might occur down the road.  And even if that speculation could be considered as evidence (of course it cannot), those indirect adverse effects do not constitute "direct adversity" under Rule 1.7.

The R&R's refusal to analyze this issue based on applicable law is clear legal error. Compounding this legal error, the R&R creates its own far-reaching, wholly unsupported rule, concluding that direct adversity was "inherently" and "necessarily" present solely because Kirkland represented an unsolicited bidder for the overseas grandparent corporation of the Mylan clients. R&R at 25. The R&R's analysis should be rejected, and this Court should find there was no "direct adversity" under well-settled law.

### b. Corporate Distinctions Cannot Be Ignored When Analyzing Direct Adversity

A second material aspect of the R&R's misinterpretation of "direct adversity" is its utter disregard of corporate structure and corporate law. R&R at 26–28. Indeed, the R&R goes so far as to suggest that the strategic creation of Mylan N.V. as a Dutch corporation headquartered in England, formed in connection with a $6.3 billion acquisition of foreign subsidiaries of Abbott Laboratories to obtain massive tax benefits, is merely a "fortuitous circumstance" that Kirkland is somehow exploiting to relieve itself "of an important component of its fiduciary duty." *Id.* at 26. This statement, contrary to the basic tenet of American corporate law that a corporation and its shareholders are distinct,[4] constitutes a foundational error in the R&R. *Dole Food Co. v. Patrikson*, 538 U.S. 468, 475 (2003) (noting that "a corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary;

---

[4] The R&R gratuitously and unjustifiably impugns Kirkland's integrity by highlighting two other instances in which the firm has defended itself against allegations of an ethical violation. R&R at 56 & n.70. To the extent the R&R relies on these factually-distinct cases to draw its conclusions and to establish cumulative evidence against Kirkland, it commits legal error. The first case the R&R cites is more than fifteen years old. And in the second, the court actually ***denied*** the motion for disqualification, in large part because, as here, Kirkland represented only the subsidiaries of a particular entity, not the parent itself. "Corporate separateness is a fundamental tenet of American law," the court explained, and "companies cannot be lumped together and treated as if they were a single enterprise." Order, *In re Caesars Entm't Operating Co.*, No. 15-01145 (Bankr. N.D. Ill. May 28, 2015), ECF No. 1713. That tenet is no less fundamental in this case, and the same result should obtain.

and, it follows with even greater force, the parent does not own or have legal title to the subsidiaries of the subsidiary").[5]

The R&R fails to appreciate that the specific identities and characteristics of corporations are of enormous significance to the professional responsibilities of lawyers who represent business entities.  Indeed, the ABA Formal Opinions discussed above emphasize that corporate formalities *must* be observed when analyzing alleged attorney conflicts of interest.

Plaintiffs do not contend they are alter egos of Mylan N.V. or that their corporate separateness should be disregarded in business dealings with others—including the U.S. taxing authorities.  That in turn means that others—including outside counsel—are entitled to rely on the same corporate formalities in dealing with them.  *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820 (7th Cir. 2014) (Posner, J.), *cert. denied*, 2015 WL 1206313 (U.S. 2015) ("[A] corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties. . . .  Distinct in uno, distinct in omnibus." (internal quotation marks omitted)).  It is thus no answer, as the R&R repeats so often, that Mylan N.V. derives 90% of its income from Mylan Inc. because Mylan N.V. was never Kirkland's client.  R&R at 10, 27 & n.32.

The "fact that the corporate client wholly owns, or is wholly owned by, its affiliate does not in itself make them alter egos" for purposes of imputing conflicts.  ABA Formal Op. 95-390 at 9; *cf. Janus Capital Grp. v. First Derivative Traders*, 131 S. Ct. 2296, 2304 (2011) (reiterating

---

[5]   *See also United States v. Bestfoods*, 524 U.S. 51, 61–63 (1998) (reiterating that it is a "bedrock principle" of corporate law, "deeply ingrained in our economic and legal systems," that "corporate distinctions" should be respected (internal quotation marks omitted)); Rule 1.7 cmt. 34 ("A lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any constituent or affiliated organization, such as a parent or subsidiary.").  The R&R violates that principle by permitting Plaintiffs to disregard their individual identities and thereby to use the corporate form "both as shield and sword." *Alford v. Frontier Enters., Inc.*, 599 F.2d 483, 484 (1st Cir. 1979).

that where corporate formalities have been observed, corporate separateness must be respected as a matter of federal law).  The R&R disregards these principles, lumping Mylan N.V. and its separate direct and indirect subsidiaries together in one "bag."  R&R at 27.  In so doing, the R&R gives short shrift to centuries of corporate law and imperils the ability of corporations to plan and organize their business operations through subsidiaries and affiliates.

Kirkland was engaged solely to represent three Mylan entities, to the exclusion of any "parent, subsidiary, affiliate, or other entity or person" (Lefkowitz Decl., Ex. 1, at 3), but those three entities are now claiming a conflict based on Kirkland's adversity with respect to an overseas grandparent.  The ABA has unambiguously stated that such indirect effects diffused through the corporate structure will **not** be the basis for disqualification under Rule 1.7.  ABA Formal Op. 95-390 at 13.  A proper application of Rule 1.7 leads unambiguously to the conclusion that there was no "directly adverse" representation here.  It is not surprising, then, that the R&R cites **no case** holding that an interest in avoiding changes in the ownership of a holding company's stock can trigger "direct adversity."  R&R at 27–31.  The R&R's unprecedented application of Rule 1.7(a)(1) is legally erroneous and should be rejected.

c.     **The R&R's Wholesale Substitution Of A "Related To" Standard In Place Of Direct Adversity Is Legally Erroneous**

According to the R&R, "whether the potential adversity [raised by a concurrent representation] is direct, and in violation of Rule 1.7, turns on whether the adverse representation is *related to* counsel's representation of the client."  R&R at 32 (emphasis omitted).  Applying that standard, the R&R concludes that "even if the adverse effect" on the Mylan clients was "solely derivative," Kirkland's representation of Teva nonetheless was barred by Rule 1.7(a) because it was "'related' to" Kirkland's representation of the Mylan clients.  *Id.*

17

Unlike other provisions of the Model Rules (including Rule 1.9), Rule 1.7—the Rule applicable here—does not contain the word "related" or its cognates.  Nor does it require disqualification whenever it can be reasoned that two "adverse" representations are somehow "related." It is true that some authorities mention "relatedness" as a factor in determining whether a representation that is directly adverse to a non-client corporate entity is also considered directly adverse to that non-client's corporate affiliate (here, indirect subsidiaries).  But the R&R profoundly misapplies that "relatedness" inquiry in the Rule 1.7 context.

The R&R acknowledges that "Rule 1.7 contains no requirement of relatedness" and "no definition of the term."  R&R at 33 n.41.  The R&R's analysis immediately then goes awry when, mistakenly and without any precedent whatsoever, it simply borrows a standard from a *different* rule (Rule 1.9), which uses the term "substantially related" for a *different* purpose. R&R at 32–33.

Rule 1.9, which deals with former client conflicts, has two distinct requirements.  First, the lawyer's representation of a client must be "materially adverse to the interests of [a] former client."  Pa. R. Prof'l Conduct 1.9(a).  If not, that is the end of the inquiry because there is no conflict without that degree of adversity.  If so, the other independent inquiry is whether the representation is "in the same or a substantially related matter."  *Id.*  That inquiry focuses on whether there are likely to be confidences the lawyer learned from the former client that could be used to advance a client's interests that are "materially adverse to the interests of [a] former client." *Id.*  But the substantial relationship test does not inform the first step inquiry into adversity in any way.  Matters can be closely related under Rule 1.9, and yet a lawyer will not be barred from working on a new matter unless the initial independent inquiry into cognizable adversity is satisfied.  The inquiries associated with Rule 1.7 and Rule 1.9 simply are not interchangeable.

18

In effect, then, the R&R errs as a matter of law by reading into Rule 1.7(a) a "related to" standard as an "*alternative*" to the direct adversity requirement.  R&R at 32 (emphasis added).  And having announced an erroneous legal standard, other errors follow.  Most significantly, the R&R erroneously concludes that the mere fact that Kirkland received confidential information from the Mylan clients that (purportedly) was "pertinent to" the Teva representation is sufficient grounds for disqualification.  R&R at 33.  In other words, the R&R, having replaced "direct adversity" with "related to," then proceeds to define "related to" based simply on whether confidential information was received.

Confidentiality has nothing to do with determining whether Kirkland's work for Teva was "directly adverse" to the Mylan clients.  There is no evidence—nor even an argument—that Kirkland ever breached its duty of confidentiality.  On the contrary, the uncontroverted evidence shows that Kirkland promptly erected a sophisticated ethical wall between the attorneys engaged on the Teva deal and on the representation of the Mylan clients.  Kuhns Decl. ¶¶ 6–11; Fox Decl. ¶ 19.  The lead partner on the Teva deal, David Fox, personally instructed the deal team to avoid communicating with attorneys working for any Mylan entity and has periodically verified that no confidential information has been passed between the teams.  Fox Decl. ¶ 20.  Those measures fully discharged Kirkland's duties under Rule 1.6 governing confidentiality of client information, and thus provide no basis for disqualification under Rule 1.7.

Having erroneously rewritten Rule 1.7, however, the R&R simply deems this undisputed evidence "immaterial."  R&R at 37.  That is yet another legal error.  *CenTra, Inc. v. Estrin*, 639 F. Supp. 2d 790, 815–17 (E.D. Mich. 2009) (no actual or imminent harm where there was "a de facto and extensive, formal screen to prevent the very harm that CenTra alleges").

Finally, the R&R recommends disqualification based on speculative "concerns" and "potentialities" about what might happen *if* Kirkland breached its ethical duty of confidentiality. R&R at 36.  But a court obviously cannot find that one ethical rule (Rule 1.7) has been breached based on an unsubstantiated "concern" that another ethical rule (Rule 1.6) *might* be breached. That is nothing more than ethics-violation bootstrapping—an impermissible approach that is all the more problematic in light of Plaintiffs' complete lack of any actual, non-speculative proof that *any* breach of confidences occurred or is likely to occur.[6]

### 2.    Kirkland's Representation Of Teva Did Not Materially Limit Its Representation Of The Subsidiaries

A concurrent conflict of interest may also exist where "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client."  Rule 1.7(a)(2).  The R&R does ***not*** find that Kirkland violated Rule 1.7(a)(2), and Plaintiffs submitted no evidence (or even argument) that Kirkland's representation of Teva somehow limited—much less materially limited—Kirkland's representation of the Mylan clients in any manner.

*    *    *

For these reasons, the R&R should be rejected because the law establishes there was simply no conflict of interest here under Rule 1.7.  Thus, Kirkland acted entirely permissibly even without regard to the conflict waiver that will now be addressed.

---

[6]   *Kaleta v. Clausi*, No. 4:12-cv-1987, 2013 WL 1804203, at *4 (M.D. Pa. Apr. 29, 2013) (declining to consider Rule 1.6 violation where no evidence that client had "good cause to believe that [counsel] will or are likely to reveal client confidences in the course of th[e] litigation"); *Doe v. Reg'l Sch. Unit No. 1*, No. 2:11-cv-25, 2013 WL 492540, at *8 (D. Me. Feb. 7, 2013) (approving of the rule that "[a] party moving to disqualify an attorney has the burden of demonstrating more than mere speculation that an ethics violation has occurred" that "[a] mere general allegation that [an] attorney has some confidential and relevant information . . . will not support disqualification").

**B.**     **THE CONFLICT WAIVER IS VALID**

Even if Kirkland would have been precluded from representing Teva absent a conflict waiver (which is not the case here), the valid Conflict Waiver in the Engagement Agreement negated any conflict of interest and independently allowed Kirkland to proceed.  The Mylan clients, represented by sophisticated counsel, contractually agreed to waive the conflict that they asserted in this lawsuit.  The R&R errs by ignoring the context in which that Agreement was signed and by rewriting the Agreement itself.

**1.**     **The R&R Ignores The Context Of The Engagement Agreement, Which Confirms That There Was "Informed Consent"**

The R&R entirely fails to come to grips with the context in which Ms. Ondos, Mylan Inc.'s Senior Vice President and Global General Counsel for Litigation, negotiated the Engagement Agreement on behalf of the Mylan clients, even though Kirkland marshaled extensive evidence to establish that context.  This was plain error in the R&R's informed consent analysis.

It bears emphasizing from the start that the unique facts of this case stand in marked contrast to the advance waiver paradigm, where there is no pre-existing adversity.  Here, by contrast, the Conflict Waiver was required because of considerable existing adversity between Teva (represented by Kirkland) and the Mylan clients.  From the beginning, Kirkland was directly adverse to the Mylan entities in very significant litigation, primarily on behalf of Teva, that ultimately challenged Mylan products generating at least $1 billion in annual revenue.  Shumsky Decl. ¶¶ 9–22; Exhibit B (Chart of Mylan Adverse Cases); 5/26/15 Tr. 65:1–66:7 (introducing and discussing the chart); Kirkland's Findings of Fact ¶ 25.  Ms. Ondos admitted knowing that Kirkland was Teva's longstanding counsel, and thus initially being "skeptical" about whether Kirkland's intense connections to Teva would interfere with the firm's ability to represent the Mylan entities.  Ondos Decl. ¶¶ 7, 12.  Ms. Ondos knew that Kirkland was, and would continue to be, ad-

21

verse to the Mylan clients as part of its existing work for Teva and other clients in matters of great magnitude and economic significance, including litigation. Ondos Decl. ¶ 12; Further Supp. Lefkowitz Decl. ¶¶ 2–3; Shumsky Decl. ¶¶ 7, 12, 25–26; Lefkowitz Decl. ¶ 5.[7]

Mylan Inc. itself had grown rapidly through a corporate strategy that focused on major acquisitions. Tan Supp. Decl., Ex. D; *see also id.* Ex. A, at 25; *id.* Ex. D, at 3. In October 2012, Mylan Inc.'s CEO told the *Wall Street Journal* that Mylan was "on the prowl for acquisitions to bolster its product line and expand geographically, and would consider deals valued at 'well over' $4 billion." Kirkland's Supp. Findings of Fact ¶ 3. Given Mylan Inc.'s prominent role in the pharmaceutical industry, Ms. Ondos plainly knew that other companies, including Teva, also had been growing through major acquisitions. For example, in May 2011, Teva had purchased Pennsylvania-based Cephalon, Inc. for $6.8 billion, a transaction that was widely publicized. Kirkland's Supp. Findings of Fact ¶ 5; R&R at 10. In that transaction, Kirkland was Teva's lead counsel, a fact that Ms. Ondos undoubtedly knew. Further Supp. Lefkowitz Decl. ¶ 8. As someone working at the highest levels in her industry, Ms. Ondos also plainly knew that Kirkland was a major participant in M&A work. Kirkland was listed in the top five—and in many instances first—on many of the rankings of leading M&A firms in the world. Resp. to Mot. to Strike at 10–11 & n.15; *see also* Further Supp. Lefkowitz Decl. ¶¶ 4–5, 9.

Thus, at the time of the Engagement Agreement, Ms. Ondos was aware of both the "ongoing consolidation of the global pharmaceutical industry" (Tan Supp. Decl., Ex. D, at 3) and Kirkland's active participation in many major acquisitions, including for Teva. She was also aware (as were so many others at Mylan Inc.) that in every acquisition, each party certainly had

---

[7] For this reason, Ms. Ondos plainly could foresee that the Engagement Agreement indisputably authorized Kirkland to continue representing clients that had and would have interests adverse to the Mylan clients in extraordinarily high-stakes litigation—which necessarily included even litigation arising out of a hostile takeover.

outside counsel, and therefore that a Mylan entity easily could confront one of its phalanx of out-side counsel in any of those deals.  All of this establishes that any sophisticated Senior Vice Pres-ident and Global General Counsel for Litigation—such as Ms. Ondos, who characterized herself under oath as a sophisticated contract negotiator during her cross-examination *by Kirkland*[8]—knew that (a) Kirkland had just represented Teva in the $6.8 billion Cephalon transaction and other recent major transactions; (b) the pharmaceutical industry was (and is) a hotbed of acquisi-tion activity; (c) Teva, Mylan Inc., and many other companies were all very active in a series of major acquisitions; (d) Kirkland frequently acted as Teva's counsel; and (e) Kirkland was one of the nation's leading and most active firms in helping clients with major M&A work across indus-tries, including the pharmaceutical industry.

These facts, in the context of the contemporaneous, material, direct adversity between a Kirkland client (Teva) and Mylan Inc., are more than enough to establish that major work—whether transactional work on a "hostile takeover" (no more adversarial than permitted "bet the company" litigation), litigation work on a hostile takeover, or even a consensual takeover—was reasonably foreseeable as coming within the scope of the waiver, and thus that there was in-formed consent.  And contrary to yet another profound error in the R&R, it was not necessary to specifically identify such transactional work in the Conflict Waiver that Ms. Ondos negotiated and signed.

The R&R erroneously states that this substantial evidence was not meaningful in deter-mining informed consent.  R&R at 43 n.55.  This statement reflects not only the R&R's failure to come to grips with the evidence actually in the record of this case, but also an unjustified refusal to recognize that the information a client already knows, independent of discussions with coun-

---

[8]  Mizzo Decl., Ex. 1, pp. 328:24–329:4.  Consistent with the Conflict Waiver, the Mylan enti-ties never objected to this cross-examination.

sel, is crucial to the informed consent analysis.  Indeed, the R&R does not acknowledge that the

Restatement and other authorities discussed below make clear that a client can give informed

consent based on information it already knows or has learned from other sources.  Restatement

(Third) of the Law Governing Lawyers § 122 cmt. c(i) (2000); Rule 1.7 cmt. 22; *Galderma*

*Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 400, 401–02 (N.D. Tex. 2013) (ex-

plaining that under Rule 1.7, "[a] lawyer need not inform a client of facts or implications already

known to the client").

The R&R also erroneously applies a "one size fits all" approach to conflict waivers,

whereas comment 22 to Rule 1.7 confirms that a clear distinction must be drawn between sophis-

ticated clients represented by counsel and other clients.  Similarly, comment 6 to Rule 1.0 (defin-

ing informed consent) states unequivocally that "generally a client or other person who is inde-

pendently represented by counsel in giving the consent should be assumed to have given in-

formed consent."  *See also* ABA Formal Op. 05-436 at 2, 4 (giving significant weight to the so-

phistication of the client and its use of independent counsel to determine that the consent was

valid).  Yet the R&R fails to account for this crucial distinction (that is, Mylan's representation

by sophisticated independent counsel) and ignores the authorities that mandate it.[9]

---

[9]  The R&R relies heavily upon *Celgene Corp. v. KV Pharmaceuticals Co.*, No. 07-4819SDW, 2008 WL 2937415 (D.N.J. July 29, 2008), in refusing to consider the circumstances sur- rounding the negotiation of the Conflict Waiver.  R&R 41–42.  But *Celgene* notes that courts should look beyond the waiver provision to determine whether a client's consent was in- formed, *id.* at *5, and the R&R's heavy reliance on *Celgene* is misplaced for three reasons. R&R at 41 n.52; 41–42 n.53; 45–46.  *First*, New Jersey's Rules of Professional Conduct have far more stringent disclosure requirements than the Pennsylvania Rules.  2008 WL 2937415 at *3.  Even the R&R acknowledges this point.  R&R at 45–46 (noting that the N.J. rules have "a different, more stringent standard" (internal quotation marks omitted)).  *Sec- ond*, the law firm in *Celgene* could not meet the more stringent requirements both because it did not discuss the waiver with the client and because it affirmatively told the client that it did not do work for the type of company it was representing in the adverse matter.  2008 WL 2937415 at *11.  *Third*, the attorney in *Celgene* **admitted** that he did not believe the client

In addition, the R&R erroneously interprets the Engagement Agreement as limited to litigation and exclusive of transactional work.  R&R 42–43 & n.55.  The R&R does this despite the admission by Ms. Ondos, the person who negotiated and signed the Engagement Agreement, that she understood that the Conflict Waiver language—*i.e.,* "including in litigation, arbitration or other dispute resolution procedures"—was not "an exclusive list of the types of matters" in which Kirkland could be adverse to the Mylan clients and related entities.  Ondos Decl. ¶ 31 (internal quotation marks omitted).  The U.S. Supreme Court and the Third Circuit similarly instruct that the word "including" should be interpreted as a term of enlargement, not limitation.[10]  Indeed, even the R&R elsewhere acknowledges that "the plain language [of the Agreement] ***does not exclude acquisitions.***"  R&R at 42 (emphasis added).

These errors led the R&R to conclude, erroneously, that informed consent required Kirkland to expressly warn the Mylan clients that it might be involved in what the R&R characterized as a "hostile takeover."  R&R at 42–43.  That approach, however, is belied by ABA Formal Opinion 05-436 and is internally inconsistent with the R&R's concurrent acknowledgement (R&R at 41) that the relevant test for informed consent is an objective, reasonable foreseeability inquiry.  *See Galderma*, 927 F. Supp. 2d at 400, 401–02 (noting that the 2002 amendments to Rule 1.7 and its comments eliminated any requirement that a firm specifically identify potential future parties or matters in a conflict waiver); *GEM Holdco, LLC v. Changing World Techs., L.P.*, 46 Misc. 3d 1207(A), at *7 (N.Y. Sup. Ct. Jan. 9, 2015) ("There is no rule that the specific

---

had given informed consent.  *Id.* at *10–11.  Thus, *Celgene* is readily distinguishable from this case, and the R&R's heavy reliance on it is misplaced.

[10]   *Burgess v. United States,* 553 U.S. 124, 132 n.3 (2008) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation." (quoting 2A N. Singer & J. Singer, *Sutherland on Statutory Construction* § 47:7 (2000)) (alteration in original)); *Cruz v. Chesapeake Shipping, Inc.*, 932 F.2d 218, 225 n.7 (3d Cir. 1991) ("Use of the word 'includes' is a term of enlargement and not a word of limitation.").

details of a conflict be itemized in a waiver for it to be valid.").[11]  An objective observer review-

ing *all* of the undisputed evidence would have no difficulty concluding that the Engagement

Agreement is sufficiently broad to encompass Kirkland's work on significant matters for phar-

maceutical companies such as Teva and others, including "bet the company" transactions—

indeed, it was signed in significant part *because* of Kirkland's prior representation of other cli-

ents in litigation of extraordinary magnitude adverse to the Mylan clients.

### 2.     The R&R Ignores The Content Of The Engagement Agreement To Avoid The Obvious Fact That The Conflict Waiver Is Applicable.

#### a.     "Related To Legal Services"

The Conflict Waiver specifies that an adverse representation is not prohibited (*i.e.,* would

not be deemed related to the legal services Kirkland was rendering to the Mylan clients) merely

by showing that certain Kirkland lawyers may have learned some confidences that might be of

potential use to a different client adverse to the Mylan clients or any of their affiliates.  Lefko-

witz Decl. ¶ 14; *id.*, Ex. 1, at 3.  Specifically, the Mylan clients agreed that they would not "as-

---

[11]  The R&R also relies heavily on the legal opinion of Professor Hazard that Kirkland was re-
quired to specify "an adverse representation of such magnitude" in the Conflict Waiver.
R&R at 41–42 & n.53.  Professor Hazard's admission in his report that he did not review any
of Kirkland's declarations or filings in this case confirms that his opinion is not based on the
totality of facts surrounding the Conflict Waiver, rendering his opinion purely theoretical and
thus of marginal evidentiary value.  Hazard Report ¶ 6; *see also Cecala v. Newman*, 532 F.
Supp. 2d 1118, 1141–42 (D. Ariz. 2007), *aff'd*, 379 F. App'x 584 (9th Cir. 2010) (declining
to rely on Professor Hazard's opinion because it was "wholly speculative" and assumed facts
without evidence).  *See generally In re IPO Sec. Litig.*, 174 F. Supp. 2d 61, 67–69 (S.D.N.Y.
2001) (noting that Professor Hazard could not give testimony stating ultimate conclusions of
law).  The R&R also implies that *Galderma Laboratories, L.P. v. Actavis Mid Atlantic LLC*,
927 F. Supp. 2d 390, 393 (N.D. Tex. 2013), supports the conclusion that Kirkland was re-
quired to specify a "hostile takeover" (ignoring of course that the "hostile takeover" is di-
rected at Plaintiffs' grandparent) because the engagement letter in *Galderma* "*specifically
identified* litigation and business transactions as areas of potential conflicting representation."
R&R 44–45 (emphasis in original).  On the contrary, *Galderma* explains that identifying a
"particular party, class of parties, or the nature of the potentially conflicting future matter" is
"not always necessary for a client to give informed consent."  927 F. Supp. 2d at 401.

sert that . . . [Kirkland's] actual or possible possession of confidential information belonging to [them] or any of [their] affiliates [was] a basis to disqualify [Kirkland] from representing another entity or person in any Allowed Adverse Representation."  Lefkowitz Decl., Ex. 1, at 3.

Mr. Lefkowitz explained why that provision was so important.  After describing the reasons why Kirkland was not able or willing to accept any Mylan entity as a client without a waiver for all matters other than those related to legal services actually rendered to the Mylan clients, Mr. Lefkowitz explained the parallel importance of excluding client confidences from the definition of "related to" in the Engagement Agreement.

> Once again, this provision was essential to the agreement.  The last circumstance I wanted was to enter into an agreement that would embroil Kirkland in disputes about whether Kirkland's work for the specified Mylan entities on a particular matter gave (or might have given) Kirkland lawyers access to information that could be of some possible use in a separate matter in which Kirkland was adverse to those or other Mylan entities.  Given the nature of the industry and the work Kirkland was doing for the specified Mylan entities, it would not be difficult to imagine an argument (supportable or otherwise) that confidences Kirkland learned while working for the specified Mylan entities on any particular pharmaceutical product were related at some level to work adverse to other Mylan entities on an entirely different pharmaceutical product.  Any waiver that left open those kinds of arguments—i.e., that overlapping confidences could create relatedness—would have been little, if any, better than no waiver at all and would have made it impractical for Kirkland to agree to take on any Mylan entities as a client. This is particularly true given that conflicts of any Kirkland lawyer may be, in many circumstances, imputed to all of Kirkland's more than 1500 lawyers across ten cities in five countries.

*   *   *

> What the specified Mylan entities were waiving was the right to assert that Kirkland's promise and professional duty to preserve confidences was insufficient on its face to protect those entities' interests and that disqualification was therefore in order (as a prophylactic measure to reduce the risk of breaches) without inquiry into whether these confidences had been breached.  [Lefkowitz Decl. ¶¶ 15–16.]

27

The parties thus agreed in their contract that relatedness should *not* be measured based on Kirkland's possession of confidential information.  It was error for the R&R to find relatedness in direct contravention of that agreed-upon definition.

Aside from defining relatedness to exclude confidentiality, the Conflict Waiver also requires that the relatedness inquiry be focused on "legal services."  Mylan's Global General Counsel for Litigation, after careful analysis and consideration, agreed to this provision, which allows Kirkland to represent clients adverse to the Mylan clients in "matters that are not related to . . . *the legal services*" that Kirkland provided to the Mylan clients.  Lefkowitz Decl., Ex. 1, at 3 (emphasis added).  This "understanding of the circumstances under which counsel will refrain from representation adverse to an affiliate is binding," as the R&R acknowledges.  R&R at 23. For that reason, an assessment of whether Kirkland's involvement in the Teva/Mylan N.V. transaction falls within the scope of the conflict waiver necessarily turns on whether that representation is "related to . . . the legal services" Kirkland has provided to the Mylan clients.[12]

Despite that unambiguous textual limitation, the R&R never analyzes the "legal services" Kirkland provided to the Mylan clients.  Rather, the R&R invents new frameworks, none of

---

[12]  Although the R&R relied on Professor Coates (R&R at 49 & n.64), Professor Coates likewise did not answer the relevant question—namely, whether the legal services Kirkland would provide to Teva in its acquisition bid were "related to the legal services" Kirkland provided to the Mylan clients.  He instead focused on whether the confidential information Kirkland received about certain Mylan products was "substantially related" to its work on the Teva transaction.  That question is irrelevant under the Conflict Waiver.  There are two additional problems with the R&R's endorsement of Professor Coates' legal analysis:  *First*, Professor Coates did not review any of the exhibits that contained the purportedly confidential information.  Coates Report at 34.  He had no basis, therefore, to know what information was transmitted and whether or how it would be meaningful to a transactional lawyer representing a company in a takeover bid.  By contrast, Kirkland provided a detailed analysis debunking that assertion.  Kirkland's Supp. Findings of Fact ¶¶ 27–43.  *Second*, Professor Coates is not in a position to discern the intent of the parties, and his legal opinions and conclusions on that subject should not have been adopted.  *See, e.g.*, *Liberty Media Corp. v. Vivendi Universal, S.A.*, 874 F. Supp. 2d 169, 176–77 (S.D.N.Y. 2012) (holding that Professor Coates could not testify about the parties' intent regarding specific clauses in a merger agreement).

which finds any support in the express words of the Engagement Agreement.  *E.g.*, R&R at 36 (assessing the relatedness of the "information received by [Kirkland]" from Teva and the Mylan clients, respectively); *id.* at 32–33 (assessing the relatedness of the subject matter involved in the different representations).

The R&R, moreover, focuses heavily on the fact that "[t]he term 'substantially related' was negotiated out of [the Agreement] by the parties" in favor of the term "related to."  R&R at 40 n.50.  But that is completely beside the point.  Whether "substantially related to" or "related to," the critical issue is "to *legal services*."  Tellingly, the R&R never deals with that issue.

Instead, the R&R merely cites to its prior Rule 1.7 relatedness analysis, which in turn erroneously had transposed Rule 1.9's confidence-based conception of relatedness.  R&R at 40; *see also* pp. 17–19, *supra*.  The R&R's relatedness analysis, however, does not address whether the *legal services* Kirkland provided to the Mylan clients were "related to" the *legal services* Kirkland provided to Teva; nor does it address the critical fact that the Agreement makes clear that the concept of relatedness is ***not*** to be assessed based on confidential information.  Rather, that section of the R&R focuses on whether "the hostile takeover representation [would be] 'related' to *the subjects of K&E's representation of Mylan*."  R&R at 32–33 (emphasis added).  This Court should reject that rewriting of the contract the parties negotiated.[13]

Using the proper framework set forth in the Agreement, Kirkland's legal services for Teva in the transaction are not "related to the legal services" Kirkland rendered to the Mylan cli-

---

[13]  The only source the R&R cites to support its "related to" conclusions is Professor Hazard's report—which focuses on the very confidence-based inquiry the Agreement rejected.  R&R at 40 n.51.  He, like Professor Coates, gives a legal opinion about language that differed from the Agreement.  *Id.* ("[Kirkland's representation of Teva . . . is related to the work [Kirkland] did, and is doing, for Mylan.").  Professor Hazard's legal opinion on the relatedness of Kirkland's representations is remarkable given that he did not review any of the declarations submitted by Kirkland or Teva.  Hazard Report ¶ 6.

ents.  Kirkland's legal services involved work regarding certain drugs, typically (though not ex-clusively) regarding 180-day exclusivity rights for the first generic to challenge a brand's patent under the Hatch-Waxman Act, contract analysis, and a small amount of intellectual property work.  Shumsky Decl. ¶ 24; Kirkland's Supp. Findings of Fact ¶ 29.  Kirkland has never done *any* transactional work for any Mylan entity (Shumsky Decl. ¶ 24; Kuhns Decl. ¶ 4)—and cer-tainly nothing even remotely resembling the complex, multi-jurisdictional, cross-border transac-tional legal services Kirkland was providing Teva.  Fox Decl. ¶¶ 4, 22–23; Desheh Decl. ¶¶ 14–15.  Kirkland has provided the Mylan clients with no M&A services, no SEC compliance ser-vices, no financing services, no executive compensation services, no corporate governance ser-vices, no restructuring services, and no tax services.  Kuhns Decl. ¶ 4.  Kirkland has never done any work related to the Mylan clients' articles of incorporation, shareholder agreements, minutes of the Board of Directors, or filings with any department of corporations or similar agency.  Kuhns Decl. ¶ 4.  And Kirkland has never provided any advice whatsoever to, represented, or even spoken with any Mylan Director or member of their senior executive management.  Lefko-witz Decl. ¶ 35; Shumsky Decl. ¶ 56.  In short, Kirkland has not provided the Mylan clients with any legal services that are at all "related to the *legal services*" required to represent a client in an acquisition.  Fox Decl. ¶ 25.

In essence, then, the R&R's reading of the Conflict Waiver improperly changes its mean-ing and distorts the provision by using a confidence-based relatedness inquiry to expand the scope of disallowed representations, and by allowing Kirkland only to represent clients adverse to the Mylan entities in "matters that are not related to the same subject matter," rather than "re-lated to the legal services" by Kirkland, as the parties actually agreed.  *See Pacemaker Yacht Co. v. NLRB*, 663 F.2d 455, 459 (3d Cir. 1981) (noting the "settled rule of contract interpretation that

30

contract language should not be interpreted to render the contract promise illusory or meaning-less" (internal quotation marks omitted)).

Finally, the R&R's repeated emphasis on the Magistrate Judge's conception of Kirk-land's duty of loyalty (*e.g.*, R&R at 22 n.20, 31 n.39, 51) is inconsistent with the plain text of the parties' Agreement and with the context in which the Mylan clients were fully aware that they were operating. The Agreement expressly defines the nature of the duty of loyalty—as lawyers and clients are allowed to do. It states that any "adversity" to the Mylan clients or any of their "affiliates" "does not breach any duty" (*e.g.*, the duty of loyalty) that would otherwise be owed. Lefkowitz Decl., Ex. 1, at 3.

The parties contractually modified the default duty of loyalty that an attorney owes his or her client from the moment Kirkland first agreed to represent the Mylan clients. The R&R there-fore manifests yet another fundamental error by ignoring the well-settled principle that a sophis-ticated client, represented by counsel, can contractually narrow the general duty of loyalty (sub-ject of course to continuing obligations to protect confidentiality). Indeed, the R&R fails to rec-ognize that inherent in any conflict waiver is a negotiated agreement about the nature of the du-ties owed. Indeed, if accepted, the R&R's conception of "undivided loyalty" that sophisticated parties represented by counsel are prohibited from contractually modifying would foreclose any valid conflict waiver—a veritable sea change in the law.

In sum, the evidence and the Agreement establish that Kirkland's involvement in the transaction was not "related to the legal services" Kirkland provided to the Mylan clients. The R&R's conclusion that the Conflict Waiver is inapplicable should be rejected.

b. **"Affiliates"**

If this Court agrees that Kirkland's representation of Teva in the proposed transaction is not "related to the legal services" Kirkland provided to the Mylan clients, then there is no need to address the R&R's departure from several well-settled rules of contract interpretation in analyzing the Conflict Waiver's unambiguous provision governing "affiliates." That error by the R&R leads to an incorrect interpretation of the waiver's plain meaning. R&R at 46–50. Specifically, the R&R's flawed contract interpretation quite literally rewrites the Conflict Waiver's bright-line distinction between the Mylan clients and any "affiliates" in contravention of at least three cardinal principles of law.

*First*, the R&R conflicts with the well-settled principle that a contract provision is not ambiguous simply because someone else might have written that provision differently.[14] *Second*, the R&R does not give effect to the language as written.[15] *Third*, the R&R effectively repudiates the well-established rule that a contract should be read to give effect to all of its provisions and to render them consistent with each other.[16] Applying these principles is especially important where, as here, two sophisticated lawyers negotiated and agreed to a contractual provision.

---

[14] *Conair Corp. v. Old Dominion Freight Line, Inc.,* 22 F.3d 529, 533–34 (3d Cir. 1994) ("[A] court should not make a different or a better contract than the parties themselves have seen fit to enter into . . . ."); *ContiMortgage Corp. v. Mortgage Am., Inc.,* 47 F. Supp. 2d 575, 577 n.1 (E.D. Pa. 1999) ("[C]ourts should not write a better contract for the parties than the one they themselves negotiated and executed."); *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 381 (6th Cir. 1996) ("The mere fact that language could have been clearer does not necessarily mean that it is not clear enough.").

[15] *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476 (1992) (noting the "basic and unexceptional rule that courts must give effect to the clear meaning" of language "as written").

[16] *Engelhard Corp. v. NLRB*, 437 F.3d 374, 381 (3d Cir. 2006) (noting a "well established principle[] of contract construction" is "to read, if possible, all provisions of a contract together as a harmonious whole"); *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 137 (3d Cir. 2004) ("When interpreting contracts, we are required to read contract language in a way that allows all the language to be read together, reconciling conflicts in the language

Adherence to the foregoing contractual principles (*i.e.*, giving effect both to the plain meaning of the language as written and to all provisions in a way that renders them meaningful) yields only one proper outcome.  Examining the language of the Conflict Waiver with the aid of colored font points the way:

> "[A]s an integral part of the Engagement, you agree that K&E LLP may, now or in the future, represent other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to you or any of your affiliates on matters that are not related to
>
> (i) the legal services that K&E LLP has rendered, is rendering or in the future will render to you **under the Engagement** and
>
> (ii) other legal services that K&E LLP has rendered, is rendering or in the future will render to you or any of your affiliates **under a separate engagement** (an Allowed Adverse Representation")."

As shown, the parties agreed that Kirkland would represent the Mylan clients ("you") under the Engagement Agreement, and potentially represent them along with other Mylan entities ("your affiliates") in the future under separate engagement agreement(s).  The language therefore tracks those two scenarios by pairing them up with the two romanettes in the Conflict Waiver:

- ***First***, with respect to the Mylan clients, Kirkland would not handle a representation adverse to the Mylan clients ("you") if it is "related to . . . the legal services" that Kirkland has rendered to the Mylan clients ("you") under the Engagement Agreement and to any services Kirkland may render to the Mylan clients ("you") under a separate agreement.

- ***Second***, with respect to any potential future representation of other Mylan entities, Kirkland would not handle a representation adverse to such entities ("your affiliates") if it is "related to . . . the legal services" that Kirkland may render to them under a separate agreement.

In other words, the plain language of the Conflict Waiver demonstrates that adversity to the affiliates only matters if services are rendered to an affiliate *under a separate agreement*. Instead of this straightforward analysis, the R&R focuses exclusively on *some* of the language in

---

without rendering any of it nugatory if possible."); *Lesko v. Frankford Hosp.-Bucks Cnty.,* 15 A.3d 337, 342 (Pa. 2011) ("[A court] will not interpret one provision of a contract in a manner which results in another portion being annulled." (internal quotation marks omitted)).

the Conflict Waiver and then rearranges that language, changing its meaning in the process.  For example, the R&R concludes that Kirkland agreed "not to represent other clients 'adversely to . . . any [Mylan] affiliates on matters' related to its legal services for the Mylan Clients."  R&R at 46 (alteration in original).  But that is *not* the *actual* language of the Agreement.  Kirkland agreed not to represent clients adverse to the Specified Mylan Entities or any of their affiliates if those matters are "related to . . . the legal services that [Kirkland] has rendered, is rendering or in the future will render to [the Mylan entities] or [their] affiliates *under a separate engagement*."  Lefkowitz Decl., Ex. 1, at 3 (emphasis added).  It is undisputed that there is no such separate agreement here.

Not only does the R&R misinterpret the provision, it actually does, quite literally, rewrite it based on how Kirkland supposedly *should* have drafted it.  R&R at 48.  The illustration below demonstrates the effect of the R&R's rewriting on the parties' contract:

> Accordingly, as an integral part of the Engagement, you agree that K&E LLP may, now or in the future, represent other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to ~~(i)~~ ~~or any of your affiliates~~ on matters that are not related to ~~(i)~~ the legal services that K&E LLP has rendered, is rendering or in the future will render to you under the Engagement ~~and (ii) you or any of your affiliates on matters that are not related to other legal services that K&E LLP has rendered, is rendering or in the future will render to you or any of your affiliates under a separate engagement~~ (an "Allowed Adverse Representation").

As demonstrated, the R&R's proposed rewriting of the Conflict Waiver provision fundamentally changes the provision's meaning—including by making the Mylan clients' grandparent an "affiliate"—thereby rendering much of the provision's language superfluous.  But sophisticated parties represented by counsel bargained for *all* of the language in the Agreement, and no words should be deleted merely because other drafters might have chosen different words.  Only Kirkland's explanation of the meaning and interaction of the Engagement Agreement's provi-

34

sions about "affiliates" gives full effect to the language that the sophisticated parties negotiated. The R&R's conclusions regarding "affiliates" therefore should be rejected.

*     *     *

When the Mylan clients discussed a limited representation with Kirkland, they knew that the firm represented other major competitors of the Mylan clients in the pharmaceutical industry, including in matters adverse to Mylan entities; they knew that Kirkland represented many pharmaceutical companies in acquisition activities; they knew of the enormous magnitude of much of the litigation between pharmaceutical companies; they knew that pharmaceutical companies periodically attempted to acquire other pharmaceutical companies in both friendly and "hostile" transactions; and they knew that Kirkland would not take them on as a client absent a contractual waiver allowing Kirkland to continue to represent those other pharmaceutical companies in all of those areas, other than with respect to the specific product-based work that was contemplated.

The Mylan clients made a bargain in the context of all that knowledge.  The Mylan clients got the benefit of the bargain—Kirkland quite effectively provided its FDA-litigation expertise as agreed.  But Kirkland most certainly did not get that benefit, because these same entities turned around and sued Kirkland for doing exactly what the Engagement Agreement said Kirkland could do.  The contract was designed to ***prevent*** lawsuits like this one, not facilitate them, and thus to prevent the enormous economic and reputational impact of such lawsuits irrespective of the merits, as the consequences of the R&R demonstrate.  Even if there was a conflict of interest under Rule 1.7, therefore, it was waived in the Engagement Agreement and cannot form the basis for disqualification in this lawsuit.

35

## C.       INJUNCTIVE RELIEF IS NOT WARRANTED

Plaintiffs' motion for a preliminary injunction should be denied because they cannot meet any of the factors for equitable relief.  Indeed, the prohibitory components of their requested injunction are moot, and the mandatory component is unlawful.

### 1.       Reasonable Likelihood Of Success

This Court should not issue an injunction against Kirkland because Plaintiffs have not established a reasonable likelihood of success on their underlying claims.

Kirkland's previous representation of Teva was consistent with its duties to the Mylan clients, permissible under the ethics rules, and authorized by the Engagement Agreement.  This position was thoroughly vetted within the law firm before the engagement and has been fully endorsed in this litigation by the nation's leading academic expert on advance waivers, Professor Richard Painter.  The record of diligent consideration shows that Kirkland's position was neither unreasonable nor adopted in bad faith.  Indeed, Mylan N.V. was not a client, and the Mylan clients never previously objected when Kirkland handled substantial matters adverse to them pursuant to the waiver agreement.  Teva, in turn, reasonably relied on Kirkland's diligence, experience, and good-faith conclusion that it could take on the engagement.

This case certainly does not involve cavalier disregard of the ethical constraints on concurrent representations.  Indeed, it is widely recognized that in the highly complex field of conflicts of interest, "[c]ompliance or noncompliance with Canons of Ethics frequently do not involve morality or venality, but differences of opinions among honest men over the ethical propriety of conduct."  *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227 (2d Cir. 1977).  In resolving such a disagreement here, the R&R adopts a highly artificial construction of both Rule 1.7 and the Engagement Agreement to conclude, contrary to controlling authority, that

there was a "conflict of interest."  That conclusion is infected with multiple independent legal errors, any one of which leads to a different outcome, and is simply wrong; and Plaintiffs will be unable to prove otherwise on the merits if the case proceeds past this preliminary stage.  And irrespective of the R&R's myriad errors, the fact remains that the technical and complex nature of the asserted "conflict" must be taken into account in the equitable analysis as it relates to the good-faith conduct of both Kirkland and Teva.

### 2.    Irreparable Injury

Injunctive relief is inappropriate here for two reasons unrelated to the merits of Plaintiffs' claims.  *First*, the mandatory component of Plaintiffs' requested injunction—which would require Kirkland to retrieve from Teva all work product relating to its representation—is available only upon proof of an actual or a substantial risk of misuse of confidential information.  Plaintiffs provided no such proof here, and Kirkland in fact proved that this risk does ***not*** exist.  *Second*, the prohibitory components of Plaintiffs' requested injunction are moot:  in light of the uncertainty created by the R&R, Teva has secured new counsel, and Kirkland is no longer advising Teva on this transaction or otherwise supporting Teva's efforts to acquire Mylan N.V.  Kirkland will have no further role in the Teva/Mylan N.V. transaction and is not communicating with Teva's successor counsel regarding that transaction.  There is nothing left to enjoin.[17]

### a.    A Mandatory Injunction Would Be Unlawful

The R&R recommends a highly unusual mandatory injunction that would require Kirkland to "retrieve its work product on the hostile takeover campaign from Teva."  R&R at 19, 61.  This issue was never briefed by Plaintiffs, who simply mentioned a mandatory injunction in passing, without citing any legal or factual support in their briefing or at oral argument.  Plain-

---

[17]   Teva's decision to replace Kirkland with new counsel has been widely reported, but Kirkland stands ready to submit evidence of this fact upon request.

tiffs' Proposed Findings of Fact at 2.  Plaintiffs spent less than half a sentence in their mountain

of papers referencing Kirkland's retrieval of work product, and then only to describe the proce-

dural posture of the case.  Plaintiffs therefore waived this issue by not briefing it.[18]

The R&R bases its dramatic treatment of work product solely on its conclusion that there

was a "conflict."  R&R at 19 & n.17.  The R&R fails to recognize that the rules regarding client

retention or use of work product after a disqualification are markedly different from the rules on

disqualification itself.  *Lorber v. Winston*, No. 12-cv-3571, 2012 WL 5989464, at *2 (E.D.N.Y.

Nov. 29, 2012) (issues concerning transition from disqualified counsel to successor counsel are

"separate and distinct" from disqualification issues); *Wagner v. Lehman Bros. Kuhn Loeb, Inc.*,

683 F. Supp. 189, 193 (N.D. Ill. 1987) (same).  The R&R errs as a matter of law in failing to ap-

ply these rules before recommending an extraordinary mandatory injunction.

The Third Circuit and many other courts have squarely rejected the proposition that the

disqualification of a law firm from the representation of a client because of the firm's obligations

to another present or former client requires precluding use of the work product prepared before

disqualification.  *See, e.g.*, *IBM Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978) (holding that

disqualification is a sufficient response to a conflict of interest where specific injury has not been

shown, and "disagree[ing]" with a per se rule prohibiting turnover of disqualified attorney's

work product to substitute counsel).

The disposition of work product is separate and analytically distinct from several of the

doctrines that govern disqualification.  For example, with regard to disqualification, the law

sometimes invokes a presumption (even absent any proof) that a lawyer who worked on a partic-

---

[18]  *United States v. DeMichael*, 461 F.3d 414, 417 (3d Cir. 2006) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." (citation omitted)); *United States v. Hoffecker*, 530 F.3d 137, 163 (3d Cir. 2008).

ular matter necessarily received relevant confidences, and the law sometimes assumes (even absent any proof) that knowledge of one lawyer within a law firm constitutes the knowledge of all. These presumptions and rules of imputation have no relation, though, to the separate question of how to deal with the work product of a disqualified firm.

The Third Circuit specifically requires ***evidence*** of an actual or a significant risk of misuse of confidential information to gain an advantage before any relief beyond disqualification can be properly ordered. *Akerly v. Red Barn Sys.*, 551 F.2d 539, 543 (3d Cir. 1977); *IBM*, 579 F.2d at 283 (upholding order permitting disqualified counsel in concurrent representation context to transfer work product and communicate with successor counsel for sixty days); *Continental Grp. v. Amoco Chems. Corp.*, 614 F.2d 351, 358–59 (3d Cir. 1980) ("There must be an imminent threat of the allegedly harmful disclosure," and mere "risk of harm" from inadvertent disclosure is "not sufficient.").

Accordingly, even where counsel have been disqualified, courts almost always have permitted transfer of *all* work product to successor counsel to avoid prejudice to the former client in the absence of actual proof that such a transfer will necessarily involve the disclosure of confidences. In *IBM*, for example, the district court disqualified plaintiff's counsel but permitted the disqualified firm to transfer its work product and to consult with successor counsel for sixty days to "effect the turnover." 579 F.2d at 274. The Third Circuit affirmed this order, noting that "disqualification in circumstances . . . where specific injury to the moving party [seeking disqualification] has not been shown is primarily justified as a vindication of the integrity of the bar," and that the disqualification of counsel was sufficient "vindication." *Id.* at 283. Other

courts similarly eschew any request that disqualified counsel retrieve work product and allow disqualified counsel to turn over work product to successor counsel.[19]

The R&R completely fails to address this entire body of applicable authority, instead relying on inapposite trade secret cases (not cited by either party, and in which there was evidence of actual use of the trade secrets).  R&R at 19 n.17.

Under the correct legal standard, no mandatory injunction could be entered on the record here.  The undisputed evidence is that (1) Kirkland has **never** disclosed, and promptly put safeguards in place to prevent disclosure of, any confidential information the firm received from the Mylan clients; (2) there has been no actual use of confidential information; and (3) Kirkland timely destroyed, at the request of the Mylan clients, certain information related to the Epi-Pen.  Kirkland's Findings of Fact ¶¶ 93–111 and evidence cited therein; Kirkland's Supp. Findings of Fact ¶¶ 65–68 and authorities cited therein.  To the extent Plaintiffs wished to dispute any of this, they could have requested an evidentiary hearing.  Having declined that opportunity, the sworn declarations that Kirkland submitted and that are undisputed must be accepted.

The R&R exposes the gravity of its legal error by dismissing those undisputed facts as "immaterial."  R&R at 37.  On the contrary, these facts are dispositive under the governing Third Circuit standard:  In the absence of evidence of an actual or a substantial risk of misuse of confidential information, no mandatory injunction can issue for the simple yet dispositive reason that Plaintiffs have proved no irreparable harm.   Plaintiffs *concede* the absence of any evidence, premising their request for a mandatory injunction on "presumptions" and the "imputation doctrine."  Plaintiffs' Proposed Findings of Fact ¶¶ 119, 122; R&R at 34 n.42.  These are inapplica-

---

[19]  *E.g.*, *First Wis. Mortg. Trust v. First Wis. Corp.*, 584 F.2d 201, 205 (7th Cir. 1978) (en banc); *Manoir-Electroalloys Corp. v. Amalloy Corp.*, 711 F. Supp. 188, 196 (D.N.J. 1989) (Barry, J.); *EEOC v. Orson H. Gygi Co.*, 749 F.2d 620, 621 (10th Cir. 1984); *Behunin v. Dow Chem. Co.*, 642 F. Supp. 870, 873 (D. Colo. 1986).

ble in this context; actual evidence is required. *Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 241, 247–50 (D.N.J. 1998) (summarizing numerous authorities rejecting double imputation doctrine and allowing use of work product by client after disqualification); *cf. Ferring Pharm., Inc. v. Watson-Pharm., Inc.*, 765 F.3d 205, 216–17 (3d Cir. 2014) (rejecting presumption of irreparable injury).[20]

### b.       A Prohibitory Injunction Is Now Moot

In addition to the mandatory injunction component, the R&R also recommends three prohibitory injunction components.  These include (1) "enjoin[ing]" Kirkland from "representing, advising, or otherwise acting on behalf of Teva in connection with its efforts to acquire Mylan N.V."; (2) "prohibit[ing]" Kirkland from "using, relying on or disclosing any information it learned from its representation of Plaintiffs in any representation" of any other Kirkland client; and (3) "maintaining the confidentiality of all non-public information" it learned as a result of its representation of the Specified Mylan Entities.  R&R at 2 nn.2, 61.

A prohibitory injunction no longer can provide any redress to Plaintiffs.  Kirkland is no longer advising Teva on this transaction or otherwise supporting Teva's efforts to acquire Mylan N.V.  Kirkland will have no further role in the transaction and has not communicated with—and will not communicate with—Teva's successor counsel regarding the transaction.  Teva's decision to secure substitute counsel has obviated the need for any injunction, and Kirkland is prepared to submit confirming declarations if the Court deems that necessary.  Since there is no le-

---

[20]   Plaintiffs also failed to establish the relevance of the information provided to Kirkland in connection with its litigation representations and the proposed acquisition of Mylan N.V. None of Plaintiffs' experts reviewed the documents, and their only "evidence" was conclusory characterizations by Mr. Miner, in-house counsel for Mylan Inc.  Kirkland provided the Magistrate Judge with a detailed analysis of all of the documents in the record, and their lack of relevance; the R&R ignores this analysis entirely.  Kirkland's Supp. Findings of Fact ¶¶ 27–43; Shumsky Decl. ¶¶ 28–56.

gal or evidentiary basis for ordering the extraordinary remedy of a mandatory injunction, the Court should vacate those aspects of the R&R that are now moot and dismiss this case with prejudice. *United States v. Munsingwear*, 340 U.S. 36, 39 (1950) ("The established practice . . . in dealing with a civil case . . . which has become moot while [under review] is to reverse or vacate the judgment below and remand with a direction to dismiss.").[21]

Even if it were not moot, a prohibitory injunction is improper because there is zero risk of irreparable injury to Plaintiffs given that Teva has retained substitute counsel. With respect to the confidential information aspects of the proposed injunction, the parties are still bound by Rule 1.6 and by their Engagement Agreement, which itself contains the acknowledgement that Kirkland can and will keep their information confidential. Thus, any prohibitory injunction regarding "using" confidential information or "maintaining" that information's confidentiality is not just moot but unnecessary. In the absence of any evidence that Kirkland has disclosed, or will in the future disclose, this confidential information, an injunction to "obey the law" is not appropriate. *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 83 (3d Cir. 1990) ("[o]verbroad language in an injunction that essentially orders a party to obey the law in the future" should be vacated); *cf.* Fed. R. Civ. P. 65(d).

### 3.    Balance Of Hardships

As between the parties to this lawsuit, the balance of hardships tips decidedly in favor of Kirkland: Plaintiffs have achieved the outcome they sought by filing this lawsuit because Kirkland no longer represents Teva in connection with the Mylan N.V. transaction, and they would

---

[21]   *15192 Thirteen Mile Rd. v. City of Warren*, 593 F. Supp. 147, 154 (E.D. Mich. 1984) (substitution of new counsel rendered disqualification motion moot); *Reddick v. Justice*, No. 2:13-cv-3379, 2014 WL 4079355, at *1 (D.S.C. Aug. 14, 2014) (Magistrate R&R moot when court agreed with Plaintiffs' statements that issues in Report had been resolved); *cf. Marshall v. Sobina*, No. 10-169, 2013 WL 5351554, at *2 (W.D. Pa. Sept. 24, 2013).

suffer no harm even on their own theory if the litigation were to end right now with no injunction.  Kirkland, on the other hand, faces both reputational and monetary consequences from the R&R's erroneous conclusions regarding the asserted "conflict of interest," and these adverse effects would only be magnified by the entry of an unnecessary and unlawful injunction.

The R&R errs in summarily dismissing the burdens that a mandatory injunction would impose on Teva, a nonparty to this lawsuit.  R&R at 2 n.2.  Work product produced by an attorney and in the possession of the client is the property of the client; Kirkland has no control over Teva's property in Teva's possession.  Kirkland cannot be enjoined to do things beyond its own power to control, and Teva would not be bound by any injunction because it is not a party to this action.  Yet the mandatory injunction would have the effect of adjudicating Teva's rights to its own property.  This harm to Teva must be factored into the injunction analysis.[22]

While the R&R states that it "considered Teva's interests," (R&R at 57), and the public interest (*id.* at 59–60), the R&R discounts these interests based on the wholly unsupported proposition that "there has been no clear showing that Teva is an innocent party in the occasioning of these unfortunate and unethical circumstances," because Teva "knew" that Kirkland also represented the Mylan clients.  *Id.* at 57.  But that knowledge alone, even if it had been established, does not demonstrate any bad faith or culpability by Teva.  Teva understood from Kirkland that Mylan had waived the conflict.  Teva did not know, and Kirkland could not and did not disclose to Teva, the specific terms of Mylan's conflict waiver, the circumstances surrounding the negotiation of the waiver, or non-public information concerning Kirkland's representations, including

---

[22] *See, e.g., Instant Air Freight Co. v. CF Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989) ("[T]he district court should take into account  . . . the possibility of harm to other interested persons from the grant or denial of the injunction . . ."); *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) (same); *CenTra v. Estrin*, 639 F. Supp. 2d 790, 817 (E.D. Mich. 2009) (interests of client must be weighed in determining whether disqualification is appropriate); *see also* Kirkland's Supp. Findings of Fact ¶¶ 69–73 and cases cited therein.

the specific products involved.  And as discussed above, the R&R's presumption of bad faith by a non-party is legally erroneous, particularly where the record fully set forth Teva's good-faith reasons for hiring Kirkland, and, as the party seeking the injunction, Mylan had the burden of proving any bad faith.  Kirkland's Findings of Fact ¶¶ 60–65, 88–89.

Teva knew that Kirkland was its counsel in major litigation matters directly adverse to the Mylan clients—and that those clients had never voiced concerns about any violation of the ethics rules.  Kirkland's Findings of Fact ¶¶ 60–69.  There is simply nothing in the record to attribute to Teva anything other than good faith, and it was extraordinarily unfair, and plain legal error, for the R&R simply to side-step any analysis of the harm to Teva on the theory that Teva somehow brought it upon itself.[23]

Further, the R&R's premise that "there is little or no discernable public interest at stake in who will prevail in the hostile takeover battle between Teva and Mylan N.V." is wrong.  R&R at 59.  The hundreds of thousands of public shareholders of the various corporations involved (Teva and Mylan N.V., in particular), as well as the millions whose pension or mutual funds invest in these companies, have a strong interest in having the process play out in ways that maximize value, and not having the legal system and the Pennsylvania ethics rules used as a tactical

---

[23]  The R&R repeatedly references *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 602 A.2d 1277 (Pa. 1992), a Pennsylvania Supreme Court case assessing a Philadelphia firm's conflict of interest, during its irreparable harm analysis.  In that case, the offending attorney bullied Maritrans, one of his firm's clients, into waiving several conflicts of interest in exchange for a promise that the firm would not represent Maritrans's biggest competitor—then blatantly broke that promise by "parking" the competitor with a conspiring attorney at another firm until the conflicted attorney could end his relationship with Maritrans and hire the conspirator as a lateral partner.  *Id.* at 1281.  Those egregious facts are a far cry from the facts of this case:  Kirkland agreed to represent Teva in good faith, and the lawyers who represented Teva never received any confidential information about the Mylan clients and were effectively walled off from such information.  Notably, even in *Maritrans*, the remedies ordered by the court did not go beyond disqualification.  If the *Maritrans* facts did not call for an extraordinary remedy like the retrieval of work product, the facts of this case certainly do not.

tool to affect their economic interests without a showing of material and irreparable harm.  *Cf.*

*Behunin*, 642 F. Supp. at 873–74 (recognizing societal harm caused by misuse of ethical rules to

materially affect legal proceedings).  That is particularly significant in the global pharmaceutical

industry, which conducts significant operations within the Third Circuit, and which is very active

in mergers, acquisitions, and other corporate transactions.

     For all of these reasons, the Court should reject or vacate the R&R, and deny Plaintiffs'

motion for a preliminary injunction in its entirety.

### V.    CONCLUSION

     For each of the foregoing independent reasons, this Court should deny Plaintiffs' motion

for a preliminary injunction and decline to adopt the R&R.

Dated:  June 23, 2015           K&L GATES LLP

           By:    /s/ Richard W. Hosking
               Richard W. Hosking, PA 32982
               Melissa J. Tea, PA 80195
               K&L GATES LLP
               210 Sixth Avenue
               Pittsburgh, Pennsylvania  15222-2613
               Telephone:  (412) 355-6500
               Facsimile:  (412) 355-6501
               Richard.hosking@klgates.com
               Melissa.tea@klgates.com

           GIBSON, DUNN & CRUTCHER LLP

               Kevin S. Rosen, (admitted pro hac)
               Daniel S. Floyd, (admitted pro hac)
               GIBSON, DUNN & CRUTCHER LLP
               333 South Grand Avenue
                Los Angeles, CA  90071-3197
               Telephone:  (213) 229-7000
               Facsimile:  (213) 229-7520
               KRosen@gibsondunn.com
               DFloyd@gibsondunn.com

           Counsel for Defendant,
           KIRKLAND & ELLIS LLP