**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MYLAN INC., MYLAN PHARMACEUTICALS INC., MYLAN TECHNOLOGIES, INC. and MYLAN SPECIALTY LP,<br><br>             Plaintiffs,<br><br>    v.<br><br>KIRKLAND & ELLIS LLP,<br><br>              Defendant. | 2:15-cv-00581-JFC-LPL |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION ON MOTION FOR PRELIMINARY INJUNCTION**

WILLIAM PIETRAGALLO, II, ESQ.
JOHN A. SCHWAB, ESQ.
PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
Tel.: 412-263-2000
Fax: 412-263-2001
WP@Pietragallo.com
JAS@Pietragallo.com

MICHAEL S. SOMMER, ESQ. (admitted *pro hac vice*)
MORRIS J. FODEMAN, ESQ. (admitted *pro hac vice*)
JESSICA L. MARGOLIS, ESQ. (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Tel.: 212-999-5800
Fax: 212-999-5899
msommer@wsgr.com
mfodeman@wsgr.com
jmargolis@wsgr.com

*Counsel for Mylan Plaintiffs*

July 7, 2015

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................... vii

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND ............................................................................... 2

    A.    Mylan's Engagement of K&E ............................................................... 2

    B.    K&E's Representation of Mylan ........................................................... 5

    C.    K&E's Representation of Teva ............................................................. 8

    D.    The Preliminary Injunction ................................................................ 10

ARGUMENT ...................................................................................................... 12

    I.    STANDARD OF REVIEW ................................................................. 12

    II.    K&E'S REPRESENTATION OF TEVA CONSTITUTES A CLEAR
            CONFLICT OF INTEREST UNDER RULE 1.7 ................................. 13

           A.    K&E's Representation of Teva Cannot be Justified by the ABA
                 Formal Opinions Cited in K&E's Objections ............................. 14

           B.    Magistrate Judge Lenihan Does Not Disregard Corporate Structure
                 in Finding Direct Adversity between K&E and the Mylan Clients .......... 18

           C.    Alternatively, K&E's Representation of Teva is Directly Adverse
                 to Plaintiffs Because it is "Related" to K&E's Representation of
                 Mylan ......................................................................................... 21

    III.    K&E'S VIOLATIONS CANNOT BE EXCUSED BY THE PARTIES'
            ENGAGEMENT LETTER ................................................................. 24

           A.    K&E's Representation of Teva Falls Outside the Scope of the
                 Advance Waiver Because it is "Related" to K&E's Representation
                 of Mylan ..................................................................................... 25

           B.    Even if the Advance Waiver Applies, K&E Fails to Show it was
                 Based on Informed Consent ........................................................ 30

      C.     The Engagement Letter Expressly Prohibits K&E from Taking on Matters Adverse to Mylan's Corporate Affiliates, Including Mylan N.V............................................................................................................36

  IV.     INJUNCTIVE RELIEF IS WARRANTED...........................................................38

      A.     Mylan Demonstrates a Reasonable Likelihood of Success on the Merits ..................................................................................................................38

      B.     The Preliminary Injunction is Necessary to Prevent Immediate and Irreparable Harm to Mylan ........................................................................39

            1.     A Mandatory Injunction is Lawful and Warranted...................... 40

            2.     A Prohibitory Injunction is Necessary ......................................... 43

      C.     The Balance of Hardships and Public Interest Both Favor Granting a Preliminary Injunction ..........................................................................44

CONCLUSION...........................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*15192 Thirteen Mile Rd. v. City of Warren*,
    593 F. Supp. 147 (E.D. Mich. 1984) ................................................................................43

*Abbott v. Pa. Dep't of Corr.*,
    No. 10-1285, 2011 U.S. Dist. LEXIS 73 (W.D. Pa. Jan. 3, 2011) ...................................12

*Akerly v. Red Barn Sys., Inc.*,
    551 F.2d 539 (3d Cir. 1977) .............................................................................................41

*Alford v. Frontier Enters., Inc.*,
    599 F.2d 483 (1st Cir. 1979) ............................................................................................20

*Allee v. Medrano*,
    416 U.S. 802 (1974) ..........................................................................................................43

*Allman v. Sears, Roebuck & Co.*,
    No. 87-6074, 1988 U.S. Dist. LEXIS 11659 (E.D. Pa. Oct. 17, 1988) ............................24

*Bd. of Managers of Eleventh St. Loftominium Ass'n v. Wabash Loftominium, L.L.C.*,
    376 Ill. App. 3d 185 (Ill. App. Ct. 2007) ........................................................................21

*Bowers v. The Ophthalmology Grp.*,
    733 F.3d 647 (6th Cir. 2013) ...........................................................................................28

*Celgene Corp. v. KV Pharm. Co.*,
    Civ. A. No. 07-4819 (SDW),
    2008 U.S. Dist. LEXIS 58735 (D.N.J. July 28, 2008) ...............................30, 31, 33, 35, 36

*Concat LP v. Unilever, PLC*,
    350 F. Supp. 2d 796 (N.D. Cal. 2004) .......................................................................23, 31

*Continental Grp., Inc. v. Amoco Chems. Corp.*,
    614 F.2d 351 (3d Cir. 1980) .............................................................................................42

*DeShields v. Barnhart*,
    No. 02-8426, 2004 U.S. Dist. LEXIS 2998 (E.D. Pa. Feb. 26, 2004) ..............................12

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003) ..........................................................................................................20

*Dougherty v. Phila. Newspapers, LLC*,
    85 A.3d 1082 (Pa. Super. Ct. 2014) ............................................................................24, 43

*Ford v. Astrue*,
No. CIV-10-468-D,
2011 U.S. Dist. LEXIS 92164 (W.D. Okla. Aug. 17, 2011) ..........................................13

*Galderma Labs., L.P. v. Actavis Mid Atl. LLC*,
927 F. Supp. 2d 390 (N.D. Tex. 2013) ......................................................................33, 34

*Goss Graphics Sys. v. MAN Roland Druckmaschinen Aktiengesellschaft*,
No. C00-0035 MJM,
2000 U.S. Dist. LEXIS 18100 (N.D. Iowa May 25, 2000)..........................................36

*Greenwood Land Co. v. Omnicare, Inc.*,
Civ. A. No. 09-686,
2009 U.S. Dist. LEXIS 74374 (W.D. Pa. Aug. 20, 2009) ...........................................26

*GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*,
644 F. Supp. 2d 333 (S.D.N.Y. 2009),
*aff'd*, 618 F.3d 204 (2d Cir. 2010) ............................................................................21

*The Hyman Cos., Inc. v. Brozost*,
964 F. Supp. 168 (E.D. Pa. 1997) ..........................................................................1, 43

*IBM Corp. v. Levin*,
579 F.2d 271 (3d Cir. 1978).................................................................................41, 42

*In re Congoleum Corp.*,
426 F.3d 675 (3d Cir. 2005).........................................................................................30

*In re Corn Derivatives Antitrust Litig.*,
748 F.2d 157 (3d Cir. 1984).................................................................................25, 30

*Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l Longshoremen's Ass'n*,
909 F. Supp. 287 (E.D. Pa. 1995) .......................................................................25, 30

*Janus Capital Grp., Inc. v. First Derivative Traders*,
131 S. Ct. 2296 (2011)...................................................................................................20

*Kessler v. Broder*,
851 A.2d 944 (Pa. Super. Ct. 2004) ............................................................................40

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
No. 2:12-cv-02182-KJM-KJN,
2015 U.S. Dist. LEXIS 45526 (E.D. Cal. Apr. 7, 2015)...............................20, 33, 35

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
874 F. Supp. 2d 169 (S.D.N.Y. 2012)..........................................................................29

*Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*,
    529 Pa. 241 (1992) ...................................................................................... passim

*Owen v. United States*,
    889 F. Supp. 1293 (D. Idaho 1995) ...............................................................13

*Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*,
    913 F.2d 64 (3d Cir. 1990)..............................................................................43

*Reddick v. Justice*,
    C/A No. 2:13-cv-3379 DCN WWD,
    2014 WL 4079355 (D.S.C. Aug. 14, 2014) ....................................................44

*Rogers v. Dir., Tex. Dep't of Criminal Justice-Corr. Insts. Div.*,
    No. 5:10-cv-150,
    2013 U.S. Dist. LEXIS 128584 (E.D. Tex. Sept. 10, 2013) ............................12

*Sovereign Bank v. Harper*,
    674 A.2d 1085 (Pa. Super. Ct. 1996) .............................................................40

*Stockton v. Ford*,
    52 U.S. 232 (1850)............................................................................................2

*Tice v. Wilson*,
    425 F. Supp. 2d 676 (W.D. Pa. 2006),
    *aff'd*, 276 Fed. Appx. 125 (3d Cir. 2008) ......................................................12

*United States v. Bestfoods*,
    524 U.S. 51 (1998)..........................................................................................20

*United States v. DeMichael*,
    461 F.3d 414 (3d Cir. 2006)............................................................................40

*United States v. Hoffecker*,
    530 F.3d 137 (3d Cir. 2008)............................................................................40

*Vanderveer Grp. v. Petruny*,
    No. 93-3677, 1993 U.S. Dist. LEXIS 13614 (E.D. Pa. Aug. 10, 1993) ...........23

*Vanderveer Grp. v. Petruny*,
    Nos. 93-3677, 93-5154,
    1994 U.S. Dist. LEXIS 8867 (E.D. Pa. June 29, 1994) ..............................22, 23

*W. Sugar Coop. v. Archer-Daniels-Midland Co.*,
    No. CV 11-3473 CBM,
    2015 U.S. Dist. LEXIS 21448 (C.D. Cal. Feb. 13, 2015)...........................31, 36

*Worldspan, L.P. v. Sabre Grp. Holdings, Inc.*,
    5 F. Supp. 2d 1356 (N.D. Ga. 1988) ...............................................................................33

## STATUTES

28 U.S.C. § 636(b)(1) ...............................................................................12

## RULES

17 C.F.R. § 230.405 ...............................................................................38

Pennsylvania Rule of Professional Conduct 1.0(e) ...............................................30

Pennsylvania Rule of Professional Conduct 1.7 ............................................... passim

Pennsylvania Rule of Professional Conduct 1.9 ............................................... passim

Western District of Pennsylvania Local Rule 72(D)(1) ............................................12

## OTHER AUTHORITIES

ABA Formal Op. 95-390 (Jan. 25, 1995) ...................................................15, 16, 22

ABA Formal Op. 05-434 (Dec. 8, 2004) ...............................................15, 16, 17, 22

ABA Formal Op. 05-435 (Dec. 8, 2004) ...............................................15, 16, 17, 22

ABA Formal Op. 05-436 (May 11, 2005) ...................................................35

## TABLE OF ABBREVIATIONS

| ABBREVIATION | DOCUMENT TITLE | CM/ECF DKT. NO. |
|---|---|---|
| Miner Decl. | Declaration of Douglas Miner in Support of Motion for Preliminary Injunction [filed in The Court of Common Pleas of Washington County, PA] | 1-2 |
| Fox Decl. | Declaration of David Fox | 35 |
| Lefkowitz Decl. | Declaration of Jay P. Lefkowitz | 48 |
| Ondos Decl. | Declaration of Jill Ondos | 75 |
| Supp. Miner Decl. | Supplemental Declaration of Douglas Miner | 73 |
| Coates Report | Expert Report of Professor John C. Coates IV | 63 |
| Moriarty Report | Expert Report of Professor Jane Campbell Moriarty | 66 |
| Hazard Report | Expert Report of Professor Geoffrey C. Hazard, Jr. | 68 |
| K&E FoF/CoL | Defendant Kirkland & Ellis LLP's Proposed Findings of Fact and Conclusions of Law | 72 |
| Mylan FoF/CoL | Plaintiffs' Proposed Findings of Fact and Conclusions of Law | 70 |
| Supp. Ondos Decl. | Supplemental Declaration of Jill Ondos | 87-1 |
| Tr. | Transcript of Proceedings on Mylan's Motion for Preliminary Injunction on May 26, 2015, United States District Court, Pittsburgh, Pennsylvania, before Lisa Pupo Lenihan, Magistrate Judge | 95 |
| R&R | Report and Recommendation on Plaintiff's Motion for Preliminary Injunction | 96 |
| Objections | Objections of Defendant Kirkland & Ellis LLP to Report and Recommendation on Plaintiffs' Motion for Preliminary Injunction | 105 |

## <u>INTRODUCTION</u>

When Plaintiffs ("Mylan" or the "Mylan Clients") decided to retain Kirkland & Ellis LLP ("K&E") as Mylan's legal advisor in connection with numerous matters involving its most important pharmaceutical products, Mylan trusted that K&E would remain loyal in accordance with its fundamental ethical and professional duties.  Yet after providing K&E some of its most sensitive product details, pricing strategies, regulatory strategies, and other highly confidential business information, Mylan was shocked to learn that K&E – without seeking any consent from Mylan – had undertaken to represent Mylan's chief competitor in a hostile attempt to acquire its entire business.  That, of course, includes the very same products about which K&E obtained confidential information from Mylan during the course of the parties' relationship.  Mylan had no choice but to bring this action in order to protect itself from its very own attorneys.

Magistrate Judge Lenihan's 61-page Report and Recommendation is extraordinarily thorough, meticulously researched, and well-reasoned.  It is a vindication of clients' rights and of the fundamental duty of loyalty – a duty that is "continuing and sacrosanct," and which "goes to the very heart of a lawyer's ethics[.]"  *The Hyman Cos., Inc. v. Brozost*, 964 F. Supp. 168, 170 (E.D. Pa. 1997).  K&E suggests that this basic tenet of the legal profession is an old-fashioned notion that no longer applies in an era of big firms representing big companies, and openly accuses Mylan – its own client – of invoking the duty of loyalty as a surreptitious "delay tactic." Objections at 10.  It then attempts to sidestep its fiduciary and ethical obligations by frivolously clinging to corporate formalities that do nothing to eradicate the conflict, by misrepresenting its own Engagement Letter in an attempt to provide a post-facto justification for its conduct, and by claiming "informed consent" despite an utter failure by K&E to actually inform Mylan.  None of these arguments contain merit, and Magistrate Judge Lenihan rejects them accordingly.

Perhaps most disturbing is K&E's effort to mislead this Court into believing that Magistrate Judge Lenihan's opinions "threaten significant destabilizing effects on corporate representation and transactions across the Third Circuit." Objections at 3. Nothing could be further from the truth. To the contrary, courts across this country, including the Pennsylvania Supreme Court, have long recognized that "[t]here are few of the business relations of life involving a higher trust and confidence than those of attorney and client or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice[.]" *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 253-54 (1992) (quoting *Stockton v. Ford*, 52 U.S. 232, 247 (1850)). Adherence to the fiduciary duty of loyalty not only "ensures that clients will feel secure that everything they discuss with counsel will be kept in confidence," but also promotes the "public's trust in the legal profession" in general. *Id.* at 252, 254. Magistrate Judge Lenihan defends these bedrock principles (R&R at 7-8), and this Court should do the same.

## FACTUAL BACKGROUND

### A.  Mylan's Engagement of K&E

Plaintiff Mylan Inc. is a leading global, generic and specialty pharmaceutical company headquartered in Canonsburg, Pennsylvania. Miner Decl. ¶ 17. On February 27, 2015, Mylan Inc. was reorganized as a wholly owned indirect subsidiary of Mylan N.V., a public limited liability company organized in the Netherlands. Miner Decl. ¶ 17; Ondos Decl. ¶ 23; R&R at 9. Each of the remaining plaintiffs is a wholly owned subsidiary of Mylan Inc. Mylan FoF/CoL ¶¶ 1-4; R&R at 2. It is undisputed that in the first quarter of 2015, approximately 90% of Mylan N.V.'s revenue came from Mylan Inc. and its subsidiaries. Ondos Decl. ¶ 24; R&R at 10, 27.

In late 2012, after repeated efforts by K&E to obtain Mylan's business, the parties entered into discussions concerning K&E's potential representation of Mylan. Miner Decl. ¶ 3;

-2-

Ondos Decl. ¶¶ 5, 7.  Those discussions were led by Jill Ondos – Mylan's Senior Vice President and Global General Counsel, Litigation – and K&E partner Jay Lefkowitz.  After exchange of various drafts, the parties signed an Engagement Letter in early 2013.  Miner Decl. ¶ 3; Ondos Decl. ¶¶ 5, 7; R&R at 10.  Prior to those discussions, Ms. Ondos had been aware that K&E had represented other clients, including Teva Pharmaceutical Industries Ltd. ("Teva"), a direct competitor whose interests were adverse to Mylan in certain regulatory and litigation matters.  R&R at 10; Ondos Decl. ¶¶ 7, 11.  Ms. Ondos, however, did not know that K&E had done corporate work for Teva, nor did she know of such work until Teva began its hostile pursuit of Mylan.  Supp. Ondos Decl. ¶ 7.  In fact, during negotiation of the Engagement Letter there was never any discussion between Ms. Ondos and Mr. Lefkowitz concerning K&E's transactional work for any client, including Teva.  Supp. Ondos Decl. ¶¶ 3-8; *see also* Ondos Decl. ¶¶ 11-17; Lefkowitz Decl. ¶ 4.  While Mylan was skeptical of engaging K&E in light of its prior litigation and regulatory work for Teva, Mylan relied upon K&E's unequivocal assurances that its relationship with Teva was not as extensive as Mylan may have thought, and that K&E would uphold its duties of loyalty to Mylan.  Ondos Decl. ¶¶ 5, 8-9.  Ms. Ondos also ensured that the parties' Engagement Letter would only allow K&E to represent other clients (including Teva) in matters completely *unrelated* to K&E's work for Mylan.  *Id.*

K&E drafted the initial version of the Engagement Letter and sent it to Mylan on January 9, 2013.  Ondos Decl. ¶ 12 and Ex. A.  K&E included language that generally is referred to as an "Advance Waiver."  This initial draft letter asked Mylan to consent to K&E "represent[ing] other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to [Mylan] or any of [Mylan's] affiliates on matters that are not ***substantially related*** to . . . the legal services that K&E LLP has rendered, is rendering or in the future will render to

-3-

[Mylan] . . . ."  *Id.* ¶ 12 and Ex. A (emphasis added); Pls.' Ex. 3.[1]  As noted in the R&R, Ms. Ondos reviewed the draft letter and made some proposed changes, including a request that K&E remove the word "substantially" from the Advance Waiver.  R&R at 11.  The effect of this revision – which K&E hardly mentions in its Objections – was clear: K&E would be prohibited from engaging in a representation that was adverse to Mylan or any of its affiliates so long as the matter was merely "related" to the work K&E was to perform for Mylan.  Ms. Ondos requested this change because it provided Mylan with increased protection if it believed that K&E was acting adversely to Mylan or any of its affiliates on any matter touching upon K&E's representation of Mylan.  Ondos Decl. ¶ 13 and Ex. B; Pls.' Ex. 4.

K&E accepted Mylan's changes on January 30, 2013, and the Engagement Letter was fully executed on February 11, 2013.  Ondos Decl. ¶¶ 14-15 and Ex. C; Pls.' Exs. 1, 5-7.  The final Advance Waiver provision states as follows:

> [A]s an integral part of the Engagement, you agree that K&E LLP may, now or in the future, represent other entities or persons, including in litigation, arbitration or other dispute resolution procedure, adversely to you *or any of your affiliates* on matters that are ***not related*** to (i) the legal services that K&E LLP has rendered, is rendering or in the future will render to you under the Engagement and (ii) other legal services that K&E LLP has rendered, is rendering or in the future will render to you or any of your affiliates under a separate engagement (an "Allowed Adverse Representation").

Pls.' Ex. 1 ("Engagement Letter") at 3 (emphasis added); *see also* Mylan FoF/CoL ¶ 29.

Thus, as Magistrate Judge Lenihan correctly observes, "under the express language negotiated by the parties and drafted by K&E, *an AAR [Allowed Adverse Representation] is a representation of another client adversely to the Mylan Clients or any affiliate in a matter not related to legal services provided to the Mylan Clients under the Engagement Letter*."  R&R at 7

---

[1]   The phrase "substantially related" is a term of art derived from the Model Rules of Professional Conduct, Rule 1.9, which prohibits adverse representations that are "substantially related" to prior client matters.  *See* Pa.R.P.C. 1.9.

-4-

n.9 (emphasis in original).  So long as a matter adverse to Mylan or its affiliates bore any relation to the legal services provided to Mylan, it was not "allowed."

Importantly, Magistrate Judge Lenihan correctly finds that during the course of the parties' negotiations, "K&E never informed Mylan of any intent or understanding that under the terms of the Engagement Letter K&E would be permitted to undertake representation in an adverse acquisition of the Mylan corporate affiliate group, including the client subsidiaries and products with respect to which K&E was being provided confidential, proprietary and attorney-client privileged information."  R&R at 11; *see also* Miner Decl. ¶¶ 22-23; Ondos Decl. ¶¶ 31-32.  And, in fact, Ms. Ondos affirmed that she "never contemplated a hostile takeover effort of Mylan by Teva or any other company, and did not and never would have knowingly consented to K&E, Mylan's current counsel on numerous matters, playing the role of lead counsel in such an effort."  Supp. Ondos Decl. ¶ 10; *see also* Miner Decl. ¶¶ 22-23; Ondos Decl. ¶¶ 31-32.  K&E failed to provide any evidence to the contrary.  R&R at 43-44 & n.55.

## B.      K&E's Representation of Mylan

Mylan provided Magistrate Judge Lenihan "with numerous examples of confidential information shared with K&E during the period of ongoing legal representation."  R&R at 13; s*ee also* Supp. Miner Decl. ¶ 11; Pls.' Exs. 130-44.  Specifically, the R&R finds that the "Declarations and Exhibits of record demonstrate that K&E provided advice to the Mylan Clients regarding substantial product and customer matters, and that the Mylan Clients shared confidential and proprietary information (including, *e.g.*, proprietary and confidential pricing strategies, and confidential market and financial forecast information) and engaged in related attorney-client privileged communications with K&E."  R&R at 13-14.  As of May 2015, K&E's website identified the firm as Mylan's "primary outside counsel."  R&R at 12; Pls.' Ex. 20.

As explained by Magistrate Judge Lenihan, Mylan initially retained K&E in connection

with two matters: one relating to generic lidocaine patch products and the other relating to olmesartan, a critical component of Mylan's product portfolio.  R&R at 11-12; Miner Decl. ¶ 3; Ondos Decl. ¶ 10.  In the course of K&E's provision of legal services regarding the generic lidocaine patch products, Mylan provided K&E confidential information and K&E generated legal and regulatory work product.  Miner Decl. ¶ 5; R&R at 12.  During K&E's representation in connection with olmesartan, Mylan provided K&E with confidential information so that K&E could secure and maintain Mylan's generic market exclusivity.  Miner Decl. ¶ 6; R&R at 12.  As recently as April 27, 2015, K&E appeared on Mylan's behalf in the olmesartan matter in the Northern District of Illinois and filed a brief in the U.S. Court of Appeals for the Federal Circuit on April 30, 2015.  Miner Decl. ¶ 7; Pls.' Exs. 22-23; R&R at 12.

The R&R further explains that K&E's work for Mylan subsequently expanded to numerous other matters beyond the two products with respect to which K&E was initially engaged.  R&R at 12; Miner Decl. ¶¶ 8-10.  In connection with those new matters, Mylan again shared confidential and proprietary information and engaged in attorney-client privileged communications with K&E, including confidential information relating to Mylan's proprietary strategies for pricing a vast array of its products, as well as confidential market and financial forecast information.  Miner Decl. ¶¶ 8-10.  K&E has handled matters involving some of Mylan's most important products and customers, and has billed Mylan substantial fees for the work it performed.  In fact, the products on which K&E advised Mylan amounted to nearly $4 billion in total market revenue last year alone.  Supp. Miner Decl. ¶¶ 2, 4, 5; R&R at 13.

For example, in October 2013, K&E advised Mylan regarding its relationship with one of its largest customers.  As the R&R recognizes, Mylan provided K&E sensitive, confidential, proprietary information regarding this matter, and K&E produced confidential memoranda to

Mylan analyzing the situation.  R&R at 13; Supp. Miner Decl. ¶¶ 7-8; Pls.' Ex. 130 (provided *in camera*).  In addition, just seven months ago, Mylan provided K&E with detailed prospective financial forecasts for a not-yet-launched product.  These highly confidential documents reveal Mylan's internal financial analysis for this specific product, as well as the modeling Mylan utilizes in financial forecasting more generally.  R&R at 13; Supp. Miner Decl. ¶ 9; Pls.' Ex. 132.  K&E was also recently privy to highly sensitive information relating to the regulatory status of a number of Mylan products pending FDA approval.  Supp. Miner Decl. ¶ 10.

In or around February 2013, K&E began advising Mylan with respect to its EpiPen® auto-injector product ("EpiPen®"), which has been the most prescribed epinephrine auto-injector in the United States for the last twenty-five years, and which is one of Mylan's most important products.  The scope of that representation was varied and involved numerous issues.  In the course of K&E's work on EpiPen® matters, Mylan provided K&E with confidential information relating to both the EpiPen® Auto-Injector and to Mylan's regulatory and legal strategies.  R&R at 12-13; Miner Decl. ¶ 11; Ondos Decl. ¶ 17.  In late 2014, the scope of K&E's representation of Mylan expanded with respect to the EpiPen® product, and Mylan continued to provide K&E with confidential information relating to EpiPen®, including confidential communications and legal and strategic analyses.  R&R at 12-13; Miner Decl. ¶ 12.

At one point, Mylan became aware that Teva had applied to the FDA for approval of an AB-rated version of the EpiPen®.  Although K&E had represented Teva with respect to other drug products in the past, K&E assured Mylan that these past representations would not create a conflict of interest with respect to K&E's representation of Mylan in connection with EpiPen®.  K&E advised that it was a "free agent" in relation to activities involving EpiPen®, and because it had been providing Mylan with legal advice relating to EpiPen® since 2013, it would be

ethically barred from representing Teva in matters in which EpiPen® was implicated.  Miner

Decl. ¶ 13.  Mylan therefore continued to work with K&E on matters relating to EpiPen® into

early December 2014.  Based upon K&E's unequivocal assurances of loyalty, Mylan forwarded

to K&E highly confidential material – including legal memoranda which addressed litigation

strategy in connection with the EpiPen® – and participated in privileged discussions involving

that material.  *See* R&R at 12-13; Miner Decl. ¶ 14; Supp. Miner Decl. ¶ 13; Ondos Decl. ¶ 20.

On December 5, 2014, K&E called Mylan and explained that it had discovered a

supposed conflict of interest in connection with its legal services to Mylan regarding EpiPen®.

Miner Decl. ¶ 15.  Mylan requested that it be provided with specifics as to the nature of the

conflict and the identity of the party to whom K&E believed it owed a duty of loyalty arising

prior to its duty to Mylan, but K&E refused to provide those details.  *Id.*; *see also* Pls.' Exs. 9-12.

### C.     K&E's Representation of Teva

On April 21, 2015, Mylan N.V. received an unsolicited letter from Teva's President and

Chief Executive Officer, Erez Vigodman, proposing a transaction to acquire Mylan N.V. and its

subsidiaries, including Plaintiffs.  Miner Decl. ¶ 16; Pls.' Ex. 14.  The letter identified K&E as

legal counsel for Teva.  This was the first time Mylan learned that K&E was representing Teva

in connection with the hostile attempt to take over the entire Mylan corporate affiliate group via

acquisition of Mylan N.V. (the "Subject Representation").  As Magistrate Judge Lenihan

correctly notes, "K&E had not previously informed Mylan that it might or would represent Teva

in the proposed acquisition and had not then sought a waiver from Mylan permitting it to engage

in such a representation."  R&R at 15; Ondos Decl. ¶¶ 22, 27, 31-32; Miner Decl. ¶ 18.

The uncontroverted facts show – and Magistrate Judge Lenihan agrees – that at no time

did K&E ever suggest to Mylan that the Engagement Letter would permit K&E to take on an

engagement to acquire Mylan in its entirety, including the very products with respect to which

K&E provided legal services and obtained confidential, proprietary, and attorney-client privileged information.  Miner Decl. ¶ 23; Ondos Decl. ¶¶ 31-32; *see also* R&R at 43-44 & n.55. Had K&E made such a suggestion or requested that Mylan waive such a conflict of interest, Mylan would never have agreed.  Miner Decl. ¶¶ 22-23; Ondos Decl. ¶¶ 31-32; Supp. Ondos Decl. ¶ 10.  Rather, the Advance Waiver only permits K&E to represent entities adverse to Mylan or its affiliates, "including in litigation, arbitration or other dispute resolution procedure," where the representation is "***not related***" to the work K&E had performed and was performing for Mylan.  Engagement Letter at 3 (emphasis added).  Mylan understood that, under these terms, K&E could be adverse to Mylan on litigation-type matters only where those matters were wholly unrelated to the legal services Mylan received from K&E.[2]  Miner Decl. ¶ 22; Ondos Decl. ¶ 31.  The Advance Waiver would not permit K&E's representation of Teva in the Subject Representation, which was clearly related to the legal services provided to Mylan.

On April 27, 2015, Mylan N.V.'s Board of Directors unanimously rejected Teva's unsolicited expression of interest.  In so doing, the Board stated that the Teva bid grossly undervalued Mylan and contained nothing meaningful to indicate why a combination with Teva would be in the best interest of Mylan's employees, patients, customers, communities, and other stakeholders.  Miner Decl. ¶ 19; Ondos Decl. ¶ 26; Pls.' Ex. 15.  As Magistrate Judge Lenihan concludes, "[t]he correspondence between Teva and Mylan N.V. regarding the hostile acquisition attempt reflects plainly adverse interests."  R&R at 15; *see also* Fox Decl. Exs. B, C, D; Pls.' Exs. 15, 18.  Moreover, as explained in the R&R, the customary role of lead counsel in hostile acquisition proposals is to provide Teva with advice regarding numerous issues, including antitrust, litigation, negotiation, disclosure, regulation, products, competitors and value.  K&E's

---

[2]   Contrary to K&E's suggestion, such matters would not include litigation relating to Teva's hostile attempt to acquire Mylan.  *See infra* at 34 n.20.

advice on these issues will be based on information and assumptions regarding Mylan's products, competitors, markets, regulatory strategies, and value – facts which K&E learned in the course of its representation of Mylan under the (expected) protection of the parties' attorney-client relationship.  R&R at 15-16; Coates Report at 2, 6-11.

Despite the above, prior to accepting the Subject Representation, K&E concedes that it never ran a conflicts check concerning Plaintiffs.  Objections at 1.  Instead, K&E limited its conflicts review to a determination of whether Mylan N.V. – which had been formed over two years after the Engagement Letter was signed and approximately one month prior to K&E accepting the Subject Representation – had ever been a client of K&E.  K&E FoF/CoL ¶¶ 90-92. K&E limited its conflicts review in this manner even though 90% of Mylan N.V.'s revenue comes from Mylan Inc. and its subsidiaries and, as noted by Magistrate Judge Lenihan, "[i]n the event of a hostile takeover of Mylan N.V. by Teva, the ownership and control of the Mylan Clients and their products will be in the hands of Teva, and Teva would become the successor in interest to Mylan N.V."[3]  R&R at 10; Ondos Decl. ¶¶ 24-25.

### D.   The Preliminary Injunction

As a result of K&E taking on an impermissibly conflicted adverse representation without Mylan's consent, on May 1, 2015, Mylan filed a complaint in the Court of Common Pleas of Washington County, Pennsylvania, and moved for a preliminary injunction preventing K&E from representing, advising or otherwise acting in support of Teva in connection with its hostile takeover attempt of Mylan N.V. and its subsidiaries, including the Mylan Plaintiffs.[4]  K&E

---

[3]    Although K&E denies that any conflict of interest arises from the Subject Representation, K&E admits that it established an "ethical wall" between any attorney who would work on the proposed transaction and those who provided legal services (either previously, presently or prospectively) to Mylan.  Objections at 9, 19; K&E FoF/CoL ¶¶ 93-97.

[4]    The preliminary injunction sought by Mylan and recommended by Magistrate Judge

removed the action to this Court on May 4, 2015, and Mylan renewed its Motion for Preliminary

Injunction on May 7, 2015.  Magistrate Judge Lenihan held a status conference on May 14, 2015,

at which the parties agreed on a briefing schedule.  *See* ECF No. 28.  The parties submitted

numerous briefs, declarations, expert reports, and other materials, along with Proposed Findings

of Fact and Conclusions of Law, in connection with the motion.  A hearing was held on May 26,

2015, at which Magistrate Judge Lenihan heard over three hours of oral argument.[5]

On June 9, 2015, Magistrate Judge Lenihan issued a thorough and well-supported 61-

page R&R recommending that Mylan's Motion for Preliminary Injunction be granted.  The R&R

finds that it is "at a minimum substantially likely" that (i) the Subject Representation is

impermissible under Pennsylvania Rule of Professional Conduct 1.7; and (ii) the Subject

Representation is not excused by virtue of the conflict of interest provisions in the parties'

Engagement Letter.  The R&R also concludes that (iii) all other applicable factors weigh in favor

---

Lenihan would also (i) prohibit K&E from using, relying on or disclosing any information it
learned from its representation of Mylan in any representation of any other K&E client; (ii)
require K&E to maintain the confidentiality of all non-public information it has learned as a
result of its representation of Mylan; and (iii) require K&E to retrieve and maintain the
confidentiality of all work product provided by the law firm to Teva in connection with its efforts
to acquire Mylan N.V. and its subsidiaries.  R&R at 2 n.2, 60-61.

[5]    K&E claims that Mylan engaged in "sandbagging" in connection with the briefing
schedule.  Objections at 11.  This argument is baseless.  Magistrate Judge Lenihan set the
briefing schedule at the May 14, 2015 status conference, ordering that K&E's opposition would
be due on May 20, 2015, while Mylan's reply would be due May 22, 2015 before 5:00 pm.  This
schedule gave Mylan fewer than ***thirty-six hours*** to respond to more than ***1,100 pages*** that K&E
filed in its opposition, which K&E had almost three weeks to prepare (but withheld from filing
until nearly midnight on May 20).  Mylan did not introduce any new issues in its reply papers,
but rather responded to the issues raised in K&E's papers, including K&E's attempt to invoke
the affirmative defense of waiver.  Indeed, Magistrate Judge Lenihan specifically considered and
rejected K&E's "sandbagging" argument and concluded that all of the issues raised in Mylan's
reply papers were an appropriate response to the issues raised in K&E's voluminous opposition
filings.  Tr. at 12-13.  In any event, the alleged "sandbagging" was rendered moot by the
Magistrate Judge by giving K&E ample opportunity to respond – as evidenced by multiple
supplemental declarations and voluminous other materials it filed after the hearing – and
conducting a careful review of the entire record.  *See* R&R at 2-3.

of granting a preliminary injunction; and (iv) in light of Mylan's "strong showing of a clear right," it is entitled to the mandatory component of its requested relief.  R&R at 60-61.

## ARGUMENT

### I.    STANDARD OF REVIEW

The Magistrate Act, 28 U.S.C. § 636(b)(1), and Western District of Pennsylvania Local Rule 72(D)(1), provide that the District Judge shall make a *de novo* determination of those portions of the Magistrate Judge's Report and Recommendation to which objection is made, and may accept, reject or modify in whole or in part the findings and recommendations made by the Magistrate Judge.  *See also, e.g.*, *Abbott v. Pa. Dep't of Corr.*, No. 10-1285, 2011 U.S. Dist. LEXIS 73, at *1 (W.D. Pa. Jan. 3, 2011) (conducting *de novo* review of "the pleadings and documents in the case, together with the Report and Recommendation, and the Objections thereto").  Where no objections are made to a certain aspect of the Magistrate Judge's R&R, the District Court's review is under the more deferential standard of "plain error."  *Tice v. Wilson*, 425 F. Supp. 2d 676, 680 (W.D. Pa. 2006), *aff'd*, 276 Fed. Appx. 125 (3d Cir. 2008).

In many cases, District Judges reject objections where they merely reargue the same points considered and rejected by the Magistrate Judge, or otherwise fail to present new authority to demonstrate why the Magistrate Judge's decision was erroneous.  *See, e.g.*, *DeShields v. Barnhart*, No. 02-8426, 2004 U.S. Dist. LEXIS 2998, at *15 (E.D. Pa. Feb. 26, 2004) (adopting report and recommendation where plaintiff's objections "reassert the very same arguments presented to [the magistrate]"); *Rogers v. Dir., Tex. Dep't of Criminal Justice-Corr. Insts. Div.*, No. 5:10-cv-150, 2013 U.S. Dist. LEXIS 128584, at *2 (E.D. Tex. Sept. 10, 2013) (adopting report and recommendation where "[t]he majority of petitioner's 'objections' are simply reassertions of the same arguments addressed by the Report and Recommendation of the United States Magistrate Judge.  Petitioner fails to cite to any new authority that would prompt

-12-

reconsideration[.]"); *Ford v. Astrue*, No. CIV-10-468-D, 2011 U.S. Dist. LEXIS 92164, at *4 (W.D. Okla. Aug. 17, 2011) (adopting report and recommendation where "in [petitioner's] objection . . . , Plaintiff reasserts his arguments.  He offers no new authority in support of his contentions"); *Owen v. United States*, 889 F. Supp. 1293, 1294 (D. Idaho 1995) (adopting report and recommendation where defendants "[did] not offer the court any new authority which would cause it to reverse or modify the magistrate's report").

Here, K&E's Objections essentially reiterate arguments appropriately considered and rejected by Magistrate Judge Lenihan.  Accordingly, the Court should adopt the R&R.

## II.     K&E'S REPRESENTATION OF TEVA CONSTITUTES A CLEAR CONFLICT OF INTEREST UNDER RULE 1.7

Significantly, K&E does not challenge the portion of the R&R finding the Subject Representation to be "directly adverse" to Mylan N.V., the ultimate parent of Plaintiffs.  R&R at 24-26; Objections at 12.  Nor can this portion of the R&R – which, as with the remainder of the R&R, is well-reasoned and well-supported – be deemed "plain error."  Because the Subject Representation is indisputably adverse to Mylan N.V., a clear "affiliate" of Plaintiffs, it is prohibited under the plain language of the Engagement Letter.  *See infra* at 36-38.

Even if it were not expressly prohibited by the Engagement Letter, however, Magistrate Judge Lenihan correctly holds that the Subject Representation constitutes a blatant conflict of interest under Rule 1.7 of Pennsylvania's Rules of Professional Conduct.  Rule 1.7 prohibits representation of one client where that representation is "directly adverse" to another client.  R&R at 21; *see also id.* at 23 ("Under Rule 1.7, counsel is unequivocally prohibited from acting as an advocate against a current client.").  Magistrate Judge Lenihan properly finds that Teva's hostile attempt to acquire the entire Mylan corporate affiliate group is an attempt to acquire the Mylan Clients, rendering the Mylan Clients – not just Mylan N.V. – "the target of [Teva's]

hostile takeover attempt."  R&R at 27; *see also id.* at 29-30 (identifying the potential adverse effects on the Mylan Clients as including "unwanted change in ownership and concomitant change in, *e.g.*, control over corporate decision-making," as well as potential "losses to and of their employees, losses with regard to product ownership, and/or divestiture").  As such, the Subject Representation is directly adverse to the Mylan Clients.

Moreover, even if Teva's acquisition attempt could somehow be said to be targeting Mylan N.V. alone (and it cannot), the Subject Representation would still be directly adverse to the Mylan Clients because the representation (including the legal services provided) squarely implicates the confidential and proprietary information received and reviewed during the course of K&E's provision of legal services to Mylan.  *See* R&R at 32-38.  Although K&E attempts to argue that Magistrate Judge Lenihan's finding of a concurrent conflict of interest is based upon a misapprehension of the "direct adversity" standard set forth in Rule 1.7 (*see* Objections at 11-15), as discussed further below, not a single one of K&E's arguments survives even the slightest scrutiny.  Accordingly, this Court should adopt Magistrate Judge Lenihan's finding that the Subject Representation constitutes a concurrent conflict prohibited under Rule 1.7.

A.      **K&E's Representation of Teva Cannot be Justified by the ABA Formal Opinions Cited in K&E's Objections**

K&E's assertion that Magistrate Judge Lenihan's findings with respect to Rule 1.7 "ignores . . . relevant authorities confirming that there is no direct adversity here" is wrong. Objections at 11; *see also id.* at 12 (accusing the R&R of "simply ignor[ing]" "three Formal Opinions from the American Bar Association Ethics Committee" that are allegedly "dispositive" to the conflict analysis).  To the contrary, the R&R repeatedly relies on and correctly applies one of the allegedly "overlooked" ABA Opinions, and the remaining two Opinions cited by K&E have no bearing on the issues before this Court.

-14-

*First*, K&E grossly misrepresents both the import of, and the R&R's analysis regarding, Formal Opinion 95-390.  *See* Objections at 12-13.  According to K&E, that Opinion "makes very clear" that a lawyer can represent a party in litigation against a wholly-owned subsidiary of a corporate client, no matter what the circumstances, because the adversity to the corporate client is necessarily "indirect."  *See id.*  What K&E brazenly omits, however, is that the Opinion's finding that such adversity is indirect is limited to "situations involving an ***unrelated*** suit against an affiliate of a corporate client[.]"  ABA Formal Op. 95-390 (Jan. 25, 1995), at 8 (emphasis added); *see also id.* at 7 ("The paradigm situation here is presented by a lawyer's bringing a lawsuit, ***unrelated in substance*** to the lawyer's representation of a corporate client, seeking substantial money damages against a wholly owned subsidiary of the client[.]") (emphasis added).  Where, as here, the matter in which the lawyer represents a party adverse to a client's affiliate is ***related*** to the work done for the client itself, Formal Opinion 95-390 recognizes that the "[s]imultaneous representation" in fact can "give rise to the direct, impermissible conflict proscribed by Rule 1.7(a)."  *Id.* at 8 n.12; *see also* R&R at 34 ("The Subject Representation is inherently and uncontrovertibly related to the professional services undertaken by Defendant, in a fiduciary capacity, for the Mylan Clients.").  The R&R correctly summarizes this fundamental proposition, stating that "[t]he Opinion's analysis indicates that whether the potential adversity is direct, and in violation of Rule 1.7, turns on whether the adverse representation is ***related to*** counsel's representation of the client." [6]  R&R at 32 (emphasis added).

*Second*, K&E's reliance on ABA Formal Opinions 05-434 and 05-435 is similarly misplaced.  *See* Objections at 13-14.  Neither Opinion addresses adversity within the context of a

---

[6]     K&E's assertion that the R&R fails to address certain aspects of Formal Opinion 95-390 is baffling.  Objections at 13.  Not only does the R&R cite to and rely on Formal Opinion 95-390 in its discussion of "direct adversity," but also the R&R quotes in full the very portion that K&E claims Magistrate Judge Lenihan fails to consider.  *See* R&R at 32 n.40.

parent-subsidiary relationship – let alone in a situation where the concurrent representation includes representing a client's competitor in an attempt to acquire that client's entire corporate affiliate group, including the client itself.  This critical distinction renders both Opinions of limited if any utility in assessing whether a concurrent conflict exists in this case.  *See* ABA Formal Op. 05-434 (Dec. 8, 2004) (analyzing whether a lawyer may simultaneously represent a testator who is seeking to disinherit a beneficiary of his will and the beneficiary himself); ABA Formal Op. 05-435 (Dec. 8, 2004) (analyzing whether a lawyer may simultaneously represent a liability insurer and a plaintiff seeking to recover against a party who is insured by the insurer).

Furthermore, K&E once again omits that the ABA's findings of "indirect" adversity in these two Opinions were based on the central fact that the hypothetical matters at issue were ***unrelated***.  *See* ABA Formal Op. 05-434, at 1 ("There ordinarily is no conflict of interest when a lawyer is engaged by a testator to disinherit a beneficiary whom the lawyer represents on unrelated matters[.]"); ABA Formal Op. 05-435, at 2 ("Simultaneous representation in unrelated matters of clients whose interests are only economically adverse does not ordinarily constitute a conflict of interest requiring the consent of the respective clients.").  As Magistrate Judge Lenihan correctly finds, the concurrent Teva and Mylan matters are undoubtedly related, rendering these Opinions entirely inapplicable.  R&R at 13-14, 32-38, 40; *accord* Coates Report at 2-3, 6-22; Moriarty Report ¶ 31; Hazard Report ¶ 15; *see also infra* at 21-30.

***Third***, all three Opinions cited by K&E address scenarios where the only negative effect upon the client in the adverse representation is the loss of money.  *See* ABA Formal Op. 95-390, at 7 (noting that parent would be adversely affected because "one of its assets is the equity in the subsidiary, and its consolidated financial statements may . . . reflect the impact of material adverse judgments against the subsidiary"); ABA Formal Op. 05-434, at 2 (noting that because

-16-

beneficiary "has no legal right to [the] bequest" and testator is "free to dispose of his estate as he chooses," impact on beneficiary is merely economic); ABA Formal Op. 05-435, at 2 (noting that an insurer "has an economic interest in the litigation that ordinarily is aligned with the interests of its insured").  Yet Mylan has never asserted, and Magistrate Judge Lenihan does not hold, that direct adversity exists between Teva and Mylan just because Mylan might suffer economic harm if the hostile takeover succeeds.  To the contrary, the R&R correctly holds that direct adversity exists by virtue of Teva seeking to *acquire and control every aspect of Mylan* – including the valuable drugs about which K&E has advised – against Mylan's wishes.  *See, e.g.*, R&R at 29 (noting that the Teva hostile takeover bid is directly adverse to Mylan due both to the "unwanted change in ownership and concomitant change in, *e.g.*, control over corporate decision-making," as well as to unwelcome losses relating to employees, product ownership and/or divestitures); *see also* Coates Report at 3, 18.[7]  As stated in the R&R, "it would be hard to imagine a representation more opposed to a current client's interests, more in breach of a fiduciary duty toward those interests, than one in which the client's counsel sells his professional services to advance the interests of a competitor in a hostile takeover attempt of the clients' entire corporate affiliate group."  R&R at 28.  In such a situation, the Opinions cited by K&E actually ***confirm*** that direct adversity exists.  *See, e.g.*, ABA Formal Op. 05-434, at 2 (direct adversity exists when a "conflict involves the legal rights and duties of the two clients vis-a-vis one another").

In sum, K&E's attempt to trivialize its adversity to the Mylan Clients as merely "economic" ignores the basic realities of a hostile takeover and flies in the face of the R&R's

---

[7]   K&E's characterization of certain of these "potential adverse effects" as "speculation" (Objections at 14, 20) is bizarre considering that ***Teva*** publicly represented that the acquisition would generate "approximately $2 billion annually" in synergies and other savings through layoffs, business divestitures, and the like.  *See* Pls.' Ex. 14.  In any event, K&E misses the key point; these potential impacts demonstrate that the acquisition would lead to an unwanted change in control over the entirety of Mylan, including its products, personnel and overall business.

well-reasoned and well-supported conclusion that direct adversity exists because Teva is

attempting to acquire control of Mylan as a corporate entity.  *See* R&R at 27-31 ("They, the

Mylan Client corporate affiliates, are the target of a hostile takeover attempt.").  In fact, K&E's

claim that Magistrate Judge Lenihan focuses exclusively on adverse economic results that may

be suffered by Mylan in the event of a takeover is belied by the R&R itself, which states:

> The Court does not accept Defendant's attempt to cabin the ethical rule's
> prohibition of a "representation . . . directly adverse" to a client's showing of
> detrimental outcome.  The plain language of Rule 1.7 looks to the lawyer's
> representation – his *advocacy against* his client – not merely the potential
> detrimental effect on the client.  The Rule on its face refers to a representation
> which is "adverse" (versus one which *results* in "adversity").

R&R at 30 (emphasis in original).  For all of these reasons, Magistrate Judge Lenihan correctly

concludes that K&E's concurrent representation of Teva in its hostile bid for Mylan, another

current client, constitutes a clear conflict of interest under Rule 1.7.

> ### B.   Magistrate Judge Lenihan Does Not Disregard Corporate Structure in Finding Direct Adversity between K&E and the Mylan Clients

K&E next alleges that Magistrate Judge Lenihan misapplies the requirement of direct

adversity by "utter[ly] disregard[ing] . . . corporate structure and corporate law."  Objections at

15.  Specifically, K&E argues that Magistrate Judge Lenihan fails to appreciate "the basic tenet

of American corporate law that a corporation and its shareholders are distinct," and that "the

specific identities and characteristics of corporations are of enormous significance to the

professional responsibilities of lawyers who represent business entities."  Objections at 15-16.

Magistrate Judge Lenihan does no such thing.

Contrary to K&E's mischaracterization, Magistrate Judge Lenihan does not conflate

Mylan N.V. with the Mylan Clients in an impermissible derogation of their independent

corporate structures.  The R&R does not state that Mylan N.V. should be considered a K&E

client, nor does the R&R fail to comprehend that Mylan N.V. is a separate corporate entity from

the Mylan Clients.[8]  What Magistrate Judge Lenihan does find is that Teva's hostile attempt to acquire the entire Mylan corporate affiliate group is directly adverse to subsidiaries that are members of that group, because the Mylan Clients *themselves* are "hostile acquisition targets" – a proposition that in no way runs afoul of the fact that Mylan N.V. and the Mylan Clients are structurally distinct.[9]  *See* R&R at 26-31 ("Teva is not only after the bag (*i.e.*, the quite-recently-formed holding company); it is after the contents (*i.e.*, K&E's clients of several years, Mylan[] Inc. and its wholly-owned subsidiaries, owners of the revenue-generating pharmaceutical products)."); Coates Report at 3 ("The fact that Mylan N.V. owns its asset[s] through subsidiaries . . . does not alter my analysis.  Teva seeks to own Mylan N.V.'s stock not as an end in itself, but because it conveys control and ownership of Mylan and its products.").

K&E's theory that a hostile takeover of Mylan N.V. cannot be directly adverse to the Mylan Clients seeks to elevate form over substance.  Throughout the course of the litigation, and again in its Objections, K&E has completely ignored the indisputable truth that the *only way* Teva can acquire Mylan Inc. – the entity which accounts for 90% of Mylan N.V.'s revenues and the sole reason Teva is pursuing this takeover – is to acquire Mylan N.V.  As Magistrate Judge Lenihan properly recognizes, prior to the formation of Mylan N.V. on February 27, 2015, any takeover-related correspondence "would necessarily have been addressed to K&E's current client, Mylan[] Inc."  R&R at 26.  The fact that it is now impossible to take over Mylan Inc. (or

---

[8]    For the same reasons, K&E's insinuation that Magistrate Judge Lenihan erroneously disregards the language in the Engagement Letter stating that K&E represents only the Mylan Clients is incorrect.  Objections at 17; *see infra* at 38 n.25.

[9]    Indeed, that a representation adverse to affiliates of the Mylan Clients could be directly adverse to the Mylan Clients themselves is clearly contemplated in the Engagement Letter, which only permits K&E to be adverse to "you *or any of your affiliates*" on matters that are not related to the legal services provided to the Mylan Clients.  *See* Engagement Letter at 3 (emphasis added).  There would be no reason for such a restriction if, simply by virtue of the fact that they are distinct corporate entities, a representation adverse to Mylan N.V., an affiliate, could not also implicate ethical obligations to one of the Mylan Clients.  *See infra* at 36-38.

any of the Mylan Clients) independently of Mylan N.V. is, as the R&R properly observes, merely the "fortuitous circumstance of a recent reorganization" that K&E seeks to exploit in order to "relieve[] it of an important component of its fiduciary duty[.]"  *Id.*

Tellingly, K&E cites no authority for its contention that corporate formalities preclude Magistrate Judge Lenihan's finding that Teva's attempted acquisition of Mylan N.V. is directly adverse to the Mylan Clients.  Objections at 16.  Instead, K&E relies on cases that set forth the general principle that a corporation and its shareholders are distinct for liability purposes.  *See United States v. Bestfoods*, 524 U.S. 51, 62 (1998) (discussing limitation of liability for shareholders, including parent corporations); *Alford v. Frontier Enters., Inc.*, 599 F.2d 483, 484 (1st Cir. 1979) (refusing to allow stockholder plaintiff to shield himself from liability through the corporate form and then recover in his individual capacity for damage done to the company); *see also Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2304 (2011) (declining to reapportion Rule 10b-5 liability from client mutual fund to investment adviser where corporate formalities were observed and where such liability would be contrary to the applicable statutory provisions); *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474-77 (2003) (where a foreign state did not own a majority of shares in certain indirect subsidiaries, those subsidiaries were not entitled to "instrumentality status" under the plain language of the Foreign Sovereign Immunities Act, which focuses on technical ownership rather than control).  These cases – none of which involves a conflict of interest analysis – do not speak at all to the degree of adversity necessarily involved in a hostile takeover of an entire corporate affiliate group.

In fact, authorities that ***do*** analyze conflicts within the corporate family context – none of which were cited by K&E – make clear that disqualification can be required despite the involvement of distinct corporate entities.  *See, e.g.*, *Lennar Mare Island, LLC v. Steadfast Ins.*

*Co.*, No. 2:12-cv-02182-KJM-KJN, 2015 U.S. Dist. LEXIS 45526, at *24 (E.D. Cal. Apr. 7, 2015) ("[I]f a subsidiary alleges a concurrent conflict, its interest is sufficiently unified with its parent's if the representation reasonably diminishes the level of confidence and trust in counsel.") (internal marks and citation omitted); *GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C.*, 644 F. Supp. 2d 333, 336-37 (S.D.N.Y. 2009) (disqualifying Blank Rome from representing plaintiff where firm had represented defendant's parent corporation but not defendant), *aff'd*, 618 F.3d 204 (2d Cir. 2010); *Bd. of Managers of Eleventh St. Loftominium Ass'n v. Wabash Loftominium, L.L.C.*, 376 Ill. App. 3d 185, 193-94 (Ill. App. Ct. 2007) (defendant corporations should be considered firm's clients for conflict purposes where firm had only represented related corporations).  K&E's attempt to rely on "corporate formalities" to evade its ethical and fiduciary obligations is therefore unfounded.

### C. Alternatively, K&E's Representation of Teva is Directly Adverse to Plaintiffs Because it is "Related" to K&E's Representation of Mylan

As noted above, Magistrate Judge Lenihan properly finds that the Subject Representation is directly adverse to the Mylan Clients because those entities are the target of the hostile acquisition attempt.  *See supra* at 18-21; *see also* R&R at 26-31.  This alone is sufficient to satisfy the direct adversity requirement of Rule 1.7.  Even if Mylan N.V. were somehow deemed the exclusive target, however, Magistrate Judge Lenihan properly finds that the Subject Representation would continue to be "directly adverse" to the Mylan Clients because the Subject Representation is related to the legal services provided by K&E to Mylan.  *See* R&R at 32-37 (holding in the alternative that the concurrent representation would violate Rule 1.7 because "[t]he Subject Representation is inherently and uncontrovertibly related to the professional services undertaken by Defendant, in a fiduciary capacity, for the Mylan Clients").

In response to this alternative finding, K&E insists that the concept of "relatedness" has

nothing to do with direct adversity under Rule 1.7.  *See* Objections at 17-20.  Specifically, K&E accuses Magistrate Judge Lenihan of improperly adopting a "wholesale substitution" of an "alternative" relatedness standard "in place of direct adversity."  Objections at 17-20.  K&E's argument – which it fails to support with a single case law citation – is baseless.  As explored in depth in the R&R, whether two matters are "related" has a great deal of relevance to "direct adversity" when analyzing a potential Rule 1.7 violation involving an affiliate of a corporate client.[10]  *See* R&R at 32-37.  For example, ABA Formal Opinion 95-390 – relied upon (and misapplied) by K&E in its Objections – holds that "whether the potential adversity is direct, and in violation of Rule 1.7, turns on whether the adverse representation is ***related to*** counsel's representation of the client."  R&R at 32 & n.40 (emphasis added); *see also supra* at 15.[11]  The other Opinions relied on by K&E similarly confirm the relevance of the relatedness of the representations in question.  *See* ABA Formal Op. 05-434, at 1 (specifically noting that the matters in question were "unrelated"); ABA Formal Op. 05-435, at 2 (same).

Magistrate Judge Lenihan's use of a "relatedness" test is also supported by *Vanderveer Group v. Petruny*, Nos. 93-3677, 93-5154, 1994 U.S. Dist. LEXIS 8867 (E.D. Pa. June 29,

---

[10]   In fact, K&E explicitly acknowledges as much in the Objections:  "It is true that some authorities mention 'relatedness' as a factor in determining whether a representation that is directly adverse to a non-client corporate entity is also considered directly adverse to that non-client's corporate affiliate (here, indirect subsidiaries)."  Objections at 18.

[11]   The Opinion even sets forth factors that courts should consider, including "the practical impact" on the adversely affected client, "the circumstances in which the conflict arises, and specifically the closeness of the connection between the lawyer's actions and the adverse effect on the client[.]"  R&R at 32 n.40 (quoting ABA Formal Op. 95-390).  Magistrate Judge Lenihan does just that.  *See* R&R at 33 ("[K&E's] protestations notwithstanding, it is clear that confidential and proprietary information received and reviewed, and matters advised upon, in the course of [K&E's] fiduciary relationship as counsel to the Mylan Clients are pertinent to the Subject Representation."); 36 (summarizing confidential information received by K&E and noting it "illustrates . . . the relatedness of the information received by Defendant in the course of its representation of [Mylan] to the Subject Representation, and the broad array of potential advantage that information can provide to [Teva]").

1994), in which the court reversed its previous denial of a motion to disqualify based on counsel's representation of a plaintiff in a litigation against the client's parent corporation.[12] *Vanderveer* provides that whether a Rule 1.7(a) conflict exists in a scenario involving a representation adverse to a corporate parent of a client depends on:

> [T]he nature of the attorney-client relationship between [the law firm] and [the subsidiary-client] with respect to the subject matter of the [instant] lawsuit between [plaintiff] and [the parent corporation], *i.e., whether any confidential information which [the subsidiary-client] shared with [law firm] was related to the issues in the lawsuit and, if so, whether knowledge or use of such information would adversely impact [the subsidiary-client]*.

*Id.* at *5 (emphasis added); *see also Vanderveer*, 1993 U.S. Dist. LEXIS 13614, at *10 (direct adversity is determined by "inquiring into the nature of the information disclosed to [law firm] by [the subsidiary-client] in connection with the matters on which [the subsidiary-client] sought the counsel of [law firm] and by determining how such information might be used in the instant matter"); *Concat LP v. Unilever, PLC*, 350 F. Supp. 2d 796, 819 (N.D. Cal. 2004) (finding that partnership had standing to disqualify law firm, even though only the partners themselves were the firm's clients, because information that the partners disclosed was "inextricably intertwined with the business and financial matters of [the partnership]").  Accordingly, there is nothing improper about considering the relatedness of the Mylan and Teva representations in evaluating whether K&E's conduct violated Rule 1.7.[13]

---

[12]   The *Vanderveer* court initially denied the motion to disqualify because the parent corporation had put forth no evidence whatsoever regarding "the relationship between the matters in which [the law firm] has represented both [plaintiff] and [defendant's subsidiary]," and as a result asked the court to "assum[e] rather than decid[e] that the direct adversity of interest required by Rule 1.7(a) can be established from the relationship between [defendant-parent] and [defendant's subsidiary]."  *Vanderveer Grp. v. Petruny*, No. 93-3677, 1993 U.S. Dist. LEXIS 13614, at *8-9 (E.D. Pa. Aug. 10, 1993).

[13]   Similarly baseless is K&E's contention that Magistrate Judge Lenihan improperly "borrow[ed]" the "substantially related" standard from Rule 1.9.  Objections at 18.  The R&R merely recognized that Formal Opinion 05-436 found that the term "unrelated" as used in

-23-

Finally, K&E argues that the R&R's focus on relatedness is erroneous because "[t]here is no evidence . . . that Kirkland ever breached its duty of confidentiality." *See* Objections at 19-20. K&E's suggestion that Mylan was required to show an actual breach of confidences is demonstrably wrong. Pennsylvania law makes clear that the duty of loyalty protected by Rule 1.7 has nothing to do with whether an actual breach of confidentiality has occurred. *See, e.g.*, *Maritrans*, 529 Pa. at 260-61. That is also why K&E's construction of an ethical wall, which K&E claims Magistrate Judge Lenihan wrongfully dismisses as "immaterial" (Objections at 19), does not resolve the issue. *See* R&R at 37; *see also Dougherty v. Phila. Newspapers, LLC*, 85 A.3d 1082, 1094-95 (Pa. Super. Ct. 2014) (Donohue, J., concurring) (where a conflict is not "created by a new lawyer to the firm who brings the conflict with him as a result of his prior employment," use of an ethical screen is "irrelevant" and "will not insulate a law firm from the consequences of a . . . conflict of interest"); *Allman v. Sears, Roebuck & Co.*, No. 87-6074, 1988 U.S. Dist. LEXIS 11659, at *12-13 (E.D. Pa. Oct. 17, 1988) (finding that Chinese Wall was "not a workable solution" because "[t]o permit a law firm to simultaneously represent adverse parties, without the consent of those parties, would clearly run afoul of the . . . [Rules of Professional Conduct]"). K&E fails to identify any Pennsylvania authority to the contrary.

## III.   K&E'S VIOLATIONS CANNOT BE EXCUSED BY THE PARTIES' ENGAGEMENT LETTER

K&E further asserts that Mylan provided advanced consent for the Subject Representation by virtue of the Advance Waiver contained in the Engagement Letter. Yet as discussed below, the R&R correctly concludes that K&E has failed to meet its burden of

---

Comment 22 to Rule 1.7 "would be appropriately defined by reference to Rule 1.9, comment 3's definition of substantially related." R&R at 33 n.41. The R&R went on to hold that K&E's representations of the Mylan Clients and the Subject Representation meet the "substantially related" standard, which is a higher standard than that which was negotiated in the parties' Engagement Letter. *Id.*

demonstrating that this language permits the Subject Representation.  R&R § VI(A)(2); *see also,*

*e.g.*, *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir. 1984) ("[T]he burden of

showing consent is on [the law firm].");  *Int'l Longshoremen's Ass'n, Local Union 1332 v. Int'l*

*Longshoremen's Ass'n*, 909 F. Supp. 287, 292 n.5 (E.D. Pa. 1995) (same).  To the contrary, the

Engagement Letter plainly prohibits the very representation K&E is urging this Court to allow.

In any event, even if the Advance Waiver could somehow be said to permit the Subject

Representation – and it absolutely cannot – K&E has failed to demonstrate Mylan's informed

consent.  Accordingly, the Court should reject K&E's waiver defense.

### A.      K&E's Representation of Teva Falls Outside the Scope of the Advance Waiver Because it is "Related" to K&E's Representation of Mylan

The Advance Waiver permits K&E to represent an entity that is adverse to Mylan or any

of its affiliates only where such representation is "***not related***" to the legal services provided by

K&E to Mylan.  Engagement Letter at 3 (emphasis added).  As discussed above (*supra* at 3-4),

the parties removed the word "substantially" from K&E's initial draft so that K&E would only

be permitted to represent an entity adverse to Mylan or its affiliates if that representation ***bore no***

***relation at all*** to K&E's work for Mylan.  This revision to the Advance Waiver was specifically

intended to raise the bar and make it harder for K&E to engage in a representation adverse to

Mylan or any of its affiliates.  Ondos Decl. ¶¶ 12-15; R&R at 11.[14]

In light of the standard adopted by the parties – which Magistrate Judge Lenihan

correctly observes is broader than the "substantially related" test – the R&R refers to Rule 1.9,

Comment 3, which explains that "[m]atters are 'substantially related' . . . if they involve the

same transaction or legal dispute ***or*** if there otherwise is a substantial risk that confidential

---

[14]    The fact that K&E agreed to broaden the scope of prohibited adverse representations under the Advance Waiver contradicts its belated assertion that it would only represent Mylan if Mylan waived conflicts of interest "except in certain narrow contexts."  Objections at 7.

factual information as would normally have been obtained in the prior representation would materially advance the [new/different] client's position in the subsequent matter."  R&R at 33 n.41 (citing Pa.R.P.C. 1.9, cmt. 3) (emphasis added).  In other words, the question of whether two matters are "related" involves an analysis of (i) the ***nature and scope*** of the representations and (ii) ***whether confidences may have been disclosed*** to the attorney that could be "relevant and detrimental" in the adverse representation.  *Greenwood Land Co. v. Omnicare, Inc.*, Civ. A. No. 09-686, 2009 U.S. Dist. LEXIS 74374, at *14-15 (W.D. Pa. Aug. 20, 2009).  The R&R correctly concludes that the Subject Representation "is related to legal services rendered to the Mylan Clients by K&E," because K&E "(a) received confidential proprietary information pertinent to, and (b) provided representation to subsidiaries as to certain of their pharmaceutical products which subsidiaries and products are now the very target of, Teva's hostile takeover attempt."  R&R at 13-14, 32-38, 40; *accord* Coates Report at 2-3, 6-22; Moriarty Report ¶ 31; Hazard Report ¶ 15.

Tellingly, K&E does not appear to object to Magistrate Judge Lenihan's determination that the Subject Representation is not just "related," but "substantially related," to its representation of Mylan under the governing legal standard set forth above.  Instead, K&E makes the baseless argument that the parties' Engagement Letter adopts an alternative definition of "relatedness," such that the generally accepted definition applied in the R&R should not apply. Objections at 26-31.  In pressing this unfounded argument, K&E grossly distorts the plain terms of the Engagement Letter's conflict of interest provisions in at least three ways.

***First***, K&E claims that the Advance Waiver prohibits the consideration of Mylan's confidential information when determining whether an adverse representation is "related" and thus disallowed.  Objections at 26-28.  K&E's position is inexplicable considering the plain

language of the very portion of the Engagement Letter relied on by K&E, which states that

Mylan cannot use K&E's possession of confidential information as "a basis to disqualify [K&E]

from representing another entity or person *in any Allowed Adverse Representation*[.]"

Engagement Letter at 3 (emphasis added).  The preceding paragraph, in turn, defines an

"Allowed Adverse Representation" as one "not related" to the legal services provided by K&E to

Mylan.  *Id.*; *accord* R&R at 39.  In other words, the bar on relying on confidential information as

a basis to disqualify only exists when the matter *has already been determined* to be an Allowed

Adverse Representation; to wit, one in which K&E's other client is adverse to Mylan or its

affiliates, but which is *not* related to the legal services provided by K&E to Mylan.  K&E turns

the provision on its head by suggesting that the Advance Waiver prohibits consideration of

confidential information when determining if a matter is "related" in the first place.  This

frivolous attempt to write out the phrase "in any Allowed Adverse Representation" from the very

sentence relied on by K&E is yet further evidence that the law firm cannot justify its

representation of Teva in light of the Advance Waiver to which it actually agreed.

> **Second**, in an argument K&E did not even deem worthy of presenting to Magistrate

Judge Lenihan, K&E now asserts that the phrase "legal services" in the Advance Waiver was

somehow intended to alter the "relatedness" inquiry, such that the Court is prohibited from

considering the very subject matter or confidential information implicated by those services.

Objections at 28-30.  As an initial matter, by its silence, K&E appears to concede that it never

informed the Mylan Clients that this term would be construed to have a meaning different from

its plain meaning.  This should end the analysis right there.  *See infra* at 30-36.  But K&E also

fails to cite any authority in support of its tortured interpretation of the phrase "legal services,"

pursuant to which two engagements can never be deemed "related" so long as one involves

advice in connection with a transaction while the other involves a litigation or regulatory proceeding.  K&E's interpretation – which essentially rewrites the Advance Waiver to prohibit only those adverse representations that involve the identical type of legal services as those provided to Mylan – makes absolutely no sense and would yield absurd results.

In fact, it is impossible to divorce "legal services" from the information exchanged between counsel and client in furtherance of those services.  Confidential facts, work product, and attorney-client communications are undeniably a critical part of "legal services" and help to define the scope of those services.  For this reason, the Rules of Professional Conduct consider the concepts of "services," "nature of the services," and "confidential factual information" to be closely interrelated when determining whether matters are "substantially related":

> Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute *or* if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter.  For example, a lawyer who has represented a businessperson and learned extensive private financial information about that person may not then represent that person's spouse in seeking a divorce. . . .  A conclusion about the [lawyer's] possession of [confidential] information may be based on ***the nature of the services*** the lawyer provided the former client and ***information that would in ordinary practice be learned*** by a lawyer providing ***such services***."

Pa.R.P.C. 1.9, cmt. 3 (emphases added); *see also Bowers v. The Ophthalmology Grp.*, 733 F.3d 647, 652-54 (6th Cir. 2013) (granting motion to disqualify law firm in litigation under Rule 1.9's "substantially related" standard where firm had previously represented plaintiff in purely transactional matters, finding "there is a substantial risk that confidential information as would normally or typically have been obtained in [the firm's] prior representation of [plaintiff] would materially advance [defendant's] position in the present case").[15]

---

[15]   As such, K&E's argument that Professor Coates "did not answer the relevant question," because he focused on confidential information K&E learned from Mylan, directly contradicts the Advance Waiver, the Rules of Professional Conduct, and relevant case law.  Furthermore,

*Third*, K&E suggests that Magistrate Judge Lenihan's interpretation of "relatedness" is inconsistent with the parties' purported agreement to limit "the default duty of loyalty that an attorney owes his or her client[.]"  Objections at 31.  Specifically, K&E maintains that the Engagement Letter "expressly defines the nature of the duty of loyalty" by "stat[ing] that any 'adversity' to the Mylan clients or any of their 'affiliates' 'does not breach any duty' (e.g., the duty of loyalty) that would otherwise be owed."  *Id*. (purporting to quote Engagement Letter at 3).  K&E's argument constitutes yet *another* outrageous distortion of the Engagement Letter, this time by combining words and phrases from different paragraphs to form a sentence that does not exist in the Engagement Letter itself.  The actual sentence that appears in the Engagement Letter is as follows: "[The Mylan Clients] agree that *any Allowed Adverse Representation* does not breach any duty that this firm owes to you or any of your affiliates."  Engagement Letter at 3 (emphasis added).  In other words, once a representation has been determined to be an Allowed Adverse Representation as defined in the Advance Waiver – *i.e.*, a representation that is adverse to Mylan or its affiliates *and* that is not related to legal services rendered to Mylan – then Mylan agrees that such AAR does not in itself run afoul of K&E's duty of loyalty.  The Engagement Letter does not in any way limit K&E's duty of loyalty at all with respect to matters that are not "Allowed Adverse Representation[s]" as defined in the Advance Waiver.

In sum, Magistrate Judge Lenihan is absolutely correct in holding K&E to the plain terms

---

K&E's citation to *Liberty Media Corp. v. Vivendi Universal, S.A.* is a misleading attempt to undermine Professor Coates' testimony.  Objections at 28 n.12.  While that court ruled that Professor Coates could not testify about the *subjective intent* of contracting parties, the court permitted Professor Coates to testify regarding customs and practices based on "his extensive practical experience and academic experience" in the M&A field, which were relevant to the meaning of a contract reflecting the parties' objective intent.  874 F. Supp. 2d 169, 175-77 (S.D.N.Y. 2012); *cf*. Pa.R.P.C. 1.9, cmt. 3 ("substantially related" considers "the nature of the services the lawyer provided the former client and information that would *in ordinary practice* be learned by a lawyer providing such services") (emphasis added).

of its own Engagement Letter and thereby concluding that the Subject Representation falls

outside the scope of the Advance Waiver, and thus is prohibited.

> **B.      Even if the Advance Waiver Applies, K&E Fails to Show it was Based on Informed Consent**

Even if the Advance Waiver applied to the Subject Representation (which it does not),

Magistrate Judge Lenihan correctly concludes that K&E also failed to carry its burden of

demonstrating that Mylan validly consented to such a clear conflict of interest.  *See, e.g.*, *In re*

*Corn Derivatives*, 748 F.2d at 162 ("[T]he burden of showing consent is on [the law firm].").

As explained by Magistrate Judge Lenihan, it is well-settled that a client's consent to an

adverse representation must be "informed" in order to be valid.  *See* R&R at 41-44 & n.56

(describing legal standards for "informed consent" under the Rules of Professional Conduct).

The validity of an advance waiver is "generally determined by the extent to which the client

reasonably understands the material risks that the waiver entails.  The more comprehensive the

explanation of the types of future representations that might arise and the actual and reasonably

foreseeable adverse consequences of those representations, the greater the likelihood that the

client will have the requisite understanding."  Pa.R.P.C. 1.7, cmt. 22; *see also generally In re*

*Congoleum Corp.*, 426 F.3d 675, 691 (3d Cir. 2005) (noting that "the effect of a waiver,

particularly a prospective waiver, depends upon whether the clients have given truly informed

consent"); *Celgene Corp. v. KV Pharm. Co.*, Civ. A. No. 07-4819 (SDW), 2008 U.S. Dist.

LEXIS 58735, at *11-15 (D.N.J. July 28, 2008) (same).  The onus is on counsel to convey

adequate information and explanation about the material risks associated with the waiver.  *See*

R&R at 41 (citing Model Rules 1.0(e) and 1.7); *see also Int'l Longshoremen's Ass'n*, 909 F.

Supp. at 292 (Pennsylvania Rules of Professional Conduct require attorneys to "consult with

their clients about potential conflicts of interest, and [to] disclose the facts and circumstances

surrounding the conflicts to such an extent that the clients appreciate the significance of the conflict"); *accord* Moriarty Report ¶¶ 24-28; Hazard Report ¶ 16.

Magistrate Judge Lenihan correctly determines that Mylan never provided informed consent for K&E to represent its competitor in a hostile attempt to take over its entire business. *See* R&R at 40-46.  The Advance Waiver is vague, general, and open-ended.  It provides no disclosure regarding the types of future adverse representations (except that they may include "litigation, arbitration or other dispute resolution procedure"), the subject matter of such representations (except that they cannot be "related" to the legal services provided to Mylan), or the names of potentially adverse parties.  It certainly provides no inkling that K&E might represent another company – let alone a chief competitor – in an unsolicited attempt to acquire Mylan's entire business, including the very products implicated by K&E's representation of Mylan and with respect to which Mylan provided K&E confidential and proprietary information. Under such circumstances, Mylan's alleged consent to such a representation cannot be said to have been "informed."  *See Celgene Corp.*, 2008 U.S. Dist. LEXIS 58735, at *23 (finding an advance waiver that merely proposes "a future course of conduct that is very open-ended and vague[,]" and which does not contain any guidance on what types of cases might be considered related, to be invalid); *see also W. Sugar Coop. v. Archer-Daniels-Midland Co.*, No. CV 11-3473 CBM (MANx), 2015 U.S. Dist. LEXIS 21448, at *19-22 (C.D. Cal. Feb. 13, 2015) (finding waiver invalid where it was "open-ended" and failed to "identify a potentially adverse client, the types of potential conflicts, or the nature of the representative matters"); *Concat*, 350 F. Supp. 2d at 820 (finding advance waiver unenforceable where language was "extremely broad" and "intended to cover almost any eventuality"); *see also* Hazard Report ¶ 16.

K&E nevertheless argues that all "major work," including hostile takeovers, were

"reasonably foreseeable as coming within the scope of the waiver[.]"  Objections at 23.  In

support, K&E asserts that (i) there was pre-existing adversity with Mylan in litigation matters

where the opposing side was represented by K&E, including matters where K&E represented

Teva; and (ii) the attorney at Mylan who negotiated the Engagement Letter (Senior Vice

President and Global General Counsel for Litigation, Jill Ondos) should have known that K&E

was a major player in M&A work, including for Teva.  *Id.* at 21-23.  Although K&E accuses

Magistrate Judge Lenihan of ignoring these points, she explicitly considers and rejects them.  *See*

R&R at 43 n.55.  The Magistrate Judge's conclusions are correct for several reasons.

    ***First***, despite K&E's unsupported protestations that Ms. Ondos must have known that

K&E had previously performed transactional services for Teva, Ms. Ondos did ***not*** know that

K&E had done corporate work for Teva, nor did she know of such work until after Teva began

its hostile pursuit of Mylan.[16]  Supp. Ondos Decl. ¶ 7.  This is not surprising considering that the

only adverse representations actually discussed between the parties in negotiating the

Engagement Letter were litigation-related matters.  Ondos Decl. ¶ 11; Supp. Ondos Decl. ¶¶ 3-8.

Moreover, the matters known to Mylan in which K&E represented Teva involved specific drugs

other than those with respect to which K&E was to provide legal services to Mylan.  Ondos

Decl. ¶¶ 7, 11; Supp. Ondos Decl. ¶ 8.  As such, none of these discreet matters was remotely akin

to representing Mylan's chief competitor in an attempt to acquire Mylan's entire business.[17]  The

---

[16]   Of course, the mere fact that K&E claims to be a highly-regarded M&A firm does not
automatically put its clients on notice that K&E might assist a competitor in coming after them in
a hostile takeover.

[17]   For the same reason, K&E's representation of other entities (including Teva) in matters
adverse to Mylan since the signing of the Engagement Letter has absolutely no bearing on the
scope of the Adverse Waiver or the lack of informed consent.  Indeed, Magistrate Judge Lenihan
was justifiably "troubled" by K&E's argument that Mylan has somehow waived K&E's duty of
loyalty because such adverse representations (according to K&E) "easily could have been argued
to implicate confidences learned" through its representation of Mylan.  R&R at 43 n.55.  The

limited nature of these matters demonstrates exactly why Mylan had no reason to believe that the

Advance Waiver would apply to a hostile acquisition.  As Magistrate Judge Lenihan cogently

observes, "the conflicting representation is not restricted to an unrelated discrete product but,

much to the contrary, encompasses a hostile, opposed acquisition of the very products as to

which K&E has received confidential and proprietary information and the very entities to which

K&E has provided legal counsel."  R&R at 42; *see also Worldspan, L.P. v. Sabre Grp. Holdings,*

*Inc.*, 5 F. Supp. 2d 1356, 1360-61 (N.D. Ga. 1988) (waiver ineffective where conflicting

representation was "a matter of such an entirely different quality and exponentially greater

magnitude, and so unusual given the position of trust existing between lawyer and client," that it

should have been specifically identified); *see also* Moriarty Report ¶ 29; Hazard Report ¶ 18.

    ***Second***, K&E's continued focus on what Mylan supposedly ***should have*** known

regarding K&E's prior relationship with Teva ignores what the R&R correctly identifies as the

relevant question in an informed consent analysis; namely, did K&E adequately ***convey*** the

requisite information regarding material risks and available alternatives to Mylan.  *See Celgene*

*Corp.*, 2008 U.S. Dist. LEXIS 58735, at *33 (attorney obtaining consent must "actually inform

the client" – not merely show that the client is "someone who is informed"); *see generally* R&R

at 41.[18]  K&E does not even attempt to argue that it discussed with Mylan the possibility of being

---

Magistrate Judge repudiated "any suggestion that prior 'arguable' ethical breaches may render a
law firm exempt from its fiduciary duties."  *Id.* ("Even a client who accepts his lawyer's toe
across an ethical line need not later tolerate the lawyer's foot.").

[18]   K&E's reliance on *Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390
(N.D. Tex. 2013), lacks merit.  The waiver in *Galderma* "warn[ed] in plain language that
[plaintiffs'] consent means [Vinson & Elkins] may appear directly adverse to [plaintiffs] in
litigation, the ***very risk*** of which [plaintiffs] now claim[] they were not made aware." *Id.* at 406
(emphasis added).  Here, the Advance Waiver did not specify that the firm could appear adverse
to Mylan in a hostile takeover of the entire company – in fact, the Engagement Letter did not
mention adversity in transactional matters at all.  In such a situation, Mylan's consent cannot
possibly be characterized as "informed."  *See, e.g., Lennar Mare Island*, 2015 U.S. Dist. LEXIS

adverse in transactional matters, including matters as substantial as a hostile attempt to acquire Mylan's entire business. This in itself is dispositive on the issue of informed consent.[19]

**Third**, consistent with the discussions between Ms. Ondos and Mr. Lefkowitz, the Advance Waiver provides that an "Allowed Adverse Representation" may include "litigation, arbitration or other dispute resolution procedure[.]" Engagement Letter at 3. Although this language does not expressly exclude matters outside litigation, Magistrate Judge Lenihan correctly observes that "K&E elected to omit reference to any retained right of conflicting representation in" M&A or other transactional matters, despite "the standard industry usage and understanding of the intended scope of prospective waivers, and K&E's history of high-profile acquisitions (including for Teva)[.]" R&R at 42-43. Given that K&E failed to identify potentially adverse transactional matters in the Advance Waiver despite K&E's claimed status as a "major participant in M&A work" and the supposed foreseeability of adverse engagements such as the Subject Representation (Objections at 22), it is not at all surprising that Ms. Ondos did not construe the Advance Waiver as permitting K&E's representation of Mylan's competitor in a hostile attempt to acquire Mylan N.V. and its subsidiaries.[20] Ondos Decl. ¶¶ 31-32.

---

45526, at *42-43 (declining to follow "broader interpretation given informed consent by the court in *Galderma*" and finding no informed consent where waiver was "broad, general, and indefinite"). Indeed, Magistrate Judge Lenihan explicitly considers and rejects *Galderma* as "patently distinguishable." R&R at 44-46 & n.59 (noting that even if she had applied the *Galderma* standard, she still would have concluded that K&E failed to show informed consent).

[19]   Putting this obligation on the lawyer to inform the client makes perfect sense, because the lawyer is in a superior position to know the extent of its own current conflicts and the likelihood that future conflicts may arise based on its existing client base and areas of expertise.

[20]   K&E's suggestion that Mylan, by virtue of the Advance Waiver's reference to "litigation, arbitration or other dispute resolution procedure," was consenting to K&E's representation of Teva in litigation arising out of a hostile takeover, has no good faith basis at all. Objections at 22 n.7. To the contrary, the Advance Waiver makes clear that Mylan was not consenting to K&E's representation of any entity (including Teva) in any matter (including litigation) so long as that matter is both adverse to the Mylan Clients or their affiliates and "related to" K&E's provision of legal services to Mylan. This, of course, includes litigation arising out of a hostile takeover.

**Fourth**, contrary to K&E's suggestion (Objections at 24), Mylan's status as a "sophisticated" client does not absolve K&E of its duty of loyalty or its obligation to fully inform Mylan of any potential conflicts of interest.  Indeed, courts routinely refuse to enforce waivers against sophisticated clients.  *Celgene Corp.*, 2008 U.S. Dist. LEXIS 58735, at *27 (advance waiver invalid even though client was sophisticated and represented by in-house counsel); *Lennar Mare Island*, 2015 U.S. Dist. LEXIS 45526, at *45 (advance waiver invalid even though client was a large corporation represented by in-house counsel, because "[p]ronouncing the waiver here enforceable . . . would promote broad, static agreements over timely and forthright discussions of conflicts"); *see also* Moriarty Report ¶ 30; Hazard Report ¶ 17.[21]

In sum, the record is devoid of any evidence that Mylan knew and understood, or should have known and understood, that the Advance Waiver would permit K&E to represent Teva in a hostile takeover.  To the contrary, Ms. Ondos never contemplated such a possibility at the time she signed the Engagement Letter.  Ondos Decl. ¶¶ 31-32; Supp. Ondos Decl. ¶ 10.  Nor would any reasonable company ever believe that a waiver of the sort at issue here could be construed as an open invitation to a trusted lawyer to lead the charge of its own demise.  *See* Hazard Report ¶ 16.  Had K&E actually informed Mylan that it construed the Advance Waiver as permitting K&E "to undertake representation in an adverse acquisition of the Mylan corporate affiliate group, including the client subsidiaries and products with respect to which K&E was being provided confidential, proprietary and attorney-client privileged information" – which Magistrate Judge

---

[21]   K&E cites ABA Formal Opinion 05-436 (May 11, 2005) in support of its argument that "significant weight" must be given to a client's sophistication when determining if consent is "informed."  Objections at 24.  However, the Opinion and Model Rules actually state that consent "is more likely to be effective, particularly if, e.g., the client is independently represented by other counsel in giving consent ***and the consent is limited to future conflicts unrelated to the subject of the representation***."  *Id.* at 1, 2-3 (emphasis added) (quoting Model Rule 1.7, cmt. 22).  Here, K&E is attempting to use the Advance Waiver to do just the opposite: to represent Teva in a hostile, directly adverse, and *related* transaction.

Lenihan correctly finds K&E did not (R&R at 11) – Mylan never would have signed the

Engagement Letter or otherwise agreed to hire K&E.  *See* Miner Decl. ¶¶ 22-23; Ondos Decl. ¶¶

31-32; Supp. Ondos Decl. ¶ 10.[22]  K&E's failure to adequately inform Mylan – either through

explicit discussion or through the Advance Waiver – is fatal to its waiver defense.

### C.     The Engagement Letter Expressly Prohibits K&E from Taking on Matters Adverse to Mylan's Corporate Affiliates, Including Mylan N.V.

As discussed above (*supra* at 13-24), K&E wrongly claims that its conduct does not

violate applicable Rules of Professional Conduct because K&E has never represented Mylan's

corporate parent, Mylan N.V.  But even if K&E's conduct somehow passed muster under the

ethical rules – and it absolutely does not – this conduct is expressly prohibited by the very

Advance Waiver on which K&E so heavily relies.  This Advance Waiver provides that K&E will

only be adverse to "you [the Mylan Clients] *or any of your affiliates*" on matters that are not

related to "the legal services that K&E LLP has rendered, is rendering or in the future will render

to [the Mylan Clients] under the Engagement[.]"  Engagement Letter at 3 (emphasis added).  As

Magistrate Judge Lenihan correctly explains, and as K&E concedes, by specifying the

circumstances under which K&E *may* be adverse to Mylan's affiliates, this provision also defines

when K&E *may not* be adverse to those affiliates.  R&R at 46-47; Objections at 33 (interpreting

Advance Waiver as providing that, "with respect to the Mylan clients, Kirkland would not handle

---

[22]     *See W. Sugar*, 2015 U.S. Dist. LEXIS 21448, at *21 (conflict not waived where
corporation's general counsel stated that no one from Patton Boggs had discussed the advanced
waiver with him at the time he executed the engagement letter and that, if the law firm had made
clear its interpretation of the waiver, the general counsel would not have signed the agreement);
*Celgene Corp.*, 2008 U.S. Dist. LEXIS 58735, at *30-31 (conflict not waived where chief
counsel stated "if Buchanan Ingersoll had informed me that the waiver language was intended to
allow it to represent a generic company in ANDA litigation against Celgene, I would not have
retained Buchanan Ingersoll") (internal marks and citation omitted); *Goss Graphics Sys. v. MAN
Roland Druckmaschinen Aktiengesellschaft*, No. C00-0035 MJM, 2000 U.S. Dist. LEXIS 18100,
at *9 (N.D. Iowa May 25, 2000) (K&E's conflict not waived where corporation's CEO and CFO
stated that they "never would have consented to such representation").

a representation adverse . . . ."), 34 (by virtue of the Advance Waiver, "Kirkland agreed not to represent clients adverse to the Specified Mylan Entities or any of their affiliates . . . ."). As such, even if the Court finds that K&E did not violate Rule 1.7, K&E has still breached its fiduciary duties to Mylan as well as its express commitments under the Engagement Letter.

Faced with this express contractual prohibition, K&E once again resorts to mischaracterizing the Engagement Letter. K&E insists that under the Advance Waiver, "adversity to [the Mylan Clients'] affiliates only matters if services are rendered to an affiliate under a separate agreement." Objections at 33. This argument, which amounts to a unilateral rejection of the very commitments K&E made in the Engagement Letter, is disturbing. As noted above, the Advance Waiver prohibits K&E from representing other entities "adversely to [the Mylan Clients] or any of [their] affiliates on matters that are not related to (i) the legal services that K&E LLP has rendered, is rendering or in the future will render to you under the Engagement, and (ii) other legal services that K&E LLP has rendered, is rendering or in the future will render to you or any of your affiliates under a separate engagement . . . ." Engagement Letter at 3. Accordingly, the plain language of the Advance Waiver precludes K&E from acting adversely to the Mylan Clients' "affiliates" ***both*** with respect to matters relating to the services provided under the current engagement (*see* subsection (i)) ***and*** with respect to matters relating to future services under a separate engagement (*see* subsection (ii)). R&R at 47-48 (recognizing that the key phrase, "adversely to you or any of your affiliates," expressly prefaces – and therefore pertains to – both subsections).[23]

---

[23]   Contrary to K&E's suggestion (Objections at 33), the references to "you" in subsection (i) and "you or any of your affiliates" in subsection (ii) simply reflect the fact that subsection (i) refers to the current engagement between K&E and the Mylan Clients, whereas subsection (ii) references a potential future engagement which might include different or additional Mylan entities as clients. These subsections in no way limit the key operative language in the preceding

Sadly, K&E does not feel constrained by the plain language of its own Engagement Letter.  To the contrary, K&E argues that it made no commitment to Mylan with respect to being adverse to Mylan's affiliates – and it advances this argument by attempting to re-write the Advance Waiver to remove the words "or any of your affiliates" from the operative preamble and apply them only to subsection (ii).  Such a misguided effort by K&E has been properly rejected by Magistrate Judge Lenihan who correctly finds K&E's tortured reconstruction to be "linguistically and logically untenable."[24]  R&R at 48.  Finally, to the extent there is any ambiguity in the provision (which there is not), any such ambiguity must be construed against K&E as the firm and fiduciary that drafted the Engagement Letter.  R&R at 50.[25]

## IV.    INJUNCTIVE RELIEF IS WARRANTED

### A.    Mylan Demonstrates a Reasonable Likelihood of Success on the Merits

For all of the reasons stated in the R&R, as well as for the reasons stated above, Mylan

---

sentence, which plainly prohibits K&E from engaging in a related adverse representation against the Mylan Clients "or any of [their] affiliates[.]"

[24]    In wrongly accusing the R&R of rewriting the Advance Waiver provision (Objections at 34), K&E engages in a misleading demonstration intended to give the appearance that the phrase "or any of your affiliates" occurs after romanette (i) in the actual Engagement Letter.  In fact, as noted above, the critical phrase "or any of your affiliates" precedes and thus applies to *both* romanettes.  Engagement Letter at 3.  Also misguided is K&E's suggestion that the R&R's alleged "rewriting" "fundamentally changes the provision's meaning" by rendering Mylan's corporate "grandparent" an "affiliate."  Objections at 34.  That assertion is preposterous given that Mylan N.V. is obviously an "affiliate" of the Mylan Clients under any plausible meaning of that term.  *See, e.g.*, 17 C.F.R. § 230.405 ("An affiliate of, or person affiliated with, a specified person, is a person that directly, *or indirectly through one or more intermediaries*, controls or is controlled by, or is under common control with, the person specified.") (emphasis added).

[25]    K&E points to another provision in the Advance Waiver, which states that "no parent, subsidiary, affiliate, or other entity or person related to [the Mylan Clients] has the status of a client for conflict of interest purposes."  But as Magistrate Judge Lenihan correctly notes, this clause simply means that only the Mylan entities who signed the Engagement Letter may enforce rights against K&E as "clients" under that engagement.  This does not mean that these Mylan entities are prohibited from invoking the interests of their affiliates under the separate "affiliate" provision, as discussed above.  R&R at 49-50.

has established a reasonable likelihood of success on the merits of its claims.  K&E has provided no reason to overturn this conclusion, opting instead largely to repeat the same arguments that were already soundly rejected by the Magistrate Judge.  *See* Objections at 36; *supra* at 12-13.

Although K&E suggests that its conduct should be excused because it did not act in "bad faith" or exhibit "cavalier disregard of the ethical constraints on concurrent representations," this assertion is not founded in law and is not supported by a single citation to authority.  Objections at 36-37.  To the contrary, the analysis of whether conduct contravenes Rule 1.7 or a counsel's fiduciary duties has nothing to do with bad faith, but rather centers on whether a lawyer has engaged in a concurrent adverse representation without the client's informed consent.  *See* R&R at 30-31 ("[Rule 1.7] concerns a lawyer's duty of loyalty to a current client, and a corresponding prohibition against his concurrent undertaking to work in opposition to the clients' wishes and interests toward an objective to which the client is opposed."), 51 ("[T]he purpose of Rule 1.7 . . . is to secure the client's expectation of counsel's loyalty[.]"); *Maritrans*, 529 Pa. at 262 ("[A] fiduciary who breaches his duty of loyalty to his principal is liable to his principle, and an injunction is a proper remedy for the breach.").  K&E's attempt to obfuscate issues through references to its purported "good faith" conduct should be rejected.[26]

### B.    The Preliminary Injunction is Necessary to Prevent Immediate and Irreparable Harm to Mylan

As detailed in the R&R, failure to grant an injunction would cause irreparable harm to Mylan, while any potential harm to either K&E or Teva would not be irreparable and, in any

---

[26]    Equally unavailing is K&E's suggestion that Professor Painter's post-facto endorsement of K&E's conduct somehow excuses the violation.  Objections at 36.  With all respect to Professor Painter, Magistrate Judge Lenihan correctly questioned the soundness of Professor Painter's conclusions in this matter, including his suggestion that Teva is not acting adversely to Mylan N.V. in pursuing the hostile acquisition (R&R at 24) and his reliance on a hypothetical that was plainly inapposite (R&R at 28 n.34).

event, would flow directly from their own conduct.[27]  *See* R&R at 52-58.  K&E nevertheless objects to this portion of the R&R for two reasons:  *first*, K&E argues that the mandatory portion of the recommended injunction is unlawful; and *second*, it claims that the prohibitory portion of the recommended injunction is moot.  Objections at 37-41.  K&E is wrong on both counts.

### 1.    A Mandatory Injunction is Lawful and Warranted

Contrary to K&E's contention, Mylan is entitled to the protection afforded by the retrieval of K&E's work product from Teva.[28]  As Magistrate Judge Lenihan aptly explains, "courts have consistently recognized their power to enter a mandatory injunction" so long as the right to such relief is "clear."  *See* R&R at 19-20 (collecting cases).  This is particularly so where, as here, the mandatory portion of the injunction is necessary to restore the *status quo ante*.  *Id.*  The "clear right" requirement "does not mean that the party seeking a mandatory preliminary injunction must establish his or her claim absolutely."  *Sovereign Bank v. Harper*, 674 A.2d 1085, 1092 (Pa. Super. Ct. 1996).  Instead, the movant must simply present "substantial, credible evidence in support of [its] claim[.]"  *Kessler v. Broder*, 851 A.2d 944, 948 (Pa. Super. Ct. 2004).  Magistrate Judge Lenihan correctly found that Mylan satisfied this

---

[27]   Magistrate Judge Lenihan correctly notes that the irreparable harm analysis focuses on "the extent to which the nonmoving party will suffer irreparable harm if the injunction is issued. . . . No mention is made of harm to nonparties."  R&R at 56-57 (internal marks and citations omitted).  Nonetheless, the R&R analyzes potential harm to Teva.

[28]   While K&E suggests that Mylan has waived its right to seek retrieval of work product (Objections at 38), Mylan requested this relief from the very beginning of the case – though K&E never raised any objection specific to this component of the requested injunction.  *See, e.g.*, [Proposed] Order Granting Motion for Preliminary Injunction, ECF No. 5-1 (requesting that K&E be "required to retrieve all work product provided by Defendant to Teva in connection with its efforts to acquire Mylan N.V. and its subsidiaries and maintain the confidentiality of said work product").  The authority K&E cites regarding waiver is thus inapposite.  *See United States v. Hoffecker*, 530 F.3d 137, 162-63 (3d Cir. 2008) (rejecting defendant's attempt to raise statute of limitations defense by letter after briefing where he failed to raise the issue in his opening brief); *United States v. DeMichael*, 461 F.3d 414, 417 (3d Cir. 2006) (defendant waived right to appeal his conviction because his opening brief "clearly stated that the *only* issue he was appealing was the propriety of the fine") (emphasis in original).

-40-

standard.  *See, e.g.*, R&R at 50-52 (finding Mylan established a "substantial" likelihood of success on the merits of its underlying claims); 58-59 (finding that any harm to K&E or Teva "does not begin to approach the irreparable harm to Plaintiffs" in the absence of an injunction); 61 (finding a "strong showing of a clear right" to mandatory injunctive relief).

In its attempt to avoid the mandatory portion of the injunction, K&E maintains that "[t]he disposition of work product is separate and analytically distinct" from the issue of disqualification, and that "[t]he Third Circuit specifically requires evidence of an actual or a significant risk of misuse of confidential information to gain an advantage before any relief beyond disqualification can be properly ordered."  Objections at 38-39.  The cases cited by K&E, however, say no such thing.  For example, in *Akerly v. Red Barn Sys., Inc.*, 551 F.2d 539 (3d Cir. 1977), the Third Circuit affirmed the district court's refusal to disqualify plaintiff's lead counsel despite the court's disqualification of plaintiff's local counsel (from a different firm) based on local counsel's former association with a law firm that had represented defendants.  In so holding, the Third Circuit found that local counsel's prior work for the defendants had not been "substantially related" to the present law suit, and that "there was no real possibility that [local counsel] may have acquired confidences that are substantially related to this litigation while he was employed at [the previous] firm."  *Id.* at 542-44.  For those reasons, as well as in light of local counsel's "peripheral" role in the present litigation, the Third Circuit (unremarkably) found that there was no reason to extend the disqualification to lead counsel.[29]  *Id.* at 544.  No issues relating to the sharing or retrieval of work product were addressed.

Similarly inapposite is *IBM Corp. v. Levin*, 579 F.2d 271 (3d Cir. 1978), in which the

---

[29]   Significantly, in reaching this decision, the Third Circuit deemed it "appropriate to stress the importance of avoiding proposed representations that may generate the appearance as well as the actuality of professional impropriety."  *Akerly*, 551 F.2d at 544.

Third Circuit affirmed a district court order that disqualified plaintiffs' counsel due to counsel's concurrent representation of defendant in unrelated matters, but that permitted counsel to transfer work product to and confer with successor counsel for a period of sixty days.  In rendering this decision, the Third Circuit found that counsel's representation of defendant dealt "exclusively with labor matters" and thus was unrelated to plaintiff's antitrust suit against defendant, and that the law firm "never acquired any confidential information from [defendant] useful in the prosecution of the antitrust suit."  *Id.* at 281-83.  The Third Circuit also noted that counsel had represented plaintiff in the antitrust action "for a number of years," rendering the impact of disqualification on the client "harsh."  *Id.* at 283.[30]

The instant case stands in stark contrast to the above cases relied on by K&E.  Magistrate Judge Lenihan properly finds that Mylan conveyed "highly specific and confidential product and pricing information" to K&E in the law firm's capacity as Mylan's legal counsel, and that this information is "substantially related" to the Subject Representation.  R&R at 32-37.  Magistrate Judge Lenihan further finds that any harm suffered by Teva as a result of the requested injunction is necessarily limited given that K&E had been representing Teva in the Subject Representation for only two to three weeks before Mylan filed its motion seeking to disqualify K&E – a fact that necessarily limits the degree of work product (and concomitant harm) at issue.  *Contrast IBM Corp.*, 579 F.2d at 283 (affirming order permitting disqualified counsel to share work product with successor counsel for a limited period where disqualified counsel had represented the client in the matter "for a number of years").  In light of these circumstances, the mandatory injunction recommended by Magistrate Judge Lenihan – which would require K&E

---

[30]   The final Third Circuit case cited by K&E on this point, *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351 (3d Cir. 1980), has nothing to do with attorneys' fiduciary and ethical obligations and related work product issues, but rather relates to enforcement of a restrictive covenant in a private employment agreement.

to retrieve and maintain the confidentiality of work product provided by K&E to Teva in connection with its efforts to acquire Mylan – is wholly appropriate.[31]

### 2.    A Prohibitory Injunction is Necessary

Contrary to K&E's arguments, the prohibitory injunction is not moot.  *See* Objections at 41-42.  Teva's hostile attempt to acquire Mylan is ongoing, and the threat of irreparable injury to Mylan is coterminous with that attempt.  While Teva may have engaged new counsel in connection with the takeover, there currently is no court order in place preventing K&E from resuming its unethical representation of Teva or otherwise acting on behalf of or in support of Teva.  To the contrary, all Mylan has to give it comfort that K&E will abide by its duties and obligations is K&E's apparent word – cold comfort considering that K&E has breached its ethical duties to Mylan, violated the terms of the parties' Engagement Letter, and taken bad faith positions regarding the interpretation of the Engagement Letter in a post-facto attempt to excuse its conduct.  Given the circumstances, the continued risk of irreparable harm is evident and an injunction is plainly required.  *See, e.g.*, *Allee v. Medrano*, 416 U.S. 802, 811-12 (1974) ("It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence, since otherwise the defendants would be free to return to their old ways.") (internal marks and citations omitted).[32]

---

[31]    Magistrate Judge Lenihan's decision is also consistent with the numerous decisions confirming that attorneys' *threatened* breach of fiduciary or ethical duties – including by potentially disclosing confidential information – constitutes irreparable harm that justifies emergency relief.  R&R at 36-37 n.46, 52-53 (citing *Maritrans*, 529 Pa. at 260-63, *Hyman*, 964 F. Supp. at 172-73, and *Dougherty*, 85 A.3d at 1086).

[32]    K&E's reliance on *15192 Thirteen Mile Rd. v. City of Warren*, 593 F. Supp. 147, 154 (E.D. Mich. 1984), to support its mootness argument is misplaced.  In *City of Warren*, defendant had moved to disqualify plaintiff's counsel not because of a violation of ethical and fiduciary duties, but because counsel was likely to be called as a witness at trial.  *Id.*  For that reason, once counsel was substituted, there was no ongoing threat of irreparable injury caused by continued or repeated violations of these critical obligations.  Similarly unavailing is K&E's reliance on *Pub.*

### C.     The Balance of Hardships and Public Interest Both Favor Granting a Preliminary Injunction

Magistrate Judge Lenihan correctly held that the balance of hardships favors Mylan.  *See* R&R at 54-58 (finding harm to K&E and Teva "either (a) is economic and may be remedied by the posting of the appropriate bond and/or (b) does not begin to approach the irreparable harm to Plaintiffs of Defendant's continued adverse representation in Teva's hostile takeover attempt").

In response to the R&R, K&E merely renews its argument that it "faces both reputational and monetary consequences" from the issuance of a preliminary injunction.  Objections at 43. This argument was properly rejected in the R&R, which found that such harm "cannot be accorded substantial weight" where "K&E has brought any resulting harm to its reputation upon itself."  R&R at 54-55.  As for any supposed harm to Teva, K&E does not dispute the fact that any such harm would not be irreparable.  *See* R&R at 58 ("Defendant has not introduced evidence either that its services are irreplaceable . . . or that . . . the delay in bringing substitute counsel up to speed will likely cause Teva's takeover attempt to fail.").  Indeed, K&E admits that Teva has already arranged for substitute counsel to take K&E's place, which counsel presumably has been generating new work product for Teva.[33]  By contrast, Mylan is vulnerable to a continuing risk of irreparable harm without the preliminary injunction and would be left without any enforceable guarantee that K&E will abide by its ethical and fiduciary duties.

---

*Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 83 (3d Cir. 1990), which simply confirms that an injunction must be sufficiently specific in its terms.  Not only does K&E fail to explain how the injunction recommended by Magistrate Judge Lenihan allegedly lacks the requisite specificity, but the plain language of the injunction is both detailed in the relief granted and tailored to the instant conflict.  Finally, in *Reddick v. Justice*, C/A No. 2:13-cv-3379 DCN WWD, 2014 WL 4079355 (D.S.C. Aug. 14, 2014), the party seeking the injunctive relief advised the court that the issues addressed in that party's motions had been resolved – hardly the situation presented here.

[33]   For this reason, K&E's claim that the mandatory portion of the injunction "would have the effect of adjudicating Teva's rights to its own property" is a red herring and, in any event, compensable.

Equally sound is Magistrate Judge Lenihan's finding that the public interest favors an injunction.  R&R at 59 ("To the extent that the public interest is concerned, it must be deemed to favor enforcement of ethical rules and contractual undertakings.").  Mylan seeks nothing more than for K&E to adhere to its fiduciary and ethical obligations.  Enjoining K&E from violating its ethical duties will strengthen the public's trust in the legal profession and thereby greatly serve the public interest.  *See Maritrans*, 529 Pa. at 252 (finding that "[t]he public's trust in the legal profession undoubtedly would be undermined" if courts failed to sanction breaches of fiduciary duty).  Although K&E makes vague reference to the "strong interest" public shareholders of Teva and Mylan have in allowing the takeover process to play out "in ways that maximize value," K&E fails to articulate how the injunction recommended by Magistrate Judge Lenihan – which would ensure that K&E abides by its ethical and fiduciary obligations – would at all compromise this interest.  Objections at 44.  Finally, K&E's repeated protestation that Mylan is somehow using the ethical rules as a "tactical tool" is completely baseless and, in any event, could be alleged with respect to nearly every disqualification motion.  *Id.* at 44-45.  In sum, Magistrate Judge Lenihan correctly concludes that Mylan satisfied all the requirements for injunctive relief, and none of K&E's arguments establishes grounds for holding otherwise.

## CONCLUSION

For all the reasons stated herein, as well as in Magistrate Judge Lenihan's R&R, the Court should fully adopt the R&R and grant Plaintiffs' motion for a preliminary injunction.


Dated:  July 7, 2015                                      Respectfully submitted,

                                                          /s/ William Pietragallo, II
                                                          WILLIAM PIETRAGALLO, II, ESQ.
                                                          JOHN A. SCHWAB, ESQ.
                                                          PIETRAGALLO GORDON ALFANO BOSICK &
                                                          RASPANTI, LLP

One Oxford Centre, 38th Floor
Pittsburgh, PA 15219
Tel.:  412-263-2000
Fax:  412-263-2001
WP@Pietragallo.com
JAS@Pietragallo.com

MICHAEL S. SOMMER, ESQ. (admitted *pro hac vice*)
MORRIS J. FODEMAN, ESQ. (admitted *pro hac vice*)
JESSICA L. MARGOLIS, ESQ. (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Tel.:  212-999-5800
Fax:  212-999-5899
msommer@wsgr.com
mfodeman@wsgr.com
jmargolis@wsgr.com

*Counsel for Mylan Plaintiffs*