**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MYLAN INC., MYLAN PHARMACEUTICALS, INC., MYLAN TECHNOLOGIES, INC. and MYLAN SPECIALTY, LP,<br><br>          Plaintiffs,<br><br>   v.<br><br>KIRKLAND & ELLIS LLP,<br><br>          Defendant. | Civil Action No. 2:15-cv-00581-JFC-LPL |

**REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT KIRKLAND & ELLIS LLP'S**
**OBJECTIONS TO REPORT AND RECOMMENDATION**
**ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendant Kirkland & Ellis LLP ("Kirkland") hereby respectfully submits the following

Reply to Plaintiffs' Response to Defendant's Objections to Report and Recommendation on

Plaintiffs' Motion for Preliminary Injunction:

# TABLE OF CONTENTS

Page

I.    OVERVIEW ................................................................................................. 1

II.    ARGUMENT ............................................................................................... 2

    A.    Plaintiffs' Standard Of Review Discussion Is Misleading. .................................... 2

    B.    Kirkland's Representation Of Teva Was Not "<u>Directly</u> Adverse" To The Mylan Indirect Subsidiary Clients And Thus Did Not Present A Conflict Of Interest Under The Law. ............................................................. 3

    C.    The Conflict Waiver Is Valid And Enforceable. ...................................................... 8

        1.    Plaintiffs Misstate Applicable Law And Ignore Key Facts Confirming That There Was Informed Consent ............................................8

        2.    Plaintiffs Cannot Rewrite The Engagement Agreement............................11

            a.    Plaintiffs Cannot Rewrite "Related To The <u>Legal Services</u>" ............ 11

            b.    Plaintiffs Cannot Excise Swaths Of Text To Manufacture Their "Affiliates" Argument ............................................ 12

    D.    Plaintiffs Have Failed To Prove The Prerequisites To Any Injunction. ............... 12

III.    CONCLUSION.................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Akerly v. Red Barn Sys., Inc.*,
  551 F.2d 539 (3d Cir. 1977) ........................................................................ 13

*Bd. of Managers of Eleventh St. Loftominium Ass'n v. Wabash Loftominium, L.L.C.*,
  876 N.E.2d 65 (Ill. App. 2007) ...................................................................... 5

*Celgene Corp. v. KV Pharm. Co.*,
  No. 07-4819 (SDW), 2008 WL 2937415 (D.N.J. July 29, 2008) ...................... 9

*City News & Novelty, Inc. v. City of Waukesha*,
  531 U.S. 278 (2001) ...................................................................................... 15

*Deakins v. Monaghan*,
  484 U.S. 193 (1988) ...................................................................................... 14

*DeShields v. Barnhart*,
  No. Civ. A. 02-8426, 2004 WL 384994 (E.D. Pa. Feb. 26, 2004) .................... 2

*Dole Food Co. v. Patrikson*,
  538 U.S. 468 (2003) ........................................................................................ 4

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ...................................................................................... 13

*Ford v. Astrue*,
  No. CIV-10-468-D, 2011 WL 3625353 (W.D. Okla. Aug. 17, 2011) .................. 3

*Galderma Labs., L.P. v. Actavis Mid Atl. LLC*,
  927 F. Supp. 2d 390 (N.D. Tex. 2013) .................................................. 8, 9, 10

*GEM Holdco, LLC v. Changing World Techs., L.P.*,
  7 N.Y.S.3d 242 (N.Y. Sup. Ct. 2015) .............................................................. 8

*Greenwood Partners, L.P. v. Cimnet, Inc.*,
  No. Civ. A. 201CV06624LDD, 2003 WL 22238981 (E.D. Pa. Sept. 26, 2003) ...... 13

*GSI Commerce Solutions, Inc. v. Babycenter, L.L.C.*,
  644 F. Supp. 2d 333 (S.D.N.Y. 2009) .............................................................. 5

*Holloway v. Arkansas*,
  435 U.S. 475 (1978) ...................................................................................... 15

*IBM Corp. v. Levin*,
  579 F.2d 271 (3d Cir. 1978) .......................................................................... 13

*Janus Capital Grp. v. First Derivative Traders*,
  131 S. Ct. 2296 (2011) .................................................................................... 4

*Jersey Cent. Power & Light Co. v. New Jersey*,
  772 F.2d 35 (3d Cir. 1985) ............................................................................ 14

*Kaleta v. Clausi*,
  No. 4:12-CV-1987, 2013 WL 1804203 (M.D. Pa. Apr. 29, 2013) .................... 15

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*LaSalle Nat'l Bank v. First Conn. Holding Grp.*,
  287 F.3d 279 (3d Cir. 2002) ............................................................... 15

*Lennar Mare Island, LLC v. Steadfast Ins. Co.*,
  No. 2:12-cv-02182-KJM-KJN, 2015 WL 1540638 (E.D. Cal. Apr. 7, 2015) ..................... 4, 10

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ............................................................... 5

*Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*,
  602 A.2d 1277 (Pa. 1992) ................................................................. 14

*Matter of Anonymous Member of S.C. Bar*,
  432 S.E.2d 467 (S.C. 1993) ................................................................ 7

*Motorola Mobility LLC v. AU Optronics Corp.*,
  775 F.3d 816 (7th Cir. 2014), *cert. denied*, 2015 WL 1206313 (U.S. June 15, 2015) .............. 4

*Owen v. United States*,
  889 F. Supp. 1293 (D. Idaho 1995) .......................................................... 2

*Rogers v. Dir., Tex. Dep't of Criminal Justice-Corr. Insts. Div.*,
  Civ. A. No. 10-150, 2013 WL 4837365 (E.D. Tex. Sept. 10, 2013) ............................. 3

*Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*,
  828 A.2d 995 (Pa. 2003) ................................................................. 13

*United States v. Bestfoods*,
  524 U.S. 51 (1998) ........................................................................ 4

*United States v. Hatfield*,
  No. 06-cr-0550, 2009 WL 3806300 (E.D.N.Y. Nov. 13, 2009) ................................. 8

*United States v. Munsingwear, Inc.*,
  340 U.S. 36 (1950) ...................................................................... 15

*United States v. Raddatz*,
  447 U.S. 667 (1980) ...................................................................... 2

*Vanderveer Group, Inc. v. Petruny*,
  No. CIV. A. 93-3677, 1993 WL 308720 (E.D. Pa. Aug. 13, 1993) ............................. 6

*Vanderveer Group, Inc. v. Petruny*,
  Nos. CIV. A. 93-3677, CIV. A. 93-5154, 1994 WL 314257 (E.D. Pa. June 29, 1994) ............ 6

*W. Sugar Coop. v. Archer-Daniels-Midland Co.*,
  No. CV 11-3473 CBM (MANx), 2015 WL 690306 (C.D. Cal. Feb. 13, 2015) ..................... 9

*Williams v. Apfel*,
  98 F. Supp. 2d 625 (E.D. Pa. 2000) ........................................................ 2

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................... 13

## TABLE OF AUTHORITIES
(continued)

Page(s)

**Statute**

28 U.S.C. § 636(b)(1) ................................................................................ 2

**Other Authorities**

ABA Formal Op. 93-377 ............................................................................ 7

ABA Formal Op. 95-390 ......................................................................... 5, 6

ABA Formal Op. 05-434 ............................................................................ 5

ABA Formal Op. 05-435 ............................................................................ 5

Lucian Arye Bebchuk, John C. Coates IV & Guhan Subramanian, Symposium, *The Powerful Antitakeover Force of Staggered Boards:  Further Findings and a Reply to Symposium Participants*, 55 Stan. L. Rev. 885 (2002) ................................................ 6

Restatement (Third) of the Law Governing Lawyers § 122 cmt. d (2000) ................................. 10

**Rules**

Cal. R. Prof'l Conduct 3-310 ..................................................................... 4

Fed. R. Civ. P. 72(b)(3) ............................................................................. 2

Pa. R. Prof'l Conduct 1.0 ........................................................................... 8

Pa. R. Prof'l Conduct 1.7 .................................................................. 3, 4, 5, 6, 8

Pa. R. Prof'l Conduct 1.9 ........................................................................ 6, 12

# I.  OVERVIEW

Stripped of its rhetoric and personal attacks, Plaintiffs' Response continues to sidestep core failings of Plaintiffs' and the R&R's analysis.  First, Mylan N.V. was never Kirkland's client; nor was Kirkland's work for Teva regarding the Mylan N.V. transaction "***directly*** adverse" to the Mylan indirect subsidiary clients under Pennsylvania Rule of Professional Conduct 1.7(a)(1).  Plaintiffs and the R&R argue otherwise, but they ignore both (i) the bedrock corporate distinction between a parent and its indirect subsidiaries, and (ii) the highly attenuated and speculative "link" between the proposed transaction and those indirect subsidiaries.  As the ABA's Formal Opinions show, those corporate formalities are fundamental to the conflict-of-interest analysis, not a "fortuity."  An attenuated impact on indirect subsidiaries has never been sufficient cause to provide a client with veto power over a firm's representation of another client based on subjective "wishes."  To accept the R&R's recommendation to the contrary would affect a destabilizing sea change throughout the spectrum of lawyer-client relationships.

Second, the Mylan indirect subsidiary clients cannot evade the Conflict Waiver that their sophisticated in-house counsel negotiated, edited, and executed—a waiver that was a prerequisite for them to obtain Kirkland's representation in non-transactional, FDA-related litigation.  Those Mylan indirect subsidiary clients agreed to the waiver in the context of considerable existing adversity between them and Kirkland's other clients, including Teva.  These facts are dispositive under the objective test for informed consent; yet the R&R sidesteps them, and Plaintiffs still refuse to address them.  Plaintiffs (and the R&R) cannot escape this analytical shortcoming by rewriting portions of the Conflict Waiver and by ignoring other portions of it.

Kirkland's judgment that it could serve as Teva's transactional counsel regarding Teva's proposal to purchase the stock of Mylan N.V.'s public shareholders at a premium was correct, as

Professor Richard Painter, one of the foremost experts on conflicts of interest, confirmed in his Declaration. Nevertheless, the R&R recommends otherwise. That recommendation, irrespective of its flaws, created a new reality that forced Teva and Kirkland to make the irreversible decision that Kirkland should withdraw from the representation, that Teva should proceed with substitute counsel, and that Kirkland should have no further involvement in the transaction.

That new reality has significantly impacted the posture of this case. Plaintiffs' request for a prohibitory injunction is now moot. As for their request for a mandatory injunction, Third Circuit law precludes it, as does Plaintiffs' failure to satisfy the mandatory elements for any injunctive relief here—that is, no evidence of any risk of misuse of client confidences, of bad faith, of inequitable conduct, nor proof of irreparable harm. Despite Plaintiffs' efforts to persuade this Court otherwise using myriad misstatements of facts and law, this Court should deny Plaintiffs' motion and vacate the R&R.

## II. ARGUMENT

### A.    Plaintiffs' Standard Of Review Discussion Is Misleading.

The Constitution requires *de novo* review of the R&R by this Court. *United States v. Raddatz*, 447 U.S. 667, 683 (1980); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Williams v. Apfel*, 98 F. Supp. 2d 625, 630 (E.D. Pa. 2000). Plaintiffs nevertheless suggest that substantial deference is owed to the R&R because Kirkland's detailed arguments and significant authority are consistent with its presentation to the Magistrate Judge. Resp. at 12–13. None of Plaintiffs' cited cases supports that proposition; in fact they contradict it.[1] Indeed, Plaintiffs'

---

[1]    In *DeShields v. Barnhart*, No. Civ. A. 02-8426, 2004 WL 384994, at *5 (E.D. Pa. Feb. 26, 2004), for example, the district court analyzed "each of Plaintiff's objections" and conducted an "independent review and consideration of the entire record." So, too, in the other cases string-cited by Plaintiffs. *See Owen v. United States*, 889 F. Supp. 1293, 1294 (D. Idaho 1995) ("[T]he court has engaged in an independent, de novo review of the record, as required by 28 U.S.C.

contention would render meaningless the *de novo* standard, transforming it into a motion-for-reconsideration standard, thereby violating the Constitution and substantial precedent.[2]

**B.    Kirkland's Representation Of Teva Was Not "Directly Adverse" To The Mylan Indirect Subsidiary Clients And Thus Did Not Present A Conflict Of Interest Under The Law.**

The fundamental issue here is whether advising Teva regarding the acquisition of publicly traded shares of a corporate grandparent is "*directly adverse*" to the grandparent's indirect subsidiaries, as is required by Rule 1.7(a)(1).[3]  In arguing that there is direct adversity, Plaintiffs and the R&R jettison bedrock principles of corporate distinctiveness in favor of a "contents of the bag" metaphor (R&R at 27; Resp. at 19)—suggesting that Kirkland's involvement in the Teva transaction constitutes the same direct adversity to the Mylan indirect subsidiary clients as to Mylan N.V.  Plaintiffs also cast about for other means of defining direct adversity by focusing on their "wishes."  Both strategies fail.

To overcome the obvious gap between *indirect* subsidiaries and *direct* adversity, Plaintiffs parrot the R&R's contention that, even though Mylan N.V. undisputedly has never been a Kirkland client, its corporate distinctiveness is a mere "technicality" that Kirkland seeks to exploit.  Not surprisingly, that argument is belied by controlling case law.  *See* Obj. at 15–17

---

§ 636(b)(1).");  *Rogers v. Dir., Tex. Dep't of Criminal Justice-Corr. Insts. Div.*, Civ. A. No. 10-150, 2013 WL 4837365, at *1 (E.D. Tex. Sept. 10, 2013) (explaining that petitioner's objections "require[d] a de novo review . . . in relation to the pleadings and applicable law");  *Ford v. Astrue*, No. CIV-10-468-D, 2011 WL 3625353, at *1 (W.D. Okla. Aug. 17, 2011) ("[T]he matter is reviewed de novo.").

[2]    Plaintiffs' position is a constitutionally impermissible Catch-22:  by their reasoning, only matters not presented to the non-Article III magistrate judge would be entitled to *de novo* review; yet such matters would have been waived by not having presented them.

[3]    Neither the R&R nor Plaintiffs suggests that Kirkland's work for Teva violated Rule 1.7(a)(2) by placing a material limitation on Kirkland's representation of the Mylan Clients. This case turns, then, on direct adversity under Rule 1.7(a)(1).  Plaintiffs' assertion (Resp. at 13) that the Engagement Letter prohibits Kirkland from any representation directly adverse to Mylan N.V. is addressed in Part II.C below and was addressed in Kirkland's Objections at pp. 32–35.

(discussing precedents such as *Dole Food Co.*, *Janus*, *Bestfoods*, *Motorola*, etc.).  Corporate distinctiveness is among the most fundamental principles of corporate law.  A corporation's distinct identity determines its liability, taxes, authority, and duties to the shareholders and to the public.  Plaintiffs of course know this because their corporate distinctiveness from Mylan N.V. is what allowed Mylan N.V., pursuant to a complex $6.3 billion acquisition of the foreign subsidiaries of another public company, to reap billions in tax benefits using a "tax inversion." Fox Decl. ¶ 6; Kirkland's Findings of Fact ¶ 11; Obj. at 3, 15.

Plaintiffs cannot now have it both ways—completing a deal predicated on separateness, then collapsing the corporate form and claiming that a proposed acquisition's impact on Mylan N.V. would be *directly adverse* to the corporation's indirect subsidiaries.  The overseas wall Mylan N.V. built around itself is critically relevant to the "direct adversity" issue, just as it is critically relevant for tax purposes.  "Distinct in uno, distinct in omnibus"—tax breaks *and* conflicts of interest.  *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820 (7th Cir. 2014) (Posner, J.), *cert. denied*, 2015 WL 1206313 (U.S. June 15, 2015) (emphasis omitted).

Plaintiffs try to validate their approach by relying on three cases that supposedly "make clear that disqualification can be required despite the involvement of distinct corporate entities," Resp. at 20–21;[4] none supports Plaintiffs' radical approach.  None of the courts in those cases disqualified counsel by conflating separate corporate entities; rather, they held that the law firm

---

[4]   Plaintiffs' heavy reliance (Resp. at 20–21, 23, 31, 33–36) on cases interpreting California law is misplaced and belies the weakness of their position.  As their own case notes, California is not a Model Rules state, and its rule addressing concurrent representations, Cal. R. Prof'l Conduct 3–310, is much more stringent than Rule 1.7.  It does not even contain a "directly adverse" requirement.  *See Lennar Mare Island, LLC v. Steadfast Ins. Co.*, No. 2:12-cv-02182-KJM-KJN, 2015 WL 1540638, at *14 (E.D. Cal. Apr. 7, 2015) (noting that the California rules encompass "a broader range of concerns" and are more restrictive than the Model Rules).

facing disqualification had represented *both* parent and subsidiary.[5]  Far from supporting

Plaintiffs' position, those cases confirm the "general rule" that "corporations are distinct entities

for purposes of conflict of interest analysis." *Bd. of Managers of Eleventh St. Loftominium Ass'n*

*v. Wabash Loftominium, LLC*, 876 N.E.2d 65, 72 (Ill. App. 2007); *see* Obj. at 16–17.

Accordingly, the key inquiry is whether Kirkland's involvement in Teva's acquisition

offer to Mylan N.V.'s shareholders creates *direct* adversity to the Mylan *indirect* subsidiaries.

The ABA Formal Opinions discussed in Kirkland's Objections resolve this question in

Kirkland's favor.  ABA Formal Opinions 05-434, 05-435, and 95-390 clarify that regardless of

the relationship in question—testator-beneficiary, insurer-insured, or parent-subsidiary—Rule

1.7(a)(1) requires much *more* than attenuated adversity.  Put differently, if the path to "adversity"

requires connecting multiple dots, then it is not "direct" and thus falls outside the scope of Rule

1.7(a)(1).  ABA Formal Opinion 95-390 also explains the independent significance of "directly"

in Rule 1.7(a)(1).  Obj. at 12–13.  Plaintiffs' glib dismissal (Resp. at 15–17) of these authorities

because they do not deal specifically with transactions such as Teva's proposal is no more

persuasive than an argument that *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), is relevant

only to delivery of commissions to justices of the peace.  The ethical principle is clear:  A firm

may undertake representations adverse to a corporation that also have an adverse impact on the

firm's corporate affiliate clients because, as in this case, "*adverseness in such circumstances is*

*indirect, and not direct*."  ABA Formal Op. 95-390 at 10 (emphasis added).

Plaintiffs cannot sidestep these authorities by substituting other tests for direct adversity.

Plaintiffs (and the R&R) thus cannot overcome the attenuated nature of the alleged adversity by

---

[5]    In *GSI Commerce Solutions, Inc. v. Babycenter, L.L.C.*, 644 F. Supp. 2d 333, 335–37
(S.D.N.Y. 2009), for example, the firm was retained by Johnson & Johnson (the parent), but it
did most of its work for J&J's subsidiaries, including BabyCenter.

noting that the ABA Opinions and a comment to Rule 1.7 use the word "related" or its cognates and then replacing the binding "directly adverse" standard with a new "related to" standard. Whatever role relatedness may play as a factor is relevant only if there is cognizable adversity to the indirect subsidiaries in the first place.  Moreover, even if there is some cognizable adversity, the significance of relatedness depends on the extent to which the adversity is attenuated.  Here, any modicum of "relatedness" between Kirkland's representation of Teva and its representation of the Mylan indirect subsidiary clients is insufficient to overcome the attenuation between Teva's transactional proposal to acquire the publicly held shares of a non-client grandparent and Kirkland's product-specific litigation work for the Mylan indirect subsidiary clients.[6]

Equally unavailing is Plaintiffs' novel and unsupported argument that the proposed transaction is somehow directly adverse to the Mylan indirect subsidiary clients because it is contrary to the "wishes" of the individuals who control the Mylan indirect subsidiary clients; that, Plaintiffs say, constitutes "advocacy against [the Mylan] client[s]."  Resp. at 17–18 (emphasis omitted) (quoting R&R at 30).[7]  There should be no illusions here—Plaintiffs contend that any corporation should have unfettered discretion to veto virtually any representation

---

[6]   Plaintiffs erroneously cite *Vanderveer Group, Inc. v. Petruny*, Nos. CIV. A. 93-3677, CIV. A. 93-5154, 1994 WL 314257 (E.D. Pa. June 29, 1994), as part of their relatedness argument and as evidence that the sharing of confidential information has something to do with direct adversity.  Resp. at 22–23.  But the focus on confidentiality in that opinion was pursuant to Rule 1.9 (the rule addressing *former* clients), not Rule 1.7.  And in the 1993 *Vanderveer* opinion, No. CIV. A. 93-3677, 1993 WL 308720 (E.D. Pa. Aug. 13, 1993), the court "*reject*[*ed* the] claim that [a] suit against [the] corporate parent of a client was 'directly adverse' to the client," ABA Formal Op. 95-390 at 10 n.10, on the ground that corporate entities and their attorney-client relationships are *not* interchangeable.

[7]   Although not necessary to the analysis here, it should be noted that Plaintiffs' argument assumes that the "wishes" of Mylan N.V.'s board are consistent with the wishes of Mylan N.V.'s shareholders, a proposition with which even Plaintiffs' expert, Professor Coates, disagrees: "[D]efeating hostile bids . . . not only does not profit shareholders in the 'overwhelming majority' of cases, but commonly hurts them."  Lucian Arye Bebchuk, John C. Coates IV & Guhan Subramanian, Symposium, *The Powerful Antitakeover Force of Staggered Boards: Further Findings and a Reply to Symposium Participants*, 55 Stan. L. Rev. 885, 890 (2002).

involving any affiliate, including a new grandparent that post-facto becomes an affiliate by acquiring the client corporation (along with other unrelated businesses from a different multinational company worth many billions of dollars).  Plaintiffs (and the R&R) offer no support for their newly-minted theory, and they ignore authority that contradicts it.  *See, e.g.*, ABA Formal Op. 93-377 at 3–4 & n.4 (explaining that representation of two clients in different suits, where one suit may "create a legal precedent . . . which is likely materially to undercut the legal position being urged on behalf of the other client," does not constitute *direct* adversity).

Plaintiffs have it backwards, then, when they cavalierly dismiss the testator-beneficiary and insurer-insured adversity in the ABA Formal Opinions as involving only monetary interests. Resp. at 16–17.  Clear loss of money is far more cognizable and far less speculative than the vague, subjective concern that a new shareholder of a grandparent might act in a manner that is contrary to the conjured "wishes" of indirect subsidiaries.  Indeed, the proposition that direct adversity for purposes of Rule 1.7(a)(1) can be created simply if a corporate client subjectively does not "wish" its lawyer to be adverse to an affiliate two steps removed is as unprecedented as it is unworkable and destabilizing, particularly given the sheer number of firms and clients that for years have been acting in reliance on waivers just like Kirkland's.[8]

In view of the foregoing, Plaintiffs' default is to use the word "hostile" *ad nauseam* to conjure up direct adversity to each and every entity down the line of the corporate structure.  But casting Teva's proposal to acquire publicly held shares at a premium as a "hostile takeover" instead of an "acquisition proposal" cannot mask the wholesale absence of any support for their proposition; a proposal to acquire shares from a grandparent's shareholders does ***not*** constitute

---

[8]    Of course, it also flies in the face of the objective analysis required for direct adversity.  *E.g.*, *Matter of Anonymous Member of S.C. Bar*, 432 S.E.2d 467, 468 (S.C. 1993) ("Rule 1.7 clarifies the standard as an objective test.").

"direct adversity" to the indirect subsidiaries.  *See* Painter Decl. ¶ 29.  Nor can it mask Plaintiffs'

failure to satisfy their burden of submitting any *evidence* beyond utter speculation that

Kirkland's representation of Teva will have any "negative effect" upon the indirect subsidiaries

*at all*—direct, indirect, or otherwise.  The claimed adversity is speculative, attenuated, and

unsubstantiated and thus does not constitute "direct adversity" under Rule 1.7(a)(1).

**C.     The Conflict Waiver Is Valid And Enforceable.**

      **1.     Plaintiffs Misstate Applicable Law And Ignore Key Facts Confirming That There Was Informed Consent**

Plaintiffs' Response is based on five fatal errors about informed consent—errors that

permeate the R&R as well.  First, "[t]here is no rule that the specific details of a conflict be

itemized in a waiver for it to be valid."  *GEM Holdco, LLC v. Changing World Techs., L.P.*, 7

N.Y.S.3d 242, at *7 (N.Y. Sup. Ct. 2015); *Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F.

Supp. 2d 390, 400–02 (N.D. Tex. 2013); *see also* Obj. at 25–26.

Second, Plaintiffs still ignore the critical relevance of a party's sophistication and

representation by counsel.  This was not an agreement between Kirkland and a lay client with no

understanding of contracts and the law.  The Agreement was negotiated, revised, and executed

by highly sophisticated and experienced in-house counsel whose key responsibilities included

working on retention agreements with myriad outside law firms.  Obj. at 21–24.  There simply is

no cause for paternalistic activism here, notwithstanding Plaintiffs' invocation of hollow labels

such as "vague, general, and open-ended."  *See* Pa. R. Prof'l Conduct 1.0 cmt. 6 ("[G]enerally a

client or other person who is independently represented by other counsel in giving the consent

should be assumed to have given informed consent.");  Pa. R. Prof'l Conduct 1.7 cmt. 22 (same);

*Galderma*, 927 F. Supp. 2d at 405 (same); *United States v. Hatfield*, No. 06-cr-0550, 2009 WL

3806300, at *13 (E.D.N.Y. Nov. 13, 2009) (same) (citing Op. 309 of the DC Bar Ethics Comm.).

Third, Plaintiffs' arguments are not only unfaithful to the words of the Agreement and to the critical significance of the sophistication of the client and its counsel, but they also conflict with the "reasonable foreseeability" standard adopted by the R&R and embraced by Plaintiffs. R&R at 41, 43; Resp. at 30–31.  That standard calls for an *objective* analysis of informed consent.  Obj. at 25.[9]  Thus, as even the R&R acknowledges (R&R at 43), there was informed consent if Ms. Ondos "should reasonably have anticipated" a potential conflict in light of the undisputed factual context, irrespective of what she now contends she would or would not have done.  *Galderma*, 927 F. Supp. 2d at 403–04.  In this regard, the issue is not only what Kirkland said, but also what the Mylan clients knew, and thus includes information they knew irrespective of discussion, disclosure, or articulation in the Agreement.  Obj. at 23- 24.[10]

The unique factual context of this case, which Plaintiffs refuse to address and which the R&R outright ignores, more than demonstrates informed consent.  The Mylan indirect subsidiary clients acknowledge that when they negotiated the Engagement Agreement, they knew that Kirkland was representing numerous clients, including Teva, on matters immensely adverse to

---

[9]   It is therefore irrelevant whether Ms. Ondos, after-the-fact, says she did not know (*e.g.*, that Kirkland "had done corporate work for Teva").  Resp. at 32; Obj. at 21–23.

[10]   Remarkably, Plaintiffs rely almost exclusively on *Celgene Corp. v. KV Pharmaceutical Co.*, No. 07-4819 (SDW), 2008 WL 2937415 (D.N.J. July 29, 2008), but ignore its material distinctions from this case.  For example, unlike here, the client and law firm in *Celgene* never discussed the relevant waiver, and the law firm affirmatively told the client it did not do work for the type of company it was representing in the adverse matter.  *Id.* at *11.  Also, unlike here, the attorney admitted that he believed that the client did not give informed consent.  *Id.* at *10–12; *see also* Obj. at 24–25 n.9.  It is difficult to imagine a more inapposite fact pattern.  Plaintiffs' reliance on California law cases is equally misplaced because, as noted, California does not use the Model Rules and applies a more stringent standard for informed consent.  *See supra* n.4.  In any event, even the California authority invoked by Plaintiffs confirms that the informed-consent inquiry is fact specific and, accordingly, includes consideration of the sophistication of the client.  *W. Sugar Coop. v. Archer-Daniels-Midland Co.*, No. CV 11-3473 CBM (MANx), 2015 WL 690306, at *5 (C.D. Cal. Feb. 13, 2015).

their interests, Obj. at 21–23; and the Engagement Agreement was negotiated, edited and signed by a sophisticated lawyer with healthy "skeptic[ism]." *Id.* at 21–22.[11]

Fourth, Plaintiffs' Response (and the R&R) fails to account for the undisputedly *non-exclusive* list of matters covered by the Conflict Waiver. Ms. Ondos admits she understood that the contractual phrase "including in litigation, arbitration or other dispute resolution procedures" was not "an exclusive list of the types of matters" in which Kirkland could be adverse to the Mylan indirect subsidiary clients. Ondos Decl. ¶ 31 (quoting the Conflict Waiver). Obviously, another category of reasonably foreseeable adversity was transactional adversity.

Finally, neither Plaintiffs nor the R&R grapples with the fact that their approach, which unrealistically demands specification of each potential adversity, completely undermines what their own cited case recognizes: the increasing understanding that "without effective waivers, '[l]arge firms would never be able to take on small, specialized matters for a client unless the firms could reasonably protect against . . . abuse.'" *Lennar Mare*, 2015 WL 1540638, at *14 (quoting *Galderma*, 927 F. Supp. 2d at 395); *see also* Restatement (Third) of the Law Governing Lawyers § 122 cmt. d (2000).

The irony here is that the Mylan indirect subsidiary clients were direct beneficiaries of the law regarding advance waivers. The Conflict Waiver allowed them to secure the services of the firm they wanted. It would be a grave mistake to prevent lawyers and their sophisticated clients from making sensible agreements of this sort. It likewise would be a grave mistake to absolve those parties of the responsibility to abide by those agreements.

---

[11]   Rather than address these facts, Plaintiffs suggest that Kirkland forced itself upon their sophisticated Senior Vice President and Global General Litigation Counsel. Resp. at 2. That argument ignores that *the Mylan indirect subsidiary clients wanted to hire Kirkland* because they stood to gain substantial benefits from Kirkland's expertise in FDA litigation matters. Kirkland's Findings of Fact ¶ 24; Shumsky Decl. ¶¶ 6–7. There is no other explanation for why Kirkland, rather than another law firm, was hired by a "skeptical" Ms. Ondos.

2.      **Plaintiffs Cannot Rewrite The Engagement Agreement**

a.      **Plaintiffs Cannot Rewrite "Related To The <u>Legal Services</u>"**

The parties contractually defined the relatedness aspect of the waiver inquiry to be based on whether the legal services Kirkland provided to Teva were "related to the legal services" Kirkland provided to the Mylan indirect subsidiary clients, and ***not*** whether confidences were learned.  And it is undisputed that the legal services Kirkland provided never included transactional, corporate governance, or any other legal services akin to the firm's work for Teva.  Obj. at 29–30.  Nowhere have Plaintiffs (nor their experts, nor the R&R) even claimed that the legal services Kirkland provided to Teva in the proposed transaction were related to the legal services Kirkland provided to the Mylan indirect subsidiary clients in the FDA litigation.

Instead, Plaintiffs attempt to rewrite the Agreement to exclude matters that might involve overlapping confidences—*i.e.*, the inquiry that Rule 1.9 utilizes regarding *former* clients *and* where there is no waiver.  Resp. at 26–28.  But that is precisely what the Agreement made clear was *not* the test for the negotiated relationship.  The Mylan indirect subsidiary clients explicitly agreed that Kirkland's "actual or possible possession of [their] confidential information" would not be used as "a basis to disqualify [Kirkland] from representing another entity or person in any Allowed Adverse Representation."[12]  Plaintiffs (and the R&R) cannot rewrite the contract's

---

[12]   Plaintiffs' tortured reading of this clause is circular.  They argue that this provision applies only if a matter is an "Otherwise Allowed Representation," and that the provision does not bar Plaintiffs from arguing that Kirkland's possession of the Mylan clients' "actual or possible possession of confidential information" renders matters "related" and thus not an "Otherwise Allowed Representation."  In other words, under Plaintiffs' reasoning, the provision means the Mylan indirect subsidiary clients will not argue that Kirkland's "actual or possible possession of confidential information" is a basis for disqualification if it has already been determined that the matters are unrelated because Kirkland has no "actual or possible possession of confidential information."  The entire provision is thus rendered utterly meaningless.  By contrast, the provision makes perfect sense when it is read in its natural manner as clearly reaffirming that the standard of relatedness and disqualification will not be confidence-driven.

language by referring to a Rule 1.9 definition (Resp. at 25–26) that the parties contracted away

and that, in any event, deals with the inapplicable former-client context.[13]  Indeed, the very use

of the phrase "legal services," accompanied by the exclusion of any confidence-based

disqualifications, confirms that it was not a confidence-based inquiry.  Obj. at 28–29.[14]

### b.  Plaintiffs Cannot Excise Swaths Of Text To Manufacture Their "Affiliates" Argument

Once again, Plaintiffs advocate a tortured interpretation of the Conflict Waiver that

renders entire clauses in the Agreement meaningless.  Kirkland's explanation of the provision

does not require anything to be rewritten and accounts for all of the language:  The only time that

Kirkland is barred from being adverse to an affiliate of the Mylan indirect subsidiary clients is if

Kirkland enters into a "separate engagement" with that affiliate.  Obj. at 32–35.  Nothing in

Plaintiffs' Response, premised on selective quotation and omission, similarly accounts for *all* of

the words and clauses of the contract. *Compare* Resp. at 36–37, *with* Obj. at 34.

### D.  Plaintiffs Have Failed To Prove The Prerequisites To Any Injunction.

In addition to their failure to brief or argue the mandatory-injunction issue,[15] Plaintiffs

fail to identify a single case in which a court ordered a firm to retrieve its work product.

---

[13]  That is also why the deletion of "substantially" from the draft Agreement is inapposite
here—the phrase "substantially related" is part of Rule 1.9.  That is also why the Rule 1.9 cases
Plaintiffs cite (Resp. at 25–26) that apply the rule's two-pronged test (*i.e.*, "nature and scope of
the representations" and "whether confidences may have been disclosed") are inapposite.

[14]  Contrary to the inexplicable statement by Plaintiffs (Resp. at 26), Kirkland never accepted
the R&R's conclusion that Kirkland's representation of Teva was "related to" or "substantially
related to" the firm's representation of the Mylan indirect subsidiary clients.  Rather, Kirkland
consistently has explained that the Rule 1.9 former-client, confidence-driven standard of
relatedness upon which the R&R and Plaintiffs rely is irrelevant to the very different contractual
standard to which the parties agreed here.  Similarly, Plaintiffs are wrong when they state (Resp.
at 27) that Kirkland did not argue the significance of the phrase "legal services."  *See* Obj. at 26–
31; 5/26/15 Oral Arg. Tr. at 75:17–18, 77:21–23, 102:22–23, 103:1–6.

[15]  Plaintiffs did not "request[] this relief" from the "beginning of the case"—at least not
properly.  Resp. at 40 n.28.  They never briefed or argued this issue.  Obj. at 37–38 & n.18.  That

Moreover, they certainly have no support for a mandatory injunction where, as here, there was no evidence of any confidential information having been passed on, or likely to be passed on, in any way.  Plaintiffs thus seek a mandatory injunction without the "'actual proof of irreparable harm required'"[16] *and* in contravention of Third Circuit law.

The Third Circuit has declined to "adopt a *per se* rule that if one co-counsel is disqualified for ethical reasons, all co-counsel must be barred from representation."  *Akerly v. Red Barn Sys., Inc.*, 551 F.2d 539, 543 (3d Cir. 1977).  Contrary to the impression Plaintiffs seek to create, the disqualification in *Akerly* was based on the fact that one of the attorneys was imputed with knowledge that generated a conflict; but the Court declined to presume misuse of client confidences absent actual *evidence* of a serious risk that confidential information would be disclosed.  The Court held that removal of the lawyer from the litigation was sufficient.  Nor does it matter whether the disqualification is based on a former-client conflict (as in *Akerly*) or a current-client conflict, as confirmed by the Third Circuit in *IBM Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978).[17]  Indeed, the cases upon which Plaintiffs rely so heavily (Resp. at 43 n.31),

---

Plaintiffs, without any elaboration, merely lumped the retrieval of "work product" into a laundry list of other forms of "requested" injunctive relief in a proposed order does not alter the basic rule that a party **waives** a claim by failing to present argument supporting it.  *See Greenwood Partners, L.P. v. Cimnet, Inc.*, No. Civ. A. 201CV06624LDD, 2003 WL 22238981, at *2 (E.D. Pa. Sept. 26, 2003) ("Where a party makes no more than a single mention of a claim, the claim is consequently waived.").  Moreover, a court cannot enter an injunction without evidence sufficient to support factual findings on each of the traditional elements.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–94 (2006).

[16]   *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1002–03 (Pa. 2003) (citation omitted); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

[17]   Plaintiffs also cannot ignore the fact that a mandatory injunction would require Kirkland to attempt to "retrieve" an undefined corpus of "work product" from Teva—a nonparty—that has nothing to do with the work Kirkland did for the Mylan indirect subsidiary clients.  Obj. at 43.

such as *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 602 A.2d 1277 (Pa. 1992), cut

completely against Plaintiffs' argument.   Despite *evidence* of an actual or a serious risk of breach

of confidences (and even evidence of other egregious misconduct), the courts went no further

than ordering disqualification—they never issued any sort of mandatory injunction.

Lacking evidence and precedent, Plaintiffs resort to falsehoods and personal attacks that

ignore Kirkland's due diligence and good faith.   Kirkland undisputedly *did* run a full conflicts

check, Fox Decl. ¶¶ 16, 18; Kuhns Decl. ¶¶ 4–5; Kirkland thereby determined that Mylan N.V.

was *never* a client *and* concluded that the Mylan indirect subsidiary clients had agreed to a

waiver whose validity they had acknowledged on several occasions.   Kirkland's judgment

plainly was in good faith (and correct).[18]   Indeed, Professor Richard Painter, a leading expert on

conflicts of interest, agrees with Kirkland's judgment.   Painter Decl. ¶¶ 15–63.   Accordingly, this

is hardly the case for implementation of an unprecedented mandatory injunction.

As for the requested prohibitory injunction, that request is now moot following

Kirkland's permanent replacement as Teva's counsel.   Obj. at 41–42 & n.21; *see also, e.g.*,

*Jersey Cent. Power & Light Co. v. New Jersey*, 772 F.2d 35, 39–40 (3d Cir. 1985).   Plaintiffs

nevertheless press for a prohibitory injunction for their "comfort," invoking vitriol but failing to

cite any supporting authority.   Resp. at 43.   There simply is no such authority; it would conflict

with the principle that a "mere 'speculative contingency,'" *Deakins v. Monaghan*, 484 U.S. 193,

200 n.4 (1988) (alteration omitted) (citation omitted), "[does] not shield the case from a

---

[18]   Even if one disagrees with (1) Kirkland's judgment about the meaning of "direct adversity"
to indirect subsidiaries in the context of an acquisition proposal directed at those subsidiaries'
grandparent corporation, (2) how Kirkland interpreted the language of the waiver, and (3) how
Kirkland evaluated informed consent, one cannot deny that these are all complex issues and that
Kirkland's judgment is hardly indicative of any intentional breach of professional duty.

mootness determination." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 283 (2001).[19]

Should this Court concur that a mandatory injunction is waived or unwarranted and that the remaining prohibitory injunction is moot, even Plaintiffs do not dispute that the appropriate remedy for mootness is to vacate the R&R and dismiss this case.  Obj. at 41–42 (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950)).  Not surprisingly, then, Plaintiffs have never offered any evidentiary or other basis for contesting that outcome.

### III.   CONCLUSION

For each of the foregoing independent reasons, this Court should deny Plaintiffs' motion for a preliminary injunction, decline to adopt the R&R, and vacate the R&R as moot.

Dated:  July 17, 2015                    K&L GATES LLP

                                          By:      /s/ Richard W. Hosking
                                              Richard W. Hosking, PA 32982
                                              Melissa J. Tea, PA 80195
                                              K&L GATES LLP
                                              210 Sixth Avenue
                                              Pittsburgh, Pennsylvania  15222-2613
                                              Telephone:  (412) 355-6500
                                              Facsimile:  (412) 355-6501
                                              Richard.hosking@klgates.com
                                              Melissa.tea@klgates.com

---

[19]   As officers of the Court bound by a duty of candor, Kirkland's attorneys are entitled to be taken at their word.  *See LaSalle Nat'l Bank v. First Conn. Holding Grp., L.L.C.*, 287 F.3d 279, 293 (3d Cir. 2002) ("The court and all parties before the court rely upon representations made by counsel.  We believe without qualification that an attorney's word is his bond." (citation omitted)); *Kaleta v. Clausi*, No. 4:12-CV-1987, 2013 WL 1804203, at *4 (M.D. Pa. Apr. 29, 2013) (declining to disqualify counsel where there was no "good cause to believe that the plaintiff's lawyers will or are likely to reveal client confidences in the course of this litigation"); *cf. Holloway v. Arkansas*, 435 U.S. 475, 485 (1978) (noting practice of crediting attorney's "representations as an officer of the court regarding a conflict of interests").

GIBSON, DUNN & CRUTCHER LLP

Kevin S. Rosen, (admitted pro hac)
Daniel S. Floyd, (admitted pro hac)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520
KRosen@gibsondunn.com
DFloyd@gibsondunn.com

Counsel for Defendant,
KIRKLAND & ELLIS LLP